**Gary Bradford CONE, Petitioner,**

v.

**Roland COLSON, Warden, Riverbend Maximum Security Institution, Respondent.**

**No. 97–2312–JPM.**

United States District Court, W.D. Tennessee, Western Division.

Feb. 14, 2013.

---

Gary Bradford Cone, Nashville, TN, pro se.

Paul R. Bottei, Office of the Federal Public Defender, Nashville, TN, Robert L. Hutton, Glankler Brown, PLLC, Memphis, TN, for Petitioner.

**ORDER GRANTING RESPONDENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT[1] AND ORDER DENYING PETITIONER'S MOTION FOR RELIEF ON *BRADY*[2] CLAIMS**

JON P. McCALLA, Chief Judge.

| | | |
|---|---|---|
| I. | SUPREME COURT REMAND AND MANDATE | 933 |
| II. | PROCEDURAL HISTORY | 933 |
| III. | FACTUAL BACKGROUND | 933 |
| IV. | CONE'S PETITION FOR HABEAS CORPUS—THE BRADY CLAIM | 935 |
| V. | THE WITHHELD INFORMATION | 935 |
| VI. | THE TRIAL FOR THE MURDERS OF CLEOPATRA AND SHIPLEY TODD—FRIDAY, APRIL 16, 1982, THROUGH FRIDAY, APRIL 23, 1982 | 937 |
| | A. The Guilt Phase—April 16, 1982 through April 20, 1982 | 938 |
| | 1. Trial Day One: Friday, April 16, 1982, 8:30 a.m. to 6:25 p.m. | 938 |
| | a. Opening Statements | 938 |

1. Petitioner has raised new issues (*see* ECF No. 292) since the filing of this Motion that must be resolved prior to a final disposition of this case. The Court, therefore, only grants partial summary judgment.

2. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (stating that a prosecutor who suppresses evidence that is favorable to the defendant and "material either to guilt or to punishment" violates due process); *see United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (holding impeachment evidence also falls under the *Brady* rule).

 b. State's Proof — 939

 (1) Aaron Hayes, Jr. Manager, Brodnax Jewelry — 939

 (2) Sue Schratz Employee, Brodnax Jewelry — 941

 (3) Songu Mize Customer, Brodnax Jewelry — 942

 (4) Richard "Randy" Mize Customer, Brodnax Jewelry — 942

 (5) C.M. "Mike" Stovall Memphis Police Department ("MPD") Criminal Investigation Division — 944

 (6) Bert Allen [3] MPD Motorcycle Squad Officer shooting victim — 946

 (7) Barbara Benbrook neighborhood resident, eyewitness — 948

 (8) Deborah Stanford neighborhood resident, eyewitness — 949

 (9) John Douglas ("Doug") Clark eyewitness, shooting victim — 949

 (10) Charles Slaughter neighborhood resident, eyewitness — 951

 (11) Debbie Howell Slaughter's daughter, eyewitness — 952

 (12) Richard K. Wilson MPD Homicide Investigator — 952

 2. Trial Day Two: Saturday, April 17, 1982, 9:00 a.m. to 5:05 p.m. — 952

 a. State's Proof, continued — 952

 (1) Richard K. Wilson, continued — 952

 (2) Herschel Dalton neighborhood resident; victim, attempted-carjacking — 953

 (3) Lucille Tuech neighborhood resident; victim, attempted-home invasion — 954

 (4) Velora Hargett friend of Cleopatra Todd — 955

 (5) Gregory W. Moore Todds' grandson — 956

 (6) Paul Adams Todds' neighbor, called police to Todds' house — 956

 (7) Mary Maguire Todds' neighbor — 957

 (8) Steven R. Cole MPD Officer, first on scene at Todds' house — 957

 (9) Marjorie Todd Moore daughter of Shipley Todd, stepdaughter of Cleopatra Todd — 958

 (10) Wayne A. Todd Todds' grandson — 959

 (11) James Spencer Bell, M.D. Chief Deputy Shelby County Medical Examiner; Deputy Chief State of Tennessee Medical Examiner; expert in pathology — 959

 (12) Ruth Shreve victim, license plate theft — 961

 3. Trial Day Three: Monday, April 19, 1982, 10:45 a.m. to 6:45 p.m. — 961

 a. State's Proof, continued — 961

 (1) Jimmy Hammers MPD Officer, Violent Crimes Bureau — 961

 (2) C.J. Harrell MPD Crime Scene Squad — 965

 (3) John Birdsong MPD Tactical Unit — 965

 (4) Thomas Dwight Smith MPD Officer — 965

 (5) Joe Sanders MPD Crime Scene Squad — 966

 (6) Paulette Sutton Employee, Univ. of Tenn. Toxicology Laboratory; Forensic Serology Expert — 967

 (7) R.L. Hannah MPD Crime Scene Squad — 969

 (8) Sgt. Ralph L. Roby MPD Violent Crimes Bureau — 970

 4. Trial Day Four: Tuesday, April 20, 1982, 10:50 a.m. t o 6:00 p.m. — 974

 a. State's Proof, continued — 974

 (1) Merny Miller Keeper of Records, Illinois Bell — 974

---

**3.** The trial transcript refers to Allen as "C.B." Allen. (ECF No. 231–11 at 1053; ECF No. 232–9 at 2132.) The indictment and the Tennessee Supreme Court refer to him as "B.C." Allen. (ECF No. 231–1 at 14–15.) *See Cone v. Bell,* 243 F.3d 961, 965 (6th Cir.2001), *rev'd, Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). The witness identifies himself as "Bert." (ECF No. 231–11 at 1053; ECF No. 232–9 at 2132.)

(2) Michael P. Malone FBI, Microscopic Analysis Unit (hair and fiber) ........ 975
(3) Jerry McElrath MPD Latent Fingerprint Squad ........ 976
(4) James L. Holder MPD latent fingerprint examiner; fingerprint identification expert ........ 976
b. Defense Proof ........ 976
(1) Valeree Cone Cone's mother ........ 976
(2) Dr. Matthew Jaremko expert in clinical psychology ........ 978
5. Trial Day Five: Wednesday, April 21, 1982, 10:35 a.m. to 9:00 p.m. ........ 978
a. Defense Proof, continued ........ 978
(1) Jonathan J. Lipman, Ph.D. neuropharmacologist; expert on effects of drugs on the human body ........ 978
b. State's Rebuttal ........ 981
(1) Ilene Blankman Cone's friend, former drug-user ........ 981
6. Trial Day Six: Thursday, April 22, 1982, 8:35 a.m. to 7:55 p.m. ........ 982
a. State's Rebuttal, continued ........ 982
(1) Eugene Flynn FBI Agent ........ 982
(2) Ralph L. Roby MPD ........ 983
(3) Ben Bursten forensic psychiatrist, Midtown Mental Health Center ........ 984
(4) John Robert Hutson clinical psychologist; clinical director, Midtown Mental Health Center ........ 984
b. Guilt–Phase Closing Arguments ........ 985
c. Jury Instructions ........ 992
7. Trial Day Seven: Friday, April 23, 1982, 8:40 a.m. to 4:15 p.m. ........ 994
a. Jury Instructions, continued ........ 994
b. Jury Verdict ........ 994
B. The Penalty Phase—April 23, 1982 ........ 995
1. Opening Arguments ........ 995
2. State's Proof ........ 995
a. J.A. Blackwell Criminal Court Clerk for Shelby County ........ 995
b. MPD Officers James L. Holder, C.M. Stovall, Bert Allen, and Jimmy Hammers ........ 996
3. Defense Proof ........ 996
4. Penalty–Phase Closing Arguments ........ 996
5. Jury Instructions ........ 996
6. Jury Verdict ........ 996

VII. LEGAL ANALYSIS ........ 997
A. The Brady Standard ........ 997
B. Consideration of the Withheld Information ........ 998
C. Cone's Drug Use and Mental State ........ 999
1. Roby, LETS teletypes, Sue Cone, and the MPD Supplemental Offense Report ........ 1000
2. Eyewitness Evidence of Cone's Demeanor ........ 1003
a. Statements of Charles and Debbie Slaughter ........ 1003
b. Statement of Robert McKinney; Stepherson's Big Star Robbery ........ 1006
c. Pompano Beach Police Department Supplement ........ 1008
3. Flynn and the FBI Records ........ 1009
4. Ilene Blankman ........ 1011
5. Source of Money ........ 1013
D. Cumulative Effect ........ 1015

VIII. CONCLUSION ........ 1019

APPENDIX OF EXHIBITS ........ A–1

## I. SUPREME COURT REMAND AND MANDATE

This cause is presently before the Court on remand from the United States Supreme Court to address Petitioner Gary Bradford Cone's *Brady* claim in his habeas corpus petition. *See Cone v. Bell,* 556 U.S. 449, 476, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009). (Electronic Case Filing ("ECF") No. 221; *see* ECF No. 71 at 12–17.) The parties briefed the issue of the scope of the mandate. (ECF No. 234; ECF No. 235; ECF No. 239; ECF No. 240.) On June 3, 2010, the Court held "that the mandate is to determine whether there is a 'reasonable probability' that, had the evidence identified in paragraph 39 of Cone's habeas petition been disclosed, 'the result of the [sentencing] proceeding would have been different.' " (ECF No. 242 at 8.) *See Cone v. Bell,* No. 2:97–CV–2312–JPM, 2010 WL 2270191, at *4 (W.D.Tenn. June 3, 2010). The question for consideration, as articulated by Justice Stevens for the majority, is "whether the suppressed evidence might have persuaded one or more jurors that Cone's drug addiction—especially if attributable to honorable service of his country in Vietnam—was sufficiently serious to justify a decision to imprison him for life rather than sentence him to death." *Cone,* 556 U.S. at 475, 129 S.Ct. 1769.

## II. PROCEDURAL HISTORY

The procedural background of Cone's case prior to the Supreme Court's remand is outlined in the Supreme Court's opinion. *See Cone,* 556 U.S. at 457–64, 129 S.Ct. 1769. After the remand, a status conference was held on January 5, 2010. (ECF No. 228.) On January 28, 2010, Cone filed a notice of withheld exculpatory information. (ECF No. 230.) Respondent filed the state court record on January 28, 2010. (ECF No. 231; ECF No. 232; ECF No. 233.) On June 3, 2011, Respondent Roland Colson filed a Motion for Summary Judgment and supporting memorandum. (ECF No. 264; ECF No. 265.) Also on June 3, 2011, Cone filed a Motion for Relief on *Brady* Claims and supporting memorandum. (ECF No. 266; ECF No. 266–1.) On August 2, 2011, Cone filed his Response to Respondent's Motion for Summary Judgment (ECF No. 268), and Respondent filed his Response to Cone's Motion for Relief on *Brady* Claims (ECF No. 269). On September 2, 2011, Cone filed a Reply to further support his Motion for Relief. (ECF No. 271.)

On January 4, 2012, the Court ordered Respondent to supplement the state court record by manually filing the original trial exhibits and electronically filing an index clearly identifying each trial exhibit accompanied by a good quality digital photograph. (ECF No. 275 at 2.) On March 26, 28, and 29, 2012, Respondent filed the available original exhibits and corresponding digital photographs. (ECF No. 279; ECF No. 283–ECF No. 291.) Respondent filed a second supplemental notice of filing on September 19, 2012, with a copy of the trial court's jury instructions. (ECF No. 319.)

## III. FACTUAL BACKGROUND

The United States Court of Appeals for the Sixth Circuit summarized the relevant facts as follows:

The crime spree that culminated in Cone's conviction and sentence to death began on August 9, 1980, when he robbed a jewelry store in Memphis, Tennessee, of approximately $112,000 worth of goods. The police were alerted and they promptly spotted Cone driving a car. A high speed chase ensued, following which Cone abandoned the car in a residential neighborhood, shot pursuing police officer B.C. Allen and citizen John Douglas Clark, and unsuccessfully tried to shoot a third citizen, Herschel Dalton when Dalton refused to surrender his

car to Cone. Cone temporarily eluded the police, but they seized his car and in it found a large amount of cash, drugs, and the stolen jewelry.

The next day, Cone appeared in the same residential neighborhood at the home of Lucille Tuech. He drew a gun on Tuech when she refused to let him in to make a phone call. Later the same day, Cone broke into the home of an elderly couple, Shipley and Cleopatra Todd, who were 93 and 79 years old, respectively. Cone tried to convince the couple to help him, but when they refused to cooperate, he brutally killed them. Three days later, the Todds' severely beaten and mutilated bodies were found in their home. Cone's fingerprints and hair samples were also found in the home. In due course, Cone was arrested in Florida and returned to Tennessee.

*Cone v. Bell,* 243 F.3d 961, 965 (6th Cir. 2001), *rev'd,* 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). Cone was tried in the Shelby County Criminal Court and found guilty on two counts of first-degree murder and murder in the perpetration of a burglary; assault with intent to commit murder in the first degree for the attacks on Allen, Clark, and Dalton; and robbery with a deadly weapon for the jewelry store robbery. *Id.* at 965–66.

The Tennessee Supreme Court summarized the mitigating evidence presented at trial as follows:

Appellant was thirty-three years of age. He was an honor graduate of the University of Arkansas and shortly before the events in question here had been accepted for admission into law school, scoring in the ninety-sixth percentile on a law school admission test. He had served in the armed forces from 1966 through 1969, and had one year's service in Viet Nam as a supply sergeant. He had received a bronze star for his service there and had been honorably discharged from the army. He went to college after his discharge. In 1972, however, after graduating from college, he was convicted of three separate armed robberies in Oklahoma, these covering a period from December 1971 through May 1972. He had been imprisoned in Oklahoma until the latter part of 1979. He had then returned briefly to his home in Arkansas and had gone to Hawaii for a time. The vehicle which he was driving on August 9, 1980 had originally been registered in his name, but was registered in the name of his mother on that date.

Appellant offered the testimony of two witnesses in support of his defense of lack of mental competence. The first of these was Dr. Matthew Jaremko, a clinical psychologist at the University of Mississippi. He had interviewed appellant on two occasions for a total of about six hours, beginning in February 1982, less than two months prior to the trial. It was the opinion of Dr. Jaremko that appellant was suffering from post-traumatic stress disorder as a result of his experiences in Viet Nam, and that upon this was superimposed a serious drug-abuse disorder. Dr. Jonathan Lipman, a neuro-pharmacologist, testified that appellant, in his opinion, suffered from "chronic amphetamine psychosis" as a result of serious drug abuse. As previously stated, neither of these witnesses had ever known or treated appellant prior to the early part of 1982, and both of them based their testimony entirely upon what he told them as to the extent of his ingestion or injection of drugs. Not only was the weight of their testimony a question for the jury, but appellant's known pattern of conduct immediately before and immediately after the events in question here raised serious doubts as to the accuracy of their opin-

ions, because he did not appear to be seriously under the influence of or experiencing withdrawal from drugs according to the testimony of several witnesses who saw him during August 1980. In addition, as previously pointed out, the State offered two witnesses whose qualifications equalled or exceeded those of appellant's experts, and neither of the State's expert witnesses found any basis for an insanity defense.

*State v. Cone*, 665 S.W.2d 87, 91–92 (Tenn. 1984) (footnote omitted). Cone was sentenced to ten to twenty-five years imprisonment for the assaults, life imprisonment for the robbery, and death for the murder charges. *Cone*, 243 F.3d at 966.

## IV. CONE'S PETITION FOR HABEAS CORPUS—THE *BRADY* CLAIM

On July 1, 1997, Cone filed a habeas petition challenging his convictions. (ECF No. 71.) In paragraph 39 of Cone's habeas petition, he alleged a *Brady* claim:

> the prosecution withheld exculpatory evidence, including evidence demonstrating, for example, that petitioner did in fact suffer drug problems and/or drug withdrawal or psychosis both at the time of the offense, and which also calls into question the veracity of the prosecution's rebuttal witnesses. Such evidence was highly exculpatory to both the jury's determination of petitioner's guilt and its consideration of the proper sentence. There is a reasonable probability that, had the evidence not been withheld, the jurors would not have convicted petition-

er and would not have sentenced him to death.

(*Id.* ¶ 39, at 12.) Cone alleged that documents in the district attorney's ("DA") and Federal Bureau of Investigation's ("FBI") files show that he was a drug user and on drugs at the time of the murders. (*Id.* ¶ 39(a)-(h), ECF No. 71–5 to –17.)[4] He alleged that the DA and FBI files contained exculpatory evidence relevant to the veracity of rebuttal witness Ilene Blankman. (ECF No. 71 ¶ 39(i).) He also alleged that there was evidence that the money in his car, which the prosecution claims was from selling drugs, was related to the robbery of Stepherson's Big Star. (*Id.* ¶ 39(j); ECF No. 266–1 at 16.)

## V. THE WITHHELD INFORMATION

Cone filed the following documents as the withheld exculpatory evidence relevant to his *Brady* claim:

1. August 10, 1980, Law Enforcement Teletype System ("LETS") teletype authorized by Memphis Police Sergeant R.L. Roby ("Roby"): "SUSPECT IS HEAVY DRUG USER, ARMED AND DANGEROUS." (ECF No. 230–1);

2. August 11, 1980, LETS teletype authorized by Sergeant Roby: "*ARMED AND EXTREMELY DANGEROUS, DRUG USER.*" (ECF No. 230–2);

3. August 11, 1980, LETS teletype authorized by Sergeant Roby: "*ARMED AND EXTREMELY*

---

4. Thirteen documents were identified in connection with the *Brady* claim in the Petition and attached as exhibits. (ECF No. 71–5 to – 17.) These exhibits are reproduced in the record at ECF No. 230–1 through 230–3 and ECF No. 230–9 through 230–19. Other documents described in the Petition which were not attached to the Petition or specifically identified by reference to the file or by Bates number are also included in the notice of

filing. (*See* ECF No. 71 ¶ 39(a)-(k); *see also* ECF No. 230.) Cone initially filed twenty-seven exhibits as withheld information in the habeas proceedings. (ECF No. 230–1 to –27.) On January 4, 2012, Cone filed a supplement to his notice of withheld evidence with a "cleaner" copy of ECF No. 230–4 and what he purports to be the complete copy of ECF No. 230–7. (ECF No. 274.)

*DANGEROUS, DRUG USER."* (ECF No. 230–3);

4. Memphis Police Department Offense Report, statement of Charles and Debbie Slaughter: "They said he looked wild eyed and might not have been wearing shoes." (ECF No. 230–4; ECF No. 274–1);

5. August 27, 1980, statement of Robert H. McKinney about August 8, 1980, robbery of Stepherson's Big Star, including: "Q. The person you saw responsible for the robbery, did he appear to be drunk or high on anything? A: Well he did, he acted real weird that is the reason I watched him." (ECF No. 230–5 at 1809);

6. August 23, 1980, telephone interview of Sue Cone conducted by Sergeant Roby regarding Gary Cone's psychological and drug problems (ECF No. 230–6);

7. Pompano Beach Police Department Supplement describing Gary Cone: "Subject was observed to be looking about in a frenzied manner and also appeared to be looking for a place to run" and when officers approached "the subject was still walking in his agitated manner." (ECF No. 230–7); [5]

8. August 11, 1980, Memphis Police Department Supplementary Offense Report, written by J.L. Collier: James Daniels, Chief of Police of Lake Village, Arkansas, "did state he found out Cone was a heavy drug user, but had never been arrested in the Lake Village area." (ECF No. 230–8).

9. August 12, 1980, FBI teletype: "SUBJECT BELIEVED HEAVY DRUG USER." (ECF No. 230–9 at 526); [6]

10. August 12, 1980, FBI Airtel: "ARMED AND EXTREMELY DANGEROUS; DRUG USER." (ECF No. 230–10);

11. August 14, 1980, FBI teletype: "ARMED AND DANGEROUS. DRUG USER. ESCAPE RISK." (ECF No. 230–11 at 530);

12. August 14, 1980, FBI Airtel: *"ARMED AND DANGEROUS DRUG USER; ESCAPE RISK"* (ECF No. 230–12);

13. August 16, 1980, FBI Airtel, Alice Jane Schmidt Pelley interview: *"ARMED AND DANGEROUS. DRUG USER. ESCAPE RISK."* (ECF No. 230–13);

14. August 18, 1980, FBI Statistics Letter: *"ARMED AND DANGEROUS; DRUG USER."* (ECF No. 230–14);

15. 5 separate copies of FBI photographs and description of Gary Cone: *"ARMED AND DANGEROUS, DRUG USER, ESCAPE RISK"* (ECF No. 230–15);

16. August 13, 1980, 2:53 p.m., FBI teletype: "Drug User" (ECF No. 230–16);

---

5. Cone supplemented the record with what was purported to be a complete copy of the supplemental police report. (ECF No. 274.) The original document at ECF No. 230–7 was written by Sergeant Grieco, Detective Flynn's passenger, and designated as "DA's File 623." (*See* ECF No. 230–7.) The document at ECF No. 274–2 appears to be Detective Flynn's account of the events and precedes Grieco's report as DA's File 621 and 622. (*See* ECF No. 274–2.)

6. This teletype also states "subject believed to have been arrested for drug charge." (ECF No. 230–9 at 523.)

17. August 15, 1980, 10:49 a.m., FBI teletype: "Drug User" (ECF No. 230–17);

18. FBI report, "Re[:] Memphis teletype": "While in prison, Cone was caught in possession 750 amphetamine pills...." (ECF No. 230–18 at 549);

19. FBI report: "Subject believed heavy drug user." (ECF No. 230–19 at 554);

20. February 9, 1982, cover letter from Joseph L. Patterson to Ilene Blankman: "Enclosed please find a copy of your statement, which you requested." (ECF No. 230–20);

21. March 22, 1982, letter from Joseph L. Patterson to Ilene Blankman regarding compliance with trial subpoena (ECF No. 230–21);

22. FBI report of Special Agents Robert W. Kelly and Eugene Flynn regarding an event during trial at 9:45 p.m. on April 21, 1982, statement of "Gloria" to Ilene Blankman that she was a "turncoat" and "trying to burn" Cone. Blankman did not respond. (ECF No. 230–22 at 1946);

23. Copy of Jonathan Lipman's report from the FBI file (ECF No. 230–23);

24. Handwritten notes of DA's interview of Ilene Blankman, stating Cone "[n]ever used drugs around me." (ECF No. 230–24 at 1942);

25. April 27, 1982, post-trial letter from Joseph Patterson and Don Strother to Ilene Blankman: "We certainly appreciate your cooperation...." (ECF No. 230–25);

26. Don Strother's handwritten notes regarding indictment of Gary Cone for robbery of $1893.72 from Stepherson's Big Star (ECF No. 230–26); and

27. September 11, 1980, letter from Insurance Company of North America to MPD informing of $2013.72 insurance payment to Stepherson's Big Star for robbery loss. (ECF No. 230–27).

## VI. THE TRIAL FOR THE MURDERS OF CLEOPATRA AND SHIPLEY TODD—FRIDAY, APRIL 16, 1982, THROUGH FRIDAY, APRIL 23, 1982

The State was represented by Assistant Attorney Generals Don Strother and Joseph L. Patterson. Cone (also known as Gerald Mason Harmon) was represented by John Dice and April Ferguson. The Honorable James C. Beasley was the presiding trial judge.

Voir dire was conducted on April 12–15, 1982, and the jury was sworn at 3:00 p.m. on April 15, 1982. (*See* ECF No. 231–4 at 3–18; ECF No. 231–10 at 852.) The trial began on Friday, April 16, 1982, at 8:30 a.m. (*See* ECF No. 231–10 at 940.) The day began with the reading of the indictments: Indictment No. 74702 charging "murder first degree ... during the perpetration of a burglary and murder first degree of Cleopatra Todd (*see* ECF No. 231–1 at 2–5); Indictment No. 74703 charging murder first degree during the perpetration of a burglary and murder first degree" of Shipley Todd (*see id.* at 2, 6–8); Indictment No. 74898 charging assault with intent to commit murder in the first degree on Herschel Dalton (*see id.* at 11–13); Indictment No. 74899 charging assault with intent to commit murder in the first degree on C.B. Allen (*see id.* at 11, 14–15); Indictment No. 74900 charging assault with intent to commit murder in the first degree on Douglas Clark (*see id.* at 11, 16–17); and Indictment No. 74902 charging robbery with a deadly weapon on the person of Aaron Hayes, Jr., for the

robbery of the Brodnax Jewelry Store, located in Poplar Plaza in Memphis, Tennessee (*see id.* at 17, 18–19). (*See* ECF No. 231–10 at 942–43.) Cone pleaded not guilty by reason of insanity on all charges. (*See id.* at 943.)

The State presented thirty-five witnesses during the guilt phase of trial from April 16–20, 1982. (*See* ECF No. 231–4 at xviiii-vxx.) The defense case began on April 20, 1982, and included the presentation of three witnesses. (*See id.* at xxv-xxvii.) From April 21 to 22, 1982, the State presented five rebuttal witnesses. (*See id.* at xxvii-ixxx.) Final arguments were heard in the guilt phase on April 22, 1982. (*See id.* at ixxx.) On April 23, 1982, at 8:50 a.m., the jury retired for deliberations, and less than two hours later at 10:32 a.m., the jury advised that they had reached a verdict. (*See id.* at xxx; *see also* ECF No. 232–8 at 2101–03.)

The sentencing phase began after the guilty verdict on April 23, 1982, with both sides making opening statements. (*See* ECF No. 232–9 at kk, 2112–19.) The State presented five witnesses. (*See id.* at kk.) Cone's attorneys presented no evidence at the sentencing phase of trial and relied on mitigating circumstances presented in the guilt phase. (*See id.* at 2115–19, 2144.) The jury retired for deliberations at 3:05 p.m., and forty-five minutes later at 3:50 p.m., advised the court that a sentencing verdict had been reached. (*See* ECF No. 231–4 at xxxii; ECF No. 232–9 at 2150.)

A. The Guilt Phase—April 16, 1982, through April 20, 1982

1. Trial Day One: Friday, April 16, 1982, 8:30 a.m. to 6:25 p.m.

a. Opening Statements

The first day of trial began at 8:30 a.m. on Friday, April 16, 1982. (*See* ECF No. 231–10 at 940.) Strother presented the State's opening statement in which he out-lined a series of events occurring slightly after noon on August 9, 1980, and continuing until August 10, 1980, including: the robbery of the Brodnax Jewelry Store, the police chase, the shooting of police officer Bert Allen, the shooting of bystander Doug Clark, the assault on Herschel Dalton, the encounter with Lucille Tuech at her apartment door, and the murders of Cleopatra and Shipley Todd. (*See id.* at 944–50.)

In Cone's defense, Dice presented the opening statement and outlined the evidence he would present about Cone's background including the fact that he came from a military family, served in Vietnam, graduated with high honors from the University of Arkansas, and that he was a "changed person," "a junkie, a drug addict" when he returned from Vietnam. (*Id.* at 950–53, 958–60.) Dice asserted that Cone "suffers from a disease known as amphetamine psychosis" and that he was "a drug addict and a junkie of such unbelievable proportions that it would have been impossible for him to form any intent, much less the cool and clear and deliberated [intent] that he is charged with in the commissions of these crimes." (*Id.* at 957.) Dice asserted that Cone suffered from "a syndrome called Vietnam Veterans Syndrome." (*Id.* at 957–58.) Dice posed the question: "Is Mr. Gary Bradford Cone a person who was capable of forming the intent called for in the commissions of the crimes with which he is charged[?]" (*Id.* at 960–61.)

Dice acknowledged that some of the prosecutor's facts were "true and correct": "My client, Gary Cone, entered a store known as Brodnax in Poplar Plaza. My client robbed that store. My client was pursued by an officer in an unmarked police car. At that point, certainly an exchange of gunfire took place between Officer Allen and between my client." (*Id.* at

961.) Dice acknowledged that "gunfire was exchanged" in Cone's encounter with Clark. (*Id.*)[7] Dice stated that the next morning Cone, after hiding all night in a burned-out house, left the house looking for water and had a "confrontation with [a] lady."[8] (*Id.* at 962.) Dice stated that Cone returned to the burned-out house, and the Memphis Police Department ("MPD") "tear-gassed that house in an attempt to arrest" Cone. (*Id.*)[9]

Dice acknowledged that,

> On August 10, 1980, in the late afternoon hours, Gary Cone went to the home of the Todds. No question about that.... [W]hen he got inside he and Mrs. Todd and Mr. Todd got into a confrontation, and blows were exchanged. Okay. I don't know the exact nature of everything that happened in that home. If I did, I'll tell you about it.
>
> But I admit to you that my client, Gary Cone, killed the Todds. I deny to you, under our law, that he murdered them.

(*Id.* at 963.)

Dice posed the question of whether Cone was "the clever criminal" that Strother had described or "whether a person [like Cone] with a known record" would have left a "clear trail" by leaving fingerprints and calling his sister from the Todds' home. (*Id.* at 964.) Dice stated, "Again, I must respectfully say to you that we admit that we killed the Todds. We deny, under our law, that we murdered them. That's the position of the Defense." (*Id.*) Dice argued that Cone "had to be out of his mind to have done the things he did." (*Id.* at 965.) Dice posed the question, "whether deterrence, whether capital punishment stops the action of the man with one drink too many, much less the junkie, much less the alcoholic[?]" (*Id.* at 966.) He finished his opening statement by asking the jury "to look at the whole man in this case, and all of the proof." (*Id.*)

b. State's Proof

(1) Testimony of Aaron Hayes, Jr.

The State began its proof on the first day of trial, April 16, 1982, with the testimony of Aaron Hayes, Jr., the manager of the Brodnax Jewelry Store. (*See* ECF No. 231–11 at u, 973.) Hayes testified that he was working at approximately 12:45 p.m. on Saturday, August 9, 1980. (*See id.* at 973–74.) Hayes testified about what happened:

A. A gentleman walked in, walked around the store briefly. We approached him, as is our policy, immediately. He said he was just looking. He looked for just a minute, went around to the diamond counter, and I approached him again, and he started discussing rings, so—He wanted to look at a particular—

Q. What type of ring did he want to look at?

A. A marquise engagement ring.

. . . .

Q. Any particular size?

A. He wanted about a carat. And, at the time, I didn't have anything of that size in the store. I had something a little smaller which I told him I'd show him, or I could get him the size that he wanted. And he said that he would look at the one that I had. And as he looked

---

7. Clark did not have a gun. He had a juice jug, *see infra* p. 950.

8. The "lady" referenced is likely Lucille Tuech, *see infra* p. 955.

9. MPD Sergeant Ralph Roby testified that he ordered officers to search and tear gas a home at 156 North Belvedere, about two doors down from Tuech. (*See* ECF No. 232–3 at 1557–58.)

at it—He couldn't see it because he had on dark glasses, so—

Q. Was there a conversation about that?

A. Yes, he said he needed to go out and change his glasses in his car.

. . . .

Q. Did he re-appear?

A. Yes.

Q. What happened after that?

A. He looked at the diamonds. He liked, supposedly, the diamond that I had. He even discussed remounting the diamond and, frankly seemed to show quite a bit of knowledge of diamonds just by his conversation. And he said that there was something else that he wanted to see in the store.

Q. Did he tell you what he wanted to see?

A. Yes, he wanted to see a watch. And we walked around the counter—He walked around the counter, I just had to turn around—and he pointed at a particular watch, which was a very expensive watch, it was around $8,000.00. And at that point . . . he pulled a gun from his waist.

Q. Did he say anything when he pulled the gun? [10]

A. He told me not to make—set off any alarms, in essence and to back up. And I assumed that he thought I had an alarm under the counter. And he also wanted the watches.

(*Id.* at 974–76.) Hayes gave Cone the watches, and he put them in his jacket pocket. (*See id.* at 976.) Hayes continued,

He said he wanted the ring that he'd looked at, so we went back around the counter and I gave him that ring, and he said he wanted the rest of them, so—It's just a policy that we have. We do not take merchandise out. So—It's very offensive to us to take a lot of merchandise out at one time. But, anyway, I just took one at a time, and he kept telling me to hurry up. And then—[o]ur rings are kept on these ring bars, so you can take several out at a time, and then he insisted that I take out the ring bars so he could help me. And he just put those in his pocket, also.

. . . .

Basically, after he got what he wanted, he left the store.

(*Id.*) Hayes recalled Cone saying "something to the effect that it was either nice shopping on Saturday, or nice shopping at Brodnax on Saturday." (*Id.* at 989.)

Hayes followed Cone and saw him get into an older, faded, gray/green color, Oldsmobile Cutlass and drive off towards Highland Avenue and Walnut Grove. (*See id.* at 977–78.) Cone had parked about half a city block away from the store, in a manner so he could just pull out. (*See id.* at 978, 988.) Hayes enlisted two men coming from the nearby David's Home Fashions store to follow Cone's car. (*See id.* at 977–78.) They proceeded down Highland toward Summer Avenue, but they did not see the car. (*See id.* at 978.)

Before Hayes left the store, he alerted the store personnel to call the police, and, when he returned to the store, Hayes gave the police a description of the car. (*See id.*) He described the robber as

about—I would say about 5'7", slight build, probably 140 pounds, and had sort of brownish hair, a little—it wasn't extremely long, but it wasn't short either, sort of mod length, I guess. Had sort of a beard. . . . He had on a mismatched sort of greenish colored—I'll say outfit, the jacket didn't match the pants exact-

---

**10.** Hayes testified that the robber used a pistol, but he "couldn't tell you the caliber, or anything like that. It just looked big. . . . It looked very real." (ECF No. 231–11 at 991.)

ly. And for some reason I remembered that he had on new shoes, new black shoes, which didn't look like they went with the suit, or whatever, that he had on.

(*Id.* at 979.) Hayes noticed that the robber had a bandage on one of his fingers. (*See id.*)

Patterson presented Hayes with three pictures—one of the outside of the Brodnax store and two of the inside of the store. (*See id.* at 979–80.) Hayes identified the pictures as true and accurate pictures of the store as it appeared on August 8, 1980, and the three pictures were introduced collectively and entered as State's Exhibit 1 (ECF No. 284–1 to –2). (*See* ECF No. 231–11 at 979–80.)

Patterson presented Hayes with a picture of an automobile, and Hayes testified that the automobile was similar to the one that he saw the day of the robbery. (*See id.* at 980–81.) The picture was entered into evidence as State's Exhibit 2 (ECF No. 284–3). (*See* ECF No. 231–11 at 981.)

Patterson presented Hayes with three sheets of photographs of watches and rings. (*See id.* at 982.) Hayes testified that the photographs were of the stolen merchandise and that all the merchandise was returned to the store. (*See id.*) These three sheets were entered as State's Exhibit 3 (ECF No. 284–4 to –6). (*See* ECF No. 231–11 at 982–83.) The total value of the jewelry taken in the robbery was around $112,000. (*See id.* at 984.)

After the incident, Hayes went to the police station and identified a photograph as someone who "[l]ooks similar" to the person who robbed the store. (*See id.* at 985.) He made a notation on the photograph. (*See id.*) The beard of the person in the picture looked much heavier than the robber's beard, and the robber's hair was a bit thinner. (*See id.* at 985–86.) The photocopied photographs that Hayes viewed and identified on the day of the robbery were entered as State's Exhibit 4 (ECF No. 284–7 to –9). (*See* ECF No. 231–11' at 986.) Hayes also viewed a group of eight photographs, identified one of the photographs as the robber, and marked the back of that photograph. (*Id.* at 986–88.) Those photographs were entered as State's Exhibit 5 (ECF No. 284–10 to –13). (*See* ECF No. 231–11 at 987.)[11] Hayes identified the pants and jacket that the robber wore, and the items were entered into evidence as State's Exhibit 6 (ECF No. 284–14 to –15). (*See* ECF No. 231–11 at 990.) He identified the pair of shoes that the robber wore, and they were entered into evidence as State's Exhibit 7 (ECF No. 284–16 to –17). (*See* ECF No. 231–11 at 990–91.)

On cross-examination, Dice asked Hayes, "is it fair for me to say that at one time you made a statement that the person, whoever he was, who robbed you was sweating quite a bit" to which Hayes responded, "Yes, sir." (*Id.* at 995.) On redirect examination, Hayes testified that it was very hot on the day of the robbery. (*See id.*)

(2) Testimony of Sue Schratz

The second witness called on the first day of trial was Sue Schratz, a Brodnax employee who was working on the day of the robbery. (*See id.* at 996–97.) She was waiting on two customers when she noticed her manager Aaron ("Ronnie") Hayes "started showing rings and he was throwing them out on the counter.... He was throwing them out, one at a time, until ... the person told him to put the tray out and lay them on the counter." (*Id.* at 997–

---

11. Hayes identified an individual in the spectator area of the courtroom as someone that looked similar to the robber, but Hayes "hesitate[d] to say that it's the same person." (ECF No. 231–11 at 989.) In fact, he stated, "And I know that's not who it is." (*Id.*)

98.) She stated that one does not show diamond rings that way. (*See id.* at 997.) The robber "sat down in front of the diamond case" and was putting the rings in his pocket. (*Id.* at 998.) She described his clothing as "an olive green coat" with a stripe and "solid—kind of khaki colored—not khaki, but that olive drab, slacks." (*Id.*) Schratz said he was "short and wirey—around 5′4″, 5′5″″ with hair that was "rather long and kind of unkept, and maybe light brown, or brown. And stringy." (*Id.* at 998–99.) He had "two week's growth of beard started." (*Id.* at 999.) Schratz identified the Defendant as the robber. (*See id.* at 999–1001, 1003.) She identified the striped coat in State's Exhibit 6 (ECF No. 284–15) as the coat that the robber wore and stated that "it was awfully hot looking at that day to be dressed like that." (ECF No. 231–11 at 1004.) The defense did not cross-examine Schratz. (*See id.*)

### (3) Testimony of Songu Mize

The State's third witness was Songu Mize, a customer at Brodnax during the robbery. (*See id.* at 1005–06.) Songu Mize and her husband went to Brodnax on August 9, 1980, around noon to pick up their wedding bands. (*See id.* at 1006.) She described the events as follows:

> We walked in—When we walked in, there were not any other customers, I believe, and we were trying out rings and—in a few minutes afterwards, I saw another customer, to my right, talking to the store manager, and he was looking at the diamond rings, and the conversation seemed to be interesting, so I turned around and looked at the person, and after a few minutes I saw the same person asking the store manager to take the trays-ring trays, to put them on top of the counter, and he was grabbing them by the handful and putting them in his pocket. And then he told me not to leave the store. . . .

> . . . .

> He said, "Don't leave the store just right now, just hang around a little bit."

(*Id.* at 1006–07.) Songu Mize testified, "He was talking softly, though, quietly, but I could hear him because he was right next to me." (*Id.* at 1007.) After he told her not to leave,

> I guess, under the stress, I decided to leave, and walked toward the west—east entrance of the store where our car was parked, and I came to the door, opened the door, and I wanted to get my husband out of there so I asked him to walk out, too. He ignored me. And I decided to go and sit in the car, and I went to the car and sat in the car where I could see the store, and a few minutes after I went out, [the robber] walked out, walking fast[.]

> . . . .

> . . . At that time I saw him putting a gun in his back pocket. I saw the handle of the gun.

(*Id.* at 1007–08.)

Songu Mize described the robber: "He was a young person, 30, 35 probably. Not too tall. Not heavy at all, slim, probably, . . . [h]ad a beard, a mustache. Was wearing gray/green suit, or jacket and pants, and plaid shirt. He had sandy brown hair." (*Id.* at 1007.) She testified that State's Exhibit 6 (ECF No. 284–15) looked like the suit that the robber was wearing and that he had a bandage on one of his fingers. (*See* ECF No. 231–11 at 1008–09.) At trial, Songu Mize stood in front of Cone and stated that he looked like the robber, but "he's a lot heavier." (*Id.* at 1009–11.) The defense did not cross-examine Songu Mize. (*See id.* at 1013.)

### (4) Testimony of Richard ("Randy") Mize

The State's fourth witness was Richard ("Randy") Mize, Songu Mize's husband and a customer at Brodnax during the

robbery. (*See id.* at 1013–14.) Richard Mize testified,

> Yes, as I'm sure you all know, the store was robbed. And we were at the counter, fitting the band, and checking out whether they fit the ring—our fingers properly, and we all of a sudden noticed that a robber was collecting, first, Rolex watches, and then diamond rings. And the clerk was scooping up the rings, and the robber was then pocketing them.
>
> My wife, at that point, decided to leave the store and—then turned around and signaled for me to come out, as well, and—I backed away from the counter, because that seemed to make the robber somewhat nervous, and said to him, "Don't worry, we're not going to do anything." And, at that point, the robber said, "Don't worry, I'm not about to panic." And shortly thereafter he—I think picked up a few more rings, and then rapidly left the store.

(*Id.* at 1014.)

Richard Mize was standing three or four feet away on the same side of the counter when he first noticed the robber, and "as the events were transpiring, [the robber] went around to the other side of the counter." (*Id.* at 1015.) Richard Mize testified that the robber was

> relatively short . . . in the neighborhood of 5′8″, 5′9″. He was also quite—he seemed quite thin. I would guess in the neighborhood of 140, 150 pounds in weight. I recollect him having relatively sandy hair. And I think the two most prominent things that we noticed, were that he had a rather scraggly beard—it wasn't a full grown beard, it was rather scraggly. He had an overall appearance of being rather mussed, and, finally, he was sweating profusely. I remember—Both my wife and I commented on that, because it seemed, you know, quite striking.

(*Id.*) Richard Mize testified that it was August in Memphis and "very hot." (*Id.* at 1015–16.) Richard Mize could not make a positive identification in the courtroom. (*See id.* at 1017.)

Richard Mize testified about the robber's clothing:

> He was dressed in—To begin with, his clothes also looked mussed, to us, as though they were wrinkled and crumpled up. And I believe he had on sort of wash pants, that were of a greenish color, and a sport coat I also remember being of a greenish color.

(*Id.* at 1016.) Mize identified the clothes in State's Exhibit 6 (ECF No. 284–15) as the robber's clothing. (*See* ECF No. 231–11 at 1016.)

Mize saw the robber's gun while they were in the store. (*See id.*)

> As we went around—or as he went around the counter, so that he was facing us, at the point my wife left the store, he flashed a gun. And by that I mean—if I can show you. He had it sort of back like this [indicating back waist band of trousers], and brought it out, and sort of showed it to us, keeping the barrel pointed towards the floor, but nevertheless so that we were aware of the fact that he was armed.

(*Id.* at 1016–17.)

On cross-examination, Dice asked Richard Mize if he made the statement, "It's hot as blazes in Memphis in August." (*Id.* at 1018.) Mize responded that he said something like that. (*See id.* at 1019.) Dice verified that Mize had stated that the robber was sweating profusely. (*See id.*) Dice addressed whether Richard and Songu Mize were together when the robber showed his weapon. (*See id.* at 1020.) Richard Mize testified that he did not believe that his wife saw the weapon until after she had left the store. (*See id.*)

### (5) Testimony of C.M. ("Mike") Stovall

After a lunch recess on the first day, the fifth witness, C.M. ("Mike") Stovall with the MPD's Criminal Investigation Division, South Precinct, was called to testify. (*See id.* at 1027–28.) On August 9, 1980, around 1:00 p.m., Stovall heard a broadcast concerning the armed robbery of the Brodnax Jewelry Store. (*See id.* at 1028.) The broadcast described a "greyish/green Oldsmobile, with a male white responsible." (*Id.* at 1029.) The individual was "dressed in a green suit, had a beard and glasses." (*Id.*) Stovall heard the broadcast and headed east toward the store in his Chevelle unmarked cruiser. (*See id.* at 1028–29, 1031.)

I was headed—past Parkway, above the viaduct, when I noticed a group of cars coming up the viaduct—up the little hill there, and I looked over and I saw this grey Oldsmobile driving at a normal rate of speed, along with two or three other cars, and a male white with a beard. So I stopped right there on top, and there was no way to turn around except for a U-turn. I waited until he got by me, down the other side, and I made a U-turn, fell in behind him. I caught up with him about Union and Cooper, where he was stopped at a red light, and at this time I advised the dispatcher I was behind a possible robbery suspect, and gave the license number—which was Arkansas plates at that time. I told them we were eastbound—we were westbound on Union at an average rate of speed, about 35–40 miles an hour. And I followed him all the way down Union to past McLean, past Idlewild, to Auburndale, right there at Dunkin' Donuts. He first stopped right at the stop light at the McLean and Union—we were still going at a normal rate of speed, and he turned—turned right on Auburndale off of Union, headed north towards Madison, and he was still going 35–40 miles an hour. I was trying to

hang back a little bit to keep him from noticing me. I got—He got almost to Madison, and that's when he gunned the car and sped out in front of traffic on Madison. And then I advised the dispatcher that we were at this time in chase. . . .

. . . .

Well, he sped off in front of traffic right there at Madison, and I knew then that it had to be the robbery suspect. And so I followed behind him. He went one block—he went down Madison, headed east, one block, and took a left on Idlewild, which I was familiar with the area, it deadends, so I figured, well, I've got him right here. He goes down Idlewild about halfway, notices it's a deadend, he turns in the parking lot— This car I'm in is not as fast as the Oldsmobile he was driving. Of course, I couldn't keep up with him. He made a U-turn in a parking lot, which used to be a High Rollers Lounge there, and coming back out on the street he tried to hit the cruiser, at that time which I was in, and I had to gun it out of his way. He come back out on Idlewild headed toward Madison again, took a right on Madison which is headed westbound, to one more block, and then he took a right on Auburndale headed northbound towards Poplar.

At this time, by the time I got turned around and got back out on the street to Auburndale and Madison, it's a pretty long stretch there, and he was almost to the end of the street. He had to be going speeds of 80–85 miles an hour through those streets right there. I caught up with him at—I got to the intersection of Auburndale and Poplar, and I caught the tail end of his car one block further down, which is eastbound, to Hawthorne Street. He had gone in front of traffic and gone in that street, and by the time I could get down

there—Poplar was kind of busy. I got to the street—I saw a cloud of dust behind a black van, which he had gone behind, in a hedge of bushes. I saw the dust and I figured he had gone behind the van, and stopped. So I stopped the cruiser out in the street and got out of the car and pulled my weapon. He come around in front of the van—over the bushes, about—about this high, right here to his chest [demonstrating], and at this time he put his hand up, and I couldn't tell whether he had a gun or not. There was a person standing right behind him. I could not shoot, fear that I might hit the other person. I told him to drop the gun right there, halt. He jumped back around the van and got in his car and took off at a high rate of speed across the front yards. He jumped the curb and went back out in the street, headed northbound on Hawthorne.

. . . .

I jumped back in the cruiser, and started after him again. And, of course, his car was a lot faster than the one I was in. As I got back in the car and was headed northbound on Hawthorn[e], I looked in the rear view mirror and I saw a motorcycle officer behind me. I got to the first street, which is—I believe it's Lawrence, and—He took a left, headed back westbound. By the time I got to the intersection I had lost sight completely. But the street was kind of a long stretch so I figured he had to turn off somewhere. The first street I come to, which was Auburndale, it was left, the only way you could go, I took that, and was going up Auburndale Street at a pretty good rate of speed. And I caught him out of the side of my eye getting out of the Oldsmobile. He'd gone up Lawrence and taken the first street, left, which is Auburndale, and had taken the first drive left, up into a house behind a hedge of bushes. As I

was driving by I caught him out of the corner of my eye getting out of the car.

I went on past and slammed on the brakes. At that time the motorcycle officer, which was a pretty good distance behind me, saw me stop, and he stopped right behind the car. And the Defendant jumped out of the car and run between the garage and jumped a fence. And the motorcycle officer was right behind him. When I got out of the car I heard a lot of gunshots, and I got to the driveway and I saw the Defendant's head go by the fence. That's when I jumped up on the fence, with a gun, to pull the trigger on him when he rounded the corner on me.

(*Id.* at 1029–34.) Stovall heard gunshots when he jumped out of his car and was running toward Cone's car; he was behind a garage at the time. (*See id.* at 1035.) Stovall lost his radio at some point during the chase and went back to the motorcycle and radioed for help. (*See id.* at 1036.) He stayed by the suspect's car to protect the scene. (*See id.* at 1042.) The motorcycle officers were in the area, and the helicopter was above. (*See id.*) Stovall never fired his weapon. (*See id.* at 1043.)

Stovall identified the route that was taken during the chase on a large aerial map, which was also enlarged on a screen in the court room. (*See id.* at 1036–42.) The map was entered into evidence as State's Exhibit 8 (ECF No. 284–18 to –19). (*See* ECF No. 231–11 at 1037.) Stovall identified a photograph of the suspect's vehicle where it was left in a driveway. (*See id.* at 1043.) The photograph was entered into evidence as State's Exhibit 9 (ECF No. 284–20). (*See* ECF No. 231–11 at 1043.)

Stovall described the suspect as "a male white, he had glasses on, he had a full reddish beard—dark brown reddish beard." (*Id.* at 1044.) He identified Cone as the suspect that he chased. (*See id.*)

On cross-examination, Dice clarified that the motorcycle officer that Stovall spoke of was Bert Allen. (*See id.* at 1047.) Allen was about thirty feet away from the suspect at the time. (*See id.* at 1051.) Dice pointed out that in the offense report, Stovall stated, "[a]t this time I yelled for the officer to shoot [the] suspect." (*Id.*) Dice then quoted the offense report asking if it was correct that Stovall "heard approximately six shots as I was running toward the fence." (*Id.* at 1051–52.) Stovall replied that the report was correct. (*Id.* at 1052.)

### (6) Testimony of Bert Allen

The State's sixth witness was MPD Motorcycle Squad Officer Bert Allen. (*See id.* at 1053.) On August 9, 1980, between 1:00 and 1:30 p.m., Allen heard a broadcast concerning a chase in midtown Memphis. (*See id.* at 1053–54.) Allen intercepted the chase which was proceeding in his direction down Poplar Avenue. (*See id.* at 1054.) At Poplar and either Auburndale or Hawthorne, Allen saw an unmarked police cruiser against the curb. (*See id.*) He saw a light green Oldsmobile that fit the description of the vehicle being pursued. (*See id.*) Allen joined in the pursuit which at that time was proceeding at speeds around fifty miles an hour. (*See id.* at 1054–55.)

When Allen made the last turn, he could not see the Oldsmobile, only the tail lights, and the police cruiser. (*See id.* at 1055.) He saw the cruiser's brake lights, and he began to slow down and look for the Oldsmobile. (*See id.*) Allen passed a driveway and saw movement on his left. (*See id.*) The Oldsmobile was sitting there, and a "male white" was getting out. (*See id.*) Allen put down the kickstand on his bike and jumped off to chase the suspect on foot. (*See id.*) Allen described the foot pursuit as follows:

The suspect was going eastbound straight down the driveway towards a redwood fence, at the rear of the residence at that location. I was directly behind him, following him straight down the same side of the car, down the driver's side he had gotten out, I was probably 50 or 60 feet behind him.

. . . .

... He went over this fence [12] and turned to the right, and I lost sight of him for about two or three seconds, maybe. As I went over the fence, I also proceeded to the right, the direction he had gone. And at that point there was only one direction that he could go because of the way the fence, and another garage was—was around to the left.

At this time I continued on around the garage, and when I got to the corner of the garage was the next time I actually laid eyes on him. Just as I got right at the edge I looked to the left and I observed the same male white that I had seen get out of the automobile, standing there with his arm raised up and a pistol in his hand. And about that time, the gun went off, and he shot me in the left hip.

. . . .

... At the time he was firing the gun, I tried to dive and get out of the way, and I guess my dive took me, more or less, in a southeasterly direction from the corner—the dive and my momentum, and I fired one shot while I was in mid-air in his general direction. I don't know where the bullet landed. And when I hit the ground I kind of rolled, I knew I'd been shot, and he ran back to the same corner of this garage, ... where we had come from. And he stopped and turned around, and again raised the pistol, at which time I was laying on the ground and had my gun just kind of

---

**12.** The redwood fence was about five-and-a-half feet high. (ECF No. 231–11 at 1060.)

back behind me, and I began to fire at him and he fired at me—either three or four times. I think it was four shots, and the dirt kicked up in front of me a couple of times, and—I fired the rest of my bullets, five more shots, and he turned and ran when I ran out of bullets.

(*Id.* at 1056–57.) Allen testified that "the only thing that would keep [the suspect] in this small enclosed area there between two garages would be a short picket fence, maybe two and a half feet tall." (*Id.* at 1058.) Allen said the fence would have been easy to step over, but the suspect. was "just standing there, appeared to be waiting on me." (*Id.*)

Allen saw the suspect when he was running southbound on either Hawthorne or Idlewild. (*See id.* at 1064.) That is when Allen heard another single gun shot. (*See id.*) At this time, Allen was hurting, but he chased the suspect as far as he could. (*See id.*) Other officers were arriving on the scene, and Allen "just sat down and finally got into the back seat of one of the squad cars" and was transported to the hospital. (*Id.*) Allen was shot in the left hip. (*See id.*) The bullet ricocheted off his pelvic bone and exited from his left buttock. (*See id.*)

Allen drew a rough diagram of the car, fences and garage, where the shots were fired, and where he was shot. (*See id.* at 1058–63.) The diagram was entered as State's Exhibit 12 (ECF No. 284–24) for demonstrative purposes. (*See* ECF No. 231–11 at 1070.) Allen also pointed out where the suspect exited his car and ran down the driveway, past a few garbage cans by the garage. (*See id.* at 1059–60.) Five of Allen's bullets went into the garage. (*See id.* at 1062, 1074.)

Allen testified that State's Exhibit 9 (ECF No. 284–20) was a photograph of the automobile that the suspect was driving which was parked in the driveway where Allen began the foot pursuit. (*See* ECF No. 231–11 at 1064–65.) His motorcycle was in the background of the photograph. (*See id.* at 1065)

Allen identified a photograph of the area where the shots were fired including a picture of a picket fence; the photograph was entered into evidence as State's Exhibit 10 (ECF No. 284–21). (*See* ECF No. 231–11 at 1065, 1071.) Allen marked the location where he was shot as "O" and the suspect's location at that time as "S." (*See id.* at 1066.)

Allen described the suspect as "a male white, with more or less shoulder length hair." (*Id.*) He was wearing a plaid shirt and "looked like he hadn't shaved in a while." (*Id.*) Allen testified that he had previously seen the photographs in State's Exhibit 5 and picked out a photograph of the suspect. (*See id.* at 1067.) Allen identified the photograph, initialed it, dated it, and put the time on it. (*See id.*)

Allen identified a pair of trousers that he was wearing at the time he was shot and the bullet's entrance and exit holes. (*See id.* at 1067–71.) The trousers were entered into evidence as State's Exhibit 11 (ECF No. 284–22 to –23). (*See* ECF No. 231–11 at 1070.)

On cross-examination, Dice pointed out that Allen was "basically" a traffic enforcement officer. (*See id.* at 1073.) Dice verified that Allen made a statement that he saw "a male white come staggering out of the driveway where the suspect had run, holding his stomach."[13] (*Id.* at 1074.) The statement continued, "He fell in the grass beside the driveway as if he was shot. I did not hear the gunshot." (*Id.*) Allen carried a Smith & Wesson .38 with a four-inch barrel, which held six bullets.

---

**13.** The male white referenced is likely Doug Clark, *see infra* pp. 949–51.

(*See id.*) He fired six bullets that day; five shots went into the garage. (*See id.*) He stated that Stovall was yelling something to him that day, but Allen did not "have any idea what [Stovall] was yelling." (*Id.* at 1075–76.) Allen did not have his weapon out when he first got off the motorcycle; he did not pull it out until he was running down the driveway. (*See id.* at 1076.)

Allen testified that the MPD had a policy that an officer could use deadly force on a fleeing felon. (*See id.*) He testified that he took his gun from the holster to use it "[i]f need be." (*Id.*) Allen testified that the fence in State's Exhibit 10 (ECF No. 284–21) played no role in the shooting incident. (*See* ECF No. 231–11 at 1078–80.) He stated that a continuation of the fence in the picture was the fence that he and the suspect went over. (*See id.* at 1080)

(7) Testimony of Barbara Benbrook

The State's seventh witness, Barbara Benbrook, lived at 230 Hawthorne, Apartment 4, approximately six houses north of Poplar Avenue in August, 1980. (*See id.* at 1083.) The address is on Hawthorne, between Poplar and Lawrence. (*See id.* at 1084.) Auburndale is the next street to the west. (*See id.*) On August 9, 1980, between 1 and 2 p.m., Benbrook was sunbathing on the terrace on the second level between the two apartment buildings. (*See id.*) Benbrook described what she saw that afternoon:

Well, the first thing I noticed—of course, I was lying down, sunbathing, and it's such a quiet neighborhood that I was—you're very, very conscious of a loud noise, and I heard a car speed by— I mean—I don't know how fast, it looked like 60 miles an hour, or something, but it went by very quickly, and it was followed by, I believe an unmarked police car and then, I think, a motorcycle was behind that. And I just sort of looked up, and I noticed all that activity, and of

course after hearing it. Then it disappeared, and my first thought was—you know, something's going on and somebody's trying to get away from someone, or something. But, anyway, the next thing I knew a helicopter went over, and—My neighbor and I were out there and were just sort of playing around, I didn't know what was going on. And then I heard a gunshot—but I didn't know that was what it was ... I just heard this loud noise. At first, I thought it came from the helicopter, I didn't know.

And then within a few minutes, I don't know exactly how many minutes, I heard quite a few more gunshots—I don't recall the exact number. And it was as though they happened almost to the—at the hedge out by the street. And when we heard those, it was—natural instinct, we were scared to death, we thought we were going to be hurt, or something, and we ran inside. My neighbor and I did, into my apartment. (*Id.* at 1085–86.) Benbrook and her neighbor went to the window and saw someone running from the hedge towards their building. (*See id.* at 1086.) She described the man as "sort of hippie looking [with] long hair, ... horn rimmed glasses, a full beard, and—not very tall, maybe 5'8''", unkempt, and running very quickly. (*Id.*)

After Benbrook and her neighbor saw the suspect come towards the building, they went to Debbie Staggs's apartment because it was in the front of the building. (*See id.* at 1087.) They looked out her front window and saw a policeman limp across the sidewalk and fall in the grass. (*See id.*) Soon thereafter, they saw their neighbor Doug Clark lying in his front yard. (*See id.* at 1087–88.)

Benbrook looked at two sets of photographs at a MPD station. (*See id.* at 1088.) One group of photographs depicted

men that were more conservative looking with short hair, and the other depicted men with a more unkempt appearance. (*See id.*) She picked one photograph from each group. (*See id.*) Strother passed her two sheets of photographs which he identified as the two groups that she looked at that day. (*See id.* at 1088–89.) She marked the photographs that she picked out, and the State entered these sheets as State's Exhibit 13 (ECF No. 284–25 to –27). (*See* ECF No. 231–11 at 1089.) At trial, Benbrook identified Cone in the courtroom. (*See id.* at 1090.)

On cross-examination, Benbrook explained her comment that Cone was "hippie" looking in his appearance. (*Id.* at 1092–93.) She stated that she meant he had "extremely long hair as in shoulder length or a little bit longer" and a full beard. (*Id.* at 1093.) She testified that the trial was the third time that she had seen the pictures, and she did not recall initialing them when she first saw them. (*See id.* at 1093–94.)

(8) Testimony of Deborah Stanford

The State's eighth witness was Deborah Stanford (formerly Deborah Staggs), who lived at 230 Hawthorne, between Poplar and Lawrence, in August of 1980. (*See id.* at 1095–96.) Stanford was the neighbor who was sunbathing with Benbrook on the afternoon of August 9, 1980. (*See id.* at 1096.) She testified:

When we were sitting there we first noticed a car going across the front of the apartment, going real fast, and we remarked that, you know, something must be up and they're probably going to get caught, but they were really speeding. And just a few seconds behind that car was another car and a police motorcycle. And within a few seconds after that we heard—what sounded like gunshots, or something, and a police helicopter went [overhead], and we got up and went inside.

. . . .

Well, we first went into Barbara's apartment, I think, and looking from her window we saw a white male come across the front lawn, toward us, and go between the two buildings.

(*Id.* at 1096–97.) She described the man they saw as "mid-twentyish—white, longish hair, medium height—medium build, had on an open shirt, not buttoned, and shorts." (*Id.* at 1097.) She stated,

When he disappeared out of our sight, there appeared several policemen in the front yard; one that looked like he'd been shot, was limping, sat down on the front lawn. A couple of other officers, and then several—what I think were officers from the TACT Squad, they were dressed differently and had rifles, I guess. They continued chasing him. Two or three of them stayed with the officer that had been shot.

(*Id.* at 1098.) As the man went toward the rear of the apartment, Stanford heard "a couple more shots." (*Id.*) She saw her neighbor Doug Clark lying in the front yard a little while later. (*See id.*) Stanford could not identify Cone at trial as the person she saw that day. (*See id.* at 1099.)

(9) Testimony of John Douglas ("Doug") Clark

The State's ninth witness was John Douglas ("Doug") Clark. (*See id.* at 1100.) Clark was visiting relatives who lived on Hawthorne on August 9, 1980, around 1 p.m. when he heard a commotion. (*See id.* at 1100–01.) He testified:

Initially, I heard a car trying to pull up into a driveway, and skidding gravel around, and then I saw the car pull up behind some bushes, and another car pulled up on the street next to it, and a man got out of the car on the street and told the other car to stop. At that point, the first car started driving across some

yards, towards me—I was about four houses north. And then the first car drove out into the street and kept going, and the second car chased him, and then a motorcycle officer chased—followed the chase.

(*Id.* at 1101.) The cars went north on Hawthorne. (*See id.* at 1101–02.) Clark went back to where the first car pulled into the driveway to see if it had hit a parked car. (*See id.* at 1102.) Clark stated:

> At that point, I started walking back towards my house—my parents' house, and I saw a man who I suppose was the first man—the man in the first car, I didn't get a good look at him in the car, running back south, he had gone north and then was running back south, and—wasn't running very fast, and he ran behind the house next door to my parents, and I realized that he was being pursued and was getting away, so, I ran back down my parent's driveway to cut him off, and I picked up a vinegar bottle and confronted him about fifteen feet away and asked him where he thought he was going.
>
> . . . .
>
> I remember hearing something that sounded like firecrackers. I didn't know what it was. It was muffled.

(*Id.* at 1102–03.) When Clark went behind the house and picked up the jug,[14] he said, "Hey, buddy, where do you think you're going[?]" (*Id.* at 1104.) Clark testified that the man looked at him for a brief second. (*See id.*) Clark then saw the gun at the man's hip, and the man "just calmly shot me in the stomach" from about fifteen feet away. (*Id.*) Clark described the individual that shot him as having "fairly long

black hair; looked like he hadn't shaved for a week or two weeks, or if he was trying to grow a beard he hadn't trimmed it; sweating a little bit." (*Id.* at 1105.) [15] The individual was a white man with an untucked shirt that was unbuttoned and a gray T-shirt. (*See id.*) He was wearing shorts. (*See id.*) The individual was running very slowly when Clark first saw him, but when he saw Clark, he stopped. (*See id.*)

After Clark was shot, he walked back to the front of the yard to try to get away from the man. (*See id.* at 1105–06.) As a result of the shooting, Clark had a shattered knuckle in the center of his left hand and had to have approximately two feet of small intestine resected. (*See id.* at 1106.) Additionally, his right external iliac artery had to have a graft. (*See id.*) The bullet remained in his body, against his pelvic bone. (*See id.*)

Clark identified three photographs, which were entered as State's Exhibit 15 (ECF No. 285–1): (1) his brother's house at 224 Hawthorne; (2) a grape juice jug that Clark picked up; and (3) the front yard of the house north of his brother's house, with the mat on which Clark was placed after he was shot. (*See* ECF No. 231–11 at 1106–07.) Clark identified two photographs as the back yard of the house north of his brother's house "probably from the view that the man that shot me had" and the same backyard from the spot where Clark was standing. (*Id.* at 1107.) These photographs were entered into evidence as State's Exhibit 16 (ECF No. 285–2 to –3). (*See* ECF No. 231–11 at 1107.) Clark marked an "X" on the photo where

---

14. A gallon jug with a Welch's Grape Juice label was identified as the jug Clark used and entered as State's Exhibit 14 (ECF No. 284–28 to –30). (*See* ECF No. 231–11 at 1103–04.)

15. Clark could not identify anyone in the courtroom as the person who shot him. (*See id.* at 1105.)

he was standing, and a "Y" where the shooter was standing. (*See id.* at 1108.)

Clark identified an aerial photograph of Hawthorne, Auburndale, and another street, which was entered as State's Exhibit 17 (ECF No. 285–4 to –6). (*See* ECF No. 231–11 at 1108–09.) On this picture, Clark noted the location of the shrubbery, where the car pulled up, and the driveway he went down prior to being shot. (*See id.*)

Clark identified gym shorts, socks, tennis shoes, and the T-shirt that he was wearing that day. (*See id.* at 1110–11.) The gym shorts were entered as State's Exhibit 18 (ECF No. 285–7 to –8). (*See* ECF No. 231–11 at 1111.) Clark pointed out the blood on the shorts and the hole that resulted from the bullet going through them. (*See id.*)

On cross-examination, Dice clarified that Clark witnessed the chase on two different occasions on the same day. (*See id.* at 1113.) Clark explained that the jug was in the yard, and that he picked it up about halfway through his run. (*See id.* at 1114.) When Clark saw the man, Clark said something to him, and "that was the confrontation." (*Id.*) Clark had the jug in his hand at that time. (*See id.* at 1115.) He was face to face with the man "a couple of seconds" before being shot; the man "seemed to be in control." (*Id.* at 1115–16.)

(10) Testimony of Charles Slaughter

The State's tenth witness was Charles Slaughter, who lived in a townhouse at 143 North Auburndale, between Poplar and Madison. (*See id.* at 1117, 1119.) He was at his house on August 9, 1980, between 1 and 2 p.m., working on his daughter's car. (*See id.* at 1117–18.) He saw a white male come down the driveway "dressed in shorts, with no shirt, and he had a—some type of garment draped across his right hand." (*Id.* at 1118.) The man was walking briskly. (*See id.*) Slaughter testified that the man "wore glasses, and that kind of struck me that the glasses were clear lens and—I don't know, I picked up on the glasses for some reason." (*Id.* at 1122.)

Patterson showed Slaughter a group of seven photographs. (*See id.* at 1118–19.) Slaughter testified that he had previously been shown these photographs, that he identified one photograph as depicting the man that came through the alley or driveway, and that he signed his initials on the back. (*See id.* at 1119–20.) The photographs were entered into evidence as State's Exhibit 19 (ECF No. 285–9 to –11). (*See* ECF No. 231–11 at 1120.)

Patterson presented Slaughter with an aerial photograph of the area south of Poplar near St. Peter's Home for the Elderly. (*See id.*) Slaughter identified his driveway on the aerial photograph. (*See id.*) The photograph was entered into evidence as State's Exhibit 20 (ECF No. 285–12 to –15). (*See* ECF No. 231–11 at 1121.) Slaughter marked the path that the man took. (*See id.* at 1121–22.)

On cross-examination, Slaughter described the man he saw that day as follows:

> The only thing I saw, I turned around and this particular person somewhat startled me. He seemed to be coming toward me. I remember him wearing glasses, gold-rimmed glasses. His hair was about shoulder length. He had no shirt on, and he had a shirt—piece of cloth, or something, I assumed it was a shirt, over his right hand and arm. I couldn't see his right hand. He had a beard. He grinned a funny kind of a grin and muttered something and then walked on by. I turned to see which way the man went, and he proceeded west and turned back south in the alley,

and I couldn't see where he went after that.

(*Id.* at 1123–24.)

### (11) Testimony of Debbie Howell

The eleventh witness presented was Debbie Howell (formerly Debbie Slaughter and now Debbie Slaughter–Crawford), Charles Slaughter's daughter. (*See id.* at 1127.) She was visiting her father between 1 and 2 p.m. on August 9, 1980. (*See id.*) She testified that she saw a white man wearing "cut-offs" and "something draped over his right hand" come through the complex. (*Id.* at 1127–28.) The man was not wearing a shirt. (*See id.* at 1128.) She stated that later that day, the police came, and she had the opportunity to view a paper and make an identification of the man who came through the alley. (*See id.*) The paper with Debbie Howell's identification of the man in the alley was entered into evidence as State's Exhibit 21 (ECF No. 285–16 to –17). (*See* ECF No. 231–11 at 1128–29.) The defense did not cross-examine Debbie Howell. (*See id.* at 1129.)

### (12) Testimony of Richard K. Wilson

The State's twelfth and final witness on the first day of trial was Richard K. Wilson, a twenty-four year employee of the MPD with fifteen years experience as a homicide investigator. (*See* ECF No. 232–1 at 1130, 1138.) Wilson identified a .38 caliber spent slug and a lead, large caliber slug that were found inside the garage at 242 North Auburndale and entered into evidence as State's Exhibits 22 and 23 (ECF No. 285–18 to –19; ECF No. 285–20), respectively. (*See* ECF No. 232–1 at 1130–32.) Patterson's intention was for Wilson to testify solely for the purpose of identifying the bullets in evidence, however Dice's cross-examination was more in-depth. (*See id.* at 1152.) The court recessed at 6:25 p.m. and Wilson's testimony continued on the following day, Saturday, April 17, 1982. (*See id.* at 1135.)

### 2. Trial Day Two: Saturday, April 17, 1982, 9:00 a.m. to 5:05 p.m.

#### a. State's Proof, continued

##### (1) Testimony of Richard K. Wilson, continued

The second day of trial began at 9:00 a.m. on April 17, 1982. (*See id.*) On cross-examination, Wilson testified that he was assigned to the Security Squad, which consisted of five detectives that investigated police shootings. (*See id.*) Wilson testified that he filled out a supplementary offense report in Cone's case. (*See id.* at 1136.) He agreed with defense counsel that these reports included the notes of officers on the scene, that they were dictated, and that the officer reviewed the report and signed it to indicate that the document had been read and reviewed. (*See id.* at 1136–37.) Wilson testified that he reviewed an offense report in Cone's case, and to the best of his knowledge, it was true and correct. (*See id.* at 1137.) Wilson identified the report that he compiled on August 9 and 10, 1980. (*See id.*) Wilson admitted that he did not interview Benbrook, but that the report included a statement allegedly made by her. (*See id.* at 1144–45.) Wilson testified that the report included a statement from Allen about the chase and shooting and that Wilson interviewed the Slaughters at 8:45 p.m. (*See id.* at 1147–48.) Wilson testified that the supplementary offense report was put in the attorney general's file at a certain stage of the case and that the report would have been in their files for many months. (*See id.* at 1149.)

On re-direct, Wilson testified that the first page of the six-page report was taken right after Allen was shot and was in the hospital. (*See id.* at 1149–50.) Wilson took a statement from Allen on Wednesday, August 13, 1980. (*See id.* at 1150.) Wilson stated that the shoes in State's

Exhibit 7 (ECF No. 284–17) were taken from the suspect's Oldsmobile at the city lot on Sunday, August 10, 1980. (*See* ECF No. 232–1 at 1151–52, 1154.) Wilson testified that Allen's trousers, State's Exhibit 11 (ECF No. 284–23), appeared to have one hole—an exit wound. (*See* ECF No. 232–1 at 1154.) Wilson then stated that there was another hole inside the left pocket. (*See id.* at 1155.)

On re-cross, Dice verified that the report stated that "[t]here was an entrance hole on the left side of the pants, with no exit hole in the pants." (*Id.* at 1156.) Wilson admitted that the second statement taken by Allen was part of the offense report. (*See id.* at 1167.) [16]

### (2) Testimony of Herschel Dalton

The State next called Herschel Dalton, who lived at 143 North Evergreen, to testify. (*See id.* at 1187.) Dalton described the events on the afternoon of August 9, 1980, as follows:

> I went out into my back yard to get in my car and run over to the grocery store. And to get out into the street, I have to maneuver my car out of the garage into—aim it into the driveway, and I was in the process of doing this when this man ran around from the other side—the other half of the duplex—into the back yard, and ran up to me as I was backing out, and he said, "Wait a minute", so I did. I stopped moving the car and asked him what he

wanted. So he held up a gun and said, "I want your car." And immediately I stopped my motor running, pulled the key out of the ignition, and started opening the door. And started talking to him, to stall for time. At first, I believe he wanted me to just move over, and let him get in the car. But I was already getting out before he had—hardly had a chance to say this.

> So, I got out of the car completely, and he wanted—he held out his hand for the key, as I recall, and wanted them, of course, and I refused to give them to him. I could see—I could see a look of desperation in his eyes, and I looked around for some possible escape route—because I really needed to hang on to that car, and my life. I felt like it was damned if I do, damned if I don't, as far as my life was concerned, because I felt like he was desperate enough to kill me whether he got—whether I immediately gave him the car or not.

> And—The car was just newly purchased by my mother, it was her car and she was dying of cancer, and I needed the car badly. And—I wasn't going to give my life up for the car, but I looked for a way to escape, and I was very close to some bushes that ran—that were all the way down the side of my short driveway to the street, and I backed toward this, very slowly, as I argued with him.

---

**16.** Dice moved for mistrial on the basis of prosecutorial misconduct for the deliberate suppression of evidence, or in the alternative to strike all testimony by Allen, the Slaughters, Staggs, and Benbrook. (*See* ECF No. 232–1 at 1159.) Dice noted that Benbrook testified that she had been shown the pictures three times and identified Cone each time, but the statement said that on August 10, 1980, Staggs and Benbrook were shown the photographs and could not identify the suspect. (*See id.* at 1164–65.) Dice noted that Allen testified twice on direct that he heard a shot,

but his statement said he did not hear a shot. (*See id.* at 1165.) Dice also noted that the statements mentioned Allen reloading his weapon, but the testimony failed to mention that he reloaded his weapon while lying on the ground. (*See id.* at 1166.) Dice asserted that Cone's right of confrontation had been violated. (*See id.* at 1165.) The Court ultimately found no justification for a mistrial. (*See id.* at 1185.) Dice was allowed to put a copy of the report into evidence to be placed under seal. (*See id.* at 1185.)

And then I just—freaked him out. I just—He said, "Give me those keys or I'll shoot you," as I recall him saying, almost a year and a half ago now. He— And I said, "Well, I'm not going to give you the keys." I yelled at him as loud as I could, and, "You can just shoot me," I said, "Godammit!" and it freaked him out, he just didn't know what to do. And I started bursting into a run by then, right as close into these bushes as I could, and I made it to the street. Well, as I was very near the street, I started hearing a clicking sound, and I knew what that must be, and I looked back and there he was, aiming the gun at the sky and just clicking away, and I could see a very frustrated look on his face that the gun had been empty, after all.

And so I ran out into the street, and I saw a helicopter very low and close overhead, and I put two and two together— obviously, they must be looking for him. And I jumped up and down and waved— It was broad, bright, daylight day. I figured surely they could see me. If they were looking for some guy that would be, maybe, skulking around the bushes, maybe they could see me. And they didn't, they didn't see me.

And so, I looked back toward my house to see if he was—Well, I went over into the neighbor's yard, to the immediate north of my house, to see if I could peer in the back yard and see if he was back there. And I couldn't see him. I still waited a little bit before I went back to my house, because my girlfriend was in there and I certainly wanted to protect her. I finally decided maybe he wasn't going to come around in front of the house with a reloaded gun, so I ran for my front door as fast as I could, banged on the door, she unchained it, I went in and called the police, and that was—That's all there is to it, really. (*Id.* at 1187–90.)

Dalton was presented with five photographs of his residence, automobile, and driveway as they existed on August 9, 1980, which were identified and entered into evidence as State's Exhibit 24 (ECF No. 285–21 to –23). (*See* ECF No. 232–1 at 1190–93.) Dalton identified a photograph, which was entered as State's Exhibit 25 (ECF No. 286–1 to –3), that showed Evergreen Street and the back yard of the houses on Belvedere including his house. (*See* ECF No. 232–1 at 1193– 94.) Dalton marked "HD" on State's Exhibits 20 and 25 (ECF No. 285–13 to –14; ECF No. 286–2 to –3) to show his house. (*See* ECF No. 232–1 at 1194–95.)

Looking at State's Exhibit 19 (ECF No. 285–10), Dalton testified that he could not narrow his identification beyond two photographs, Numbers 3 and 6. (*See* ECF No. 232–1 at 1196.) He wrote on the back of both of those photographs (ECF No. 285– 11). (*See* ECF No. 232–1 at 1197.) Dalton identified Cone in the courtroom as the person who approached him on August 9, 1980. (*See id.* at 1197–98.) On crossexamination, Dalton testified that the Number 6 photograph stood out from the others because of its color. (ECF No. 285–10; *see* ECF No. 232–1 at 1203.)

(3) Testimony of Lucille Tuech

Next, the State called Lucille Tuech, who on August 10, 1980, lived in a twelveunit dwelling on Belvedere. (*See* ECF No. 232–1 at 1205.) Tuech described what happened about 8:30 a.m. (*See id.*)

Well, I was eating my breakfast out on my little screened-in porch, and I walked into my kitchen and walked over to the sink, and—at about that time, a man appeared at my back door.

. . . .

He had shorts—raggedy shorts, and they were bluish/grey color.

. . . .

He carried a paper cup—a flat paper cup in his right hand. And his left hand was always behind him.

. . . .

He was not too tall, I'd say he was about 5'6", and he could have weighed 160 pounds.

. . . .

[H]e had long, scraggly brown hair, and a two-week—about a two-week growth of beard.

. . . .

The first thing he asked me was, "Do the Manleys live in this building?" and I said, "No, nobody by that name in this building." And he said, "Now, that's strange," and then he—I said, "Well, maybe they live on the street back of me, Evergreen," and he said, "Well, maybe so." And he didn't leave, he just stood there. And I thought that was strange. Then he said, "May I use your phone?" And I said, "No, you may not."

. . . .

Then he stood there, and finally he said to me, "Is there a pay phone close by?" and I said, "Yes, right across the street." And about that time, I knew something was wrong there, and I was going to get my door shut. Just as I put my hand on the door, he brought his right—his left hand right—pointing his gun at me.

. . . .

It was a short gun, a short gun, not one of the long ones.

(*Id.* at 1205–07.) There was a hooked screen door between Tuech and the man. (*See id.* at 1207.) When he pulled the gun, he pointed it at her stomach. (*See id.*) Tuech stated, "He didn't say a word; he just stared at me and I just stared at him for a couple seconds and I just banged the door shut—as quick as I could." (*Id.*) She

ran into the other part of the house and collapsed on the floor. (*See id.* at 1208.) After about a minute, she called the police. (*See id.*)

Tuech marked State's Exhibit 25 with "LT" for her apartment building (ECF No. 286-2 to -3). (*See* ECF No. 232-1 at 1208.) Her apartment could not be seen in the picture, but she drew an arrow on the exhibit in the general direction of the back door where the man was standing. (*See id.* at 1208–09.) The next day Tuech saw a photograph of the individual in *The Commercial Appeal.* (*See id.* at 1209, 1230.) She identified the photograph that she saw in the newspaper, and it was entered into evidence as State's Exhibit 28 (ECF No. 286-7). (*See* ECF No. 232-1 at 1232–33, 1271–72.)

On cross-examination, Tuech stated that she described the man as very dirty with filthy clothes. (*See id.* at 1236–37.) She said that the person who accosted her kept looking around and appeared nervous. (*See id.* at 1237–38.) She said, "I just figured he was nervous because he kept watching the entranceway like he didn't know who was going to come in there." (*Id.* at 1238.)

(4) Testimony of Velora Hargett

The State's next witness was seventy-five-year-old Velora Hargett. (*See id.* at 1239.) Hargett and Cleopatra Todd belonged to the same church and same Sunday school class; Hargett took Cleopatra Todd to and from church every Sunday morning. (*See id.*) Hargett identified a photograph of Cleopatra and Shipley Todd, which was entered into evidence as State's Exhibit 26 (ECF No. 286-4). (*See* ECF No. 232-1 at 1240.) Hargett testified that Shipley Todd was over ninety years old, and Cleopatra Todd was "somewhere in her 70s." (*Id.*) Hargett picked up Cleopatra Todd at around 8:45 a.m. and took her to church at Madison Heights

United Methodist Church on August 10, 1980. (*See id.* at 1241.) The church was about two miles from the Todds' house. (*See id.* at 1241–42.) They returned to the house about 12:20 or 12:30 p.m. (*See id.* at 1242.) Hargett drove in front of the house and stopped, and Cleopatra Todd got out. (*See id.*) Hargett did not wait for Cleopatra Todd to get in the house. (*See id.* at 1242–43.) Hargett testified that Cleopatra Todd was "alive and well ... so well that in the winter time when my car wouldn't start, I'd walk from my home to her home, and she'd be dressed and ready, we'd walk from there onto the church and back." (*Id.* at 1243.)

(5) Testimony of Gregory W. Moore

The State then presented the testimony of Gregory W. Moore, the Todds' grandson[17] who lived in Union City, Tennessee. (*See id.* at 1246.) The Todds had been married for forty years. (*See id.*) Moore testified that the photograph at State's Exhibit 26 (ECF No. 286–4) truly and accurately portrayed the Todds. (*See* ECF No. 232–1 at 1247.) They lived at 121 North Evergreen. (*See id.*) On August 10, 1980, Moore's mother had tried to contact the Todds, but she could not reach them. (*See id.* at 1247–48.) That Wednesday, Moore called Mr. Adams, a friend that lived across the street from the Todds. (*See id.* at 1248.) Later that afternoon, the police informed Moore that the Todds had been killed. (*See id.*) The police explained that they were going to investigate and that it would be best to wait and go to the police station the following morning. (*See id.*) They went to the police station the next morning. (*See id.*)

Moore last saw the Todds in July in Union City. (*See id.* at 1249.) Shipley Todd, who was ninety-three years old, was "alive and well" and in good health. (*See id.*) Cleopatra Todd was seventy-nine

years old. (*See id.*) Moore was the executor of his grandparents' will, and as a result, he received the long-distance telephone bill. (*See id.* at 1249–50.) The phone bill had a four-minute call to Chicago, Illinois, on August 10, 1980, at 3:24 p.m. (*See id.* at 1250.) Moore identified the phone bill, and it was entered into evidence as State's Exhibit 27 (ECF No. 286–5 to –6). (*See* ECF No. 232–1 at 1250–51.) Moore did not know Gary Bradford Cone or Sue Cone, and to the best of his knowledge, the Todds did not know them either. (*See id.* at 1251.) Moore testified that the Todds would not have any reason to call anyone in Chicago. (*See id.*)

(6) Testimony of Paul Adams

The State called Paul Adams, who lived at 100 North Evergreen, about three lots "[d]iagonally north" of the Todds' home. (*Id.* at 1255.) Adams knew Mrs. Todd well; Mr. Todd did not "mix much with people." (*See id.*) Adams identified the individuals in the photograph at State's Exhibit 26 (ECF No. 286–4) as the Todds. (*See* ECF No. 232–1 at 1256.) In August 1980, Greg Moore called and spoke with Adams's wife. (*See id.* at 1257.) Moore told her that they had not been able to contact the Todds, and he wanted the Adamses to go check on them. (*See id.*) Adams's wife called Mary Maguire, a neighbor who lived about three houses north, and Maguire and her son walked across the street and talked to the Todds' next door neighbor. (*See id.*) Maguire reported back, and Adams called the police. (*See id.* at 1257–58.) Adams told the police "that there was something bad wrong at this house, where the Todds lived. And that we felt like they ought to investigate." (*Id.* at 1258.) The police came to Adams's house, and he told them where the Todds' house was. (*See id.*)

---

**17.** Mrs. Todd was his step-grandmother. (*See* ECF No. 232–1 at 1246.)

The defense did not cross-examine Adams. (*See id.*)

### (7) Testimony of Mary Maguire

The State then called Mary Maguire, who lived at 116 North Evergreen, located across the street and one house over from the Todds. (*See id.* at 1259.) On August 13, 1980, Mrs. Adams called Maguire and asked if she had seen the Todds in the last few days. (*See id.* at 1260.) Maguire said that she could not recall. (*See id.*) Mrs. Adams then said that the Todds' grandson had called and said that the Adamses had called the Todds and had not received an answer. (*See id.*) Mrs. Adams wanted to know if Maguire would go across the street and check on the Todds. (*See id.*) First, Maguire sent her son to ask the girl next door if she had seen the Todds. (*See id.*) The girl said that she "really [didn't] know when [she had] seen them last." (*See id.* at 1261.) Maguire glanced on the Todds' porch and saw two or three newspapers and mail overflowing the mailbox. (*See id.*) Maguire testified:

> And, immediately, I thought this was bad, because usually Mr. Todd would be out on the porch in the afternoon, reading the paper or getting the mail—he would be waiting for the mail. And I thought this was a bad sign. And we both agreed to this. So we went down the driveway between her house and the Todd[s'] house, and we noticed flies swarming all over that side door. Then we went around to the back door, calling to them—and, of course, we didn't get any answer.
>
> . . . .
>
> Well, we had a very uneasy feeling about it. . . .

(*Id.*) Maguire went down to the Adams' house and told them what they had found; Adams tried to call the Todds but got no answer. (*See id.* at 1261.) Adams called the police, and Maguire went back to the Todds' driveway to wait for the police to arrive. (*See id.* at 1262.) The police went in briefly, came out, and waited for the other emergency personnel. (*See id.*)

### (8) Testimony of Steven R. Cole

The State then called Steven R. Cole, uniform patrol officer for the MPD's west precinct, as the next witness. (*See id.* at 1264.) Cole was working from 4:00 p.m. to midnight on August 13, 1980. (*See id.*) He received a complaint call from Adams. (*See id.* at 1265.) When he arrived at 121 North Evergreen, he spoke with complainants Mary Maguire and a Ms. Rasp. (*See id.*) Cole parked in the driveway of 121 North Evergreen and went to the front door and noticed several newspapers on the front porch and mail protruding from the mailbox. (*See id.*) Cole knocked on the door and did not get a reply. (*See id.*) There was a door open on the north side of the house, but the storm door was locked and covered with flies. (*See id.* at 1265–66.) Cole went to the west side or rear of the house, and found a screen door covered with flies. (*See id.* at 1266.) Cole and his partner called inside but did not get a response. (*See id.*) The back door was not locked; the screen door was closed, and the wooden door was open. (*See id.*) When Cole and his partner first went in the house, there was a "real foul odor." (*Id.*) Cole went to the left through the kitchen, where he found a dead woman. (*See id.*)

> She was on her left side with her head facing east, which is the front part of the house, and she had on some type of a white top that was pulled up to—about her breast, had on a girdle and pantyhose, and her body was real swollen and it'd started to burst, it appeared. And she had newspapers laid over the top of her head.

(*Id.*)

Cole went into the living room and found a dead man lying on his back in front of the couch. (*See id.* at 1267.)

He was dead, on his back, and he had some type of a towel—looked like sort of a turban the way the towel was wrapped around his head and it came down to—just past the bridge of his nose, and he had dried up blood coming down both of his arms—Just like the lady, she was in a large puddle of blood, and it was mostly dried up, like they'd been there for a period of time.

(*Id.*)

Cole and his partner back-tracked out of the house, the way they had come in, and tried not to disturb the crime scene. (*See id.*) They called for a lieutenant. (*See id.*) Once the lieutenant arrived, they re-entered the house and checked for other victims and a suspect. (*See id.* at 1267–68.) They did not let anyone in the house except for the investigators. (*See id.* at 1268.) The defense did not cross-examine Cole. (*See id.* at 1270.)

(9) Testimony of Marjorie Todd Moore

Marjorie Todd Moore of Union City, Tennessee, was the next person to testify for the State. (*See id.* at 1273.) Shipley Todd was her father, and Cleopatra Todd was her stepmother. (*See id.*) Moore testified that the last time she saw them was around June 30, 1980. (*See id.* at 1273–74) The last time she spoke with them was Friday, August 8, 1980. (*See id.* at 1274.) She was very close to both of them. (*See id.*) Moore testified that they did not know Gary Bradford Cone, Sue Cone, or anyone in Chicago that the Todds would have called long distance. (*See id.*) Moore had tried to call the Todds "all day long Monday, Tuesday and Wednesday, constantly, at different times of the day, . . . and I tried all times during the day." (*Id.*) She testified that they were both hard of hearing and thought that their phone may not have been ringing or was out of order. (*See id.*) Moore was not successful at reaching the Todds on any of those days. (*See id.* at 1275.) She asked her

son what to do, and he said he would call Adams to see if there was anything wrong with the phone or with the Todds. (*See id.*) Prior to that, Moore had contacted the telephone company in Union City, who contacted the Memphis telephone company. (*See id.*)

Moore testified that her father was ninety-three years old, and her stepmother was seventy-nine years old. (*See id.* at 1276.) Shipley Todd was very hard of hearing, and he had gout. (*See id.*) He was about five feet six inches or five feet seven inches tall and weighed approximately 145 pounds. (*See id.* at 1278.) Cleopatra Todd weighed approximately 150 to 160 pounds. (*See id.*) Moore identified the picture at State's Exhibit 26 (ECF No. 286-4) as her parents. (*See* ECF No. 232–1 at 1278.)

Moore testified about the couple's normal routine on Sunday:

Well, my stepmother went to Sunday School and church every Sunday, barring illness. And—My [D]ad did not go, because he was so hard of hearing that even with a hearing aid he could not hear. And then when she would get home from church, she would prepare their meal, and they would eat. And in a short while, Dad would go to bed on the couch in the living room for a nap, somewhere, I would say, in the neighborhood of 1:00 to 2:00. And then in the afternoons, maybe read the paper, or sit on the porch, as their house was not air-conditioned. And that about covers what they did on Sunday.

(*Id.* at 1276–77.)

Moore testified about how she learned of the Todds' death:

My son came to the restaurant where I was eating, and called me outside, and told me that the Union City police had called and said that Dad and Clee had been killed, and we immediately went to

our place of business where we have two phones and started calling the relatives, and that's about it. (*Id.* at 1277.) [18]

(10) Testimony of Wayne A. Todd

The State called Wayne A. Todd as the next witness. (*See id.* at 1282.) Wayne Todd identified the persons in the photograph at State's Exhibit 26 (ECF No. 286–4) as his grandparents Shipley and Cleopatra Todd. (*See* ECF No. 232–1 at 1282.) Wayne Todd identified their bodies at the county morgue. (*See id.* at 1283.) The defense did not cross-examine Wayne Todd. (*See id.*)

(11) Testimony of James
Spencer Bell, M.D.

The next witness called by the State was James Spencer Bell, M.D., who was employed as an associate professor of pathology at the University of Tennessee Center for the Health Sciences and as the Chief Deputy Shelby County Medical Examiner and Deputy Chief State of Tennessee Medical Examiner. (*See* ECF No. 232–2 at 1284.) Bell was qualified as an expert in forensic pathology. (*See id.* at 1286.) On August 13, 1980, at 6:22 p.m., Bell received a call from the MPD about the homicide at 121 North Evergreen. (*See id.* at 1286–88.) Shortly thereafter, Bell arrived on the scene, identified the first individual that was dead in the living room, and proceeded into the hallway area where a second individual was dead on the floor. (*See id.* at 1287.) Bell then described the cursory examination that he made and his findings:

I also, in examining them, noticed that they were dead and had been dead for some amount of time; noticed that there were wounds about the head of both of them; that the one in the living room area—the male individual on the floor, appeared to have insect larvae apparently around his head area. There were numerous insects, flies, and insect larvae, maggot-like items, on the—and about the premises. There was a strong, foul odor in the room, as well as in the hallway. I noticed that blood had run down the right arm of the female [decedent] lying in the hall. This had run down the arm for several inches—eight or ten inches worth of run, and then had changed directions on the arm to a 90° change of directions; it had run downward and then forward on the arm. I notice that she also had head wounds present[.]

. . . .

It means that the individual was upright when the bleeding occurred to allow it to run down the arm, and then the individual has moved from that initial position, such that now the arm is turned so the blood can change directions and run more toward the ground forward. So, the arm has been in two positions with bleeding occurring. With blood drainage occurring.

. . . .

I also noticed that there was blood on the floor and smear of blood and material on the floor, sort of a greasy material, which is the material that when deceased individuals decompose—sort of the fatty material seeps out and becomes greasy on the floor. This was observed on the floor.

There was apparently some—sort of linen, or sheet-like material, as well as newspapers, sort of under as well as

18. On cross-examination, Dice questioned Moore about contacting the Todds' relatives and a letter from her Aunt Abbey in Silver Springs, Maryland, dated September 2, 1980. (*See* ECF No. 232–1 at 1279–80.) The letter was marked for identification, but not entered as an exhibit. (*See id.*)

slightly on the remains that were lying on the floor in the hallway.

(*Id.* at 1288–89.)

Bell stated that they "had been dead longer than a few minutes, or longer than a few hours, because they had started to undergo decomposition, or autolysis, and the insects were starting to be attracted to them, as well as the odors in the area." (*Id.* at 1290.) Bell testified that the decomposition "suggests to me that the death of these individuals was a period of days, like a day or two or three." (*Id.* at 1292.) Bell noted that the smear of blood on the floor between Cleopatra Todd and the front door indicated that the body had been moved. (*See id.* at 1305–06.)

Bell performed an autopsy on Cleopatra Todd, and the external examination revealed the following:

As I've mentioned before, [an] individual undergoing decomposition who had multiple lacerations and bruises around the head area. These lacerations or skin tears, as well as bruises of the skin, occurred around the face-forehead area, on the back right side of the head, a few on the left side of the head, and numerous ones in the right side of the head. There were also pools of fluid, as well as bruising of the extremities, present.

(*Id.* at 1293.) Bell testified that Cleopatra Todd was five feet four-and-a-half inches tall and 119 pounds. (*See id.* at 1294.) There were numerous lacerations, contusions or bruises to the hands, arms, and fingers. (*See id.*) The right middle finger at the last knuckle joint and the right ring finger were bruised. (*See id.*) There was bruising and pooling of fluid on the back side of the right hand. (*See id.*) These injuries occurred close to the time of death and were consistent with a defensive wound or "someone trying to ward off somebody who is attacking them, or beating upon them, and they attempt to place their hand to protect—either their body,

or their head." (*Id.* at 1294–95.) There was "bruising of the left hand also, in the region of the index finger and knuckle" and "an abrasion and a bruise of the right elbow." (*Id.* at 1295.) The left hand injuries were defensive wounds. (*See id.*)

There were twenty-two wounds, including scalp lacerations and tears, to the head, and also other bruising. (*See id.* at 1295–96.) These wounds "represent[ed] an attempt to subdue the individual, or produce more than subduction, possibly death in the individual." (*Id.* at 1296.) Each wound represented a separate blow. (*See id.*) The wounds were located at the "left forehead, the right forehead, above the right eye, in the back of the head, a few on the left side, and then numerous ones on the right side of the head." (*Id.*)

Bell's internal examination revealed the following:

There was a massive comminuted, multi-fragmented, fracture of the skull on the right side, extending from just behind the right eye, going back to behind the ear to the back side of the head, where the bone was crushed like an eggshell, and had been driven [into] the brain, tearing the covering of the brain, and the brain.

(*Id.*) Bell testified that this injury was the result of multiple blows, "at least 10 in that area." (*Id.* at 1297.) Based on Cleopatra Todd's gastric contents, Bell determined she had been dead "more than a day and less than a month, and less than a week." (*Id.* at 1297–98.)

Bell then testified about his external examination of Shipley Todd:

He was 68–1/2″ tall, and weighed 116 pounds. He also had multiple lacerations to the head, and bruises of the head. He had some lacerations and bruises of the right posterior neck. His head lacerations and bruises consisted of only one laceration of the right side of

the head, about five on the left side of the head, but all the rest of them were in the back of the head, totaling a total of 16, in total, which means that 9 were in the back of the head.

. . . .

He had lacerations of the hands, and fingers, also.

. . . .

. . . The hand wounds—specifically, the right hand included a laceration on the dorsal aspect to these lacerations; the left hand included a laceration of the left middle finger, and sort of turning of the little fingers of both hands.

(*Id.* at 1298–99.) These wounds were consistent with defensive wounds. (*See id.* at 1299.)

Bell's internal examination revealed,

a depressed skull fracture—that means the skull had been shoved in, again, as I've mentioned before, against the brain covering and against the brain, on both the left side and on the right side and on the right back side. This fracturing and breaking of this skull allowed the skull to move into and tear the covering of the brain and produce [hemorrhage] in the brain.

(*Id.* at 1299.) Sixteen blows struck Shipley Todd crushing his skull and driving it into his brain. (*See id.* at 1299–1300.)

The cause of death for both of the Todds was "[m]ultiple blunt trauma to the head." (*Id.* at 1300.) The blunt instruments that were used would be consistent with "something approximately an inch, or so, in diameter, possibly a hammer or possibly the heel of a knife, or a weapon, a gun." (*Id.*)

Bell identified containers where he placed hair from the Todds' heads, and they were admitted into evidence as State's Exhibit 30 (ECF No. 286–13 to –18). (*See* ECF No. 232–2 at 1304.) Bell was excused without cross-examination. (*See id.* at 1306.)

(12) Testimony of Ruth Shreve

The next witness called by the State was Ruth Shreve. (*See* ECF No. 232–2 at 1350.) She testified that in August of 1980, she drove her car to work at Warren Radio Company on 180 South Cooper and parked on the side of the building. (*See id.* at 1350, 1352.) A customer came in on the afternoon of Friday, August 8, 1980, and asked about the missing license plate on Shreve's car. (*See id.* at 1351.) Shreve identified her license plate, and it was admitted into evidence as State's Exhibit 31 (ECF No. 286–19 to –20). (*See* ECF No. 232–2 at 1350–51.) The second day of trial concluded at 5:05 p.m. on April 17, 1982. (*See id.* at 1356.)

3. Trial Day Three: Monday, April 19, 1982, 10:45 a.m. to 6:45 p.m.

a. State's Proof, continued

(1) Testimony of Jimmy Hammers

The third day of trial began at 10:45 a.m. on Monday, April 19, 1982, with the State's presentation of MPD officer Jimmy Hammers of the Violent Crimes Bureau. (*See id.* at 1392.) On August 13, 1980, Hammers received a call to go to 121 North Evergreen. (*See id.* at 1393.) Captain Tommy Smith briefed Hammers and Sergeant B.O. Wheeler on their arrival, and they entered the house through the rear door "as it was open and the front door was locked." (*See id.* at 1393, 1415.) As they started in the back door, Hammers noticed on the north panel "what appeared to [be] a bare footprint." (*Id.* at 1394.) Hammers noticed the broken "eye of a screen hook . . . the little round piece where the screen door hook fastens into and keeps the screen door closed" had been broken from the screen door and was lying on the second step from the top. (*Id.*) Hammers described the scene as he entered the house:

As you entered the back door you enter a small hallway, take—after taking

approximately three or four steps, immediately on your left would be a small bathroom. After looking into the bathroom, observed a sink, commode, a green and white towel on the floor underneath the sink. Observed that there was hair in the sink, hair around on the floor around the commode, also hair on the toilet seat itself, and in the toilet, and also hair in the bathroom sink. Also, there was a bottle of aftershave lotion sitting on the sink, and the top of this—aftershave—was off, which made me think that possibly someone had shaved in this bathroom.

. . . .

After coming out of the bathroom, come back in the hall, walked a few steps where you come to a T-intersection, and on your right was a downstairs—which would have been south, to my right would have been the south side of the house—was a small bedroom, and on the other—the left of that T-intersection, would have been the kitchen.

. . . .

As we entered the bedroom, there was a bed immediately to your left. A dresser. On this bed, we observed a ladies' purse, which the contents had been poured out—or lying on the bed beside the purse. There was a newspaper. There was a ladies' blue dress, and a slip, hanging on the end of the bed. We noticed that in this room—the bedroom, the drawers to the dressers were open. The room gave the appearance that it had been ransacked. There were clothes that had been tossed around, in different places.

. . . .

There was a knife by the purse on the bed. . . .

(*Id.* at 1394–96.)

Hammers described the scene in the kitchen:

After you come out of the bedroom, you'd [have] been immediately facing the kitchen, walk down the hall. As you entered the kitchen, noticed there was a body of an elderly female white lying in the floor, with her head in an eastern direction, her feet [were] pointed in the western direction. She was dressed in a beige and brown dress, which was pulled up around her waist, a white panty girdle, and brown hose. One white strap shoe was on her, and there was one white strap shoe by the refrigerator just before you reach the victim. The victim's face was covered with a newspaper, which we later determined was a Commercial Appeal dated August 8, 1980. The victim was lying in a large pool of blood. There was also flies on the body, around the body. There was a large puddle of body fluid, which had seeped from the body and made the floors very slippery, around the body, and a very strong odor.

. . . .

There was a pantry there, it appeared it had been ransacked. Drawers had been pulled out. Blood on the door leading from the kitchen to the living room was splattered. Also, on the walls of the kitchen, the refrigerator, and a small table.

(*Id.* at 1396–97.)

Hammers described the living room area of the Todds' home:

We left the kitchen, walked through a small entry-way, which would have been in an east direction, into the living room. After entering the living room we noticed on the left—which would have been the north wall—a set of stairs that appeared to be leading up to the second floor. In the center of this room was a couch, with the back of the couch facing north, the front of the couch facing south. And just south of the couch was a coffee table, which had a glass top.

Lying between the coffee table and the couch was a body of an elderly male white. His head was facing a western direction, his feet in the eastern direction. His arms were straight beside him. He was lying on his back. He was dressed in a white undershirt, brown pants, had a pair of brown suspenders on. He was barefooted. He had a white towel wrapped around his face, covering his eyes, which was soaked in blood. There was a large puddle of blood around his head.

. . . .

The couch was covered with a bedspread, and on the east end—the far east end of the couch was a pillow—bed pillow, and on this bed pillow was a considerable amount of blood, and quite a considerable amount of blood on the east end of the couch.

(*Id.* at 1397–98.) Blood had either been smeared or wiped just west of the front door. (*See id.* at 1398–99.) The bodies were not visible from either the front or the back door. (*See id.* at 1399.) Hammers saw blood splatters on the walls and on the curtains to the right and left of the front door and on the north wall where the stairs lead up. (*See id.* at 1399–1400.) There were blood splatters on the wall south of the door, and blood spots on a large mirror. (*See id.* at 1400.) The victim's billfold was lying on a small, black night stand under the mirror; his identification had been pulled out. (*See id.*) A cup and saucer with blood spots on them were on the night stand. (*See id.*)

Hammers and the other officers unlocked the front door and noticed blood on the screen, inside the screen door, and outside the front door, which was wooden and glass. (*See id.*) Newspapers from August 11–13 were on the porch. (*See id.*)

The upstairs of the house appeared to be normal. (*See id.* at 1401.) In the basement, Hammers noticed a cot that someone had slept on or been laying on, and boxes with personal papers and items. (*See id.*) There was also $1070 in cash in a bank envelope in the basement. (*See id.* at 1420.)

Hammers identified a set of thirty-nine photographs which he stated truly and accurately portrayed the scene on August 13, 1980; the photographs were entered into evidence as State's Exhibit 33 (ECF No. 287–1 to –40). (*See* ECF No. 232–2 at 1401–03.) Hammers went through each photograph describing what each photograph depicted as follows:

1. The front view of the two-story white house at 121 North Evergreen;

2. Three newspapers lying on the front porch at the front door of the house;

3. A photo taken from the front door looking into the living room, in a western direction, showing the lawn chair and the ledger book and pad just west of the front door;

4. The back view of the house showing the back door;

5. Another view of the back door and the five steps leading up to the door;

6. What appeared to be a bare footprint just left of the back door;

7. Photograph taken from standing outside on the back steps, or in the backyard, looking into the back door of the house;

8. The ledger book where someone was listing the items that they had purchased at the store, the date they purchased them, and the amount, and part of the lawn chair in the living room at the front door;

9. The front door showing the porch and the living room;

10. The living room showing the couch where the victim (Shipley Todd) was lying or had been sitting, the pillow, and the newspaper;

11. The couch;

12. The back of the couch;

13. The living room taken from the north showing the direction south;

14. The living room showing the male victim, the coffee table, and couch;

15. Part of the male victim's feet and the coffee table;

16. Photograph showing where the male victim was between the couch and the coffee table;

17. Photograph taken from the hallway showing the entrance to the kitchen as one enters from the back;

18. Photograph taken in the living room, in a western direction, showing the entrance from the kitchen to the living room;

19. A portion of the kitchen, along with the female victim's body;

20. Photograph taken from the living room showing the hall entrance into the kitchen where the victim was found;

21. The small bathroom at the rear of the house;

22. The small bathroom showing the location of the sink;

23. The sink showing the hair inside;

24. The commode, showing hair on the floor and around the commode;

25. Photograph showing the commode and the hair;

26. A photograph taken from the hallway looking into the small bathroom, showing the sink and the towel that was on the floor underneath the sink;

27. A photograph taken at the rear of the house as one enters the back door, looking down the hallway, showing a cabinet which had doors open and the drawers pulled out;

28. The bed in the back bedroom, downstairs on the south side of the house, showing a white purse with its contents;

29. The back bedroom showing the bed, the purse, the newspaper, and the blue dress with the white slip hanging on the end of the bed;

30. The back bedroom showing the bed, purse, and a small night table;

31. The back bedroom showing the open chest of drawers;

32. The back bedroom showing the Sunday newspaper, a white purse, a white lacy ladies garment with blood spots on it;

33. The back bedroom showing the television and dresser;

34. The back bedroom showing the night stand on the west side of the bed;

35. The back bedroom showing the television, dresser, and cedarrobe with the doors hanging open;

36. The blood spots on the ceiling in the living room above the mirror and the east wall;

37. The east wall in the living room and the molding with blood spots;

38. The front door taken from inside the house, showing the curtain with blood spots on it; and

39. The living room with a blood smear that had been wiped.

(*Id.* at 1403–08.) [19]

Hammers returned to the Todds' home the following day on August 14, 1980, at

---

**19.** The photographs filed as exhibits do not appear to be in the exact same order as pre-

approximately 10:45 a.m., with Sergeant Holder to meet the crime scene investigators. (*See id.* at 1408, 1415–16.) The following day, he found a closet in the small bathroom that housed the electric meters to the house and several pieces of paper where someone had logged the meter reading each day. (*See id.* at 1408–09.) The last entry was "829" on August 9. (*Id.* at 1409.) Hammers identified two pieces of paper with the meter readings as those he found in the house, and they were entered into evidence as State's Exhibit 34 (ECF No. 287–41 to –45). (*See* ECF No. 232–2 at 1409.)

Hammers testified that there was a set of rubber gloves that looked like they had been used for yard work in one of the drawers of a cabinet in the hallway. (*See id.* at 1410.) Hammers and Holder found a butcher knife in the kitchen sink with blood on it which may have been the murder weapon. (*See id.*) Hammers found more than a dollar in change in Shipley Todd's pocket. (*See id.* at 1420.)

### (2) Testimony of C.J. Harrell

The State called MPD Sergeant C.J. Harrell of the Crime Scene Squad to describe the evidence that was collected at the Todds' house. (*See* ECF No. 232–3 at 1422–23.) Harrell identified a green and white towel collected from the bathroom floor, which was entered as State's Exhibit 35 (ECF No. 287–46 to –48). (*See* ECF No. 232–3 at 1423–24.) He identified a broken screen door hook, which was found at the rear door of the house on the steps. (*See id.* at 1427–28.) The hook was entered into evidence as State's Exhibit 36 (ECF No. 287–49). (*See id.* at 1428.) Harrell identified three newspapers, dated Monday, August 11, 1980; Tuesday, August 12, 1980; and Wednesday, August 13, 1980, and seven pieces of mail from the Todds' mailbox. (*See id.*) Harrell identi-

fied a Norelco electric razor as an item collected from the Todds' bathroom; it was entered into evidence as State's Exhibit 37 (ECF No. 287–50 to –52). (*See* ECF No. 232–3 at 1430.)

Harrell testified that the investigators attempted to process fingerprints that night, but the lighting conditions were very poor. (*See id.* at 1429.) The crime scene investigation was terminated that night due to the lighting conditions. (*See id.*)

On cross-examination, Dice pointed out that Harrell reported that Shipley Todd had personal property including "a brown leather coin purse; one gold Timex man's wristwatch; one key ring, with three keys; one small pocket knife; one white handkerchief; one $2 bill; and $1.53 in change." (*Id.* at 1431–32.)

### (3) Testimony of John Birdsong

The State called John Birdsong of the MPD's Tactical Unit. (*See id.* at 1433.) Birdsong was called to secure the Todds' house and keep anyone from going into the house on August 13, 1980. (*See id.* at 1433–34.) He was there until 11:00 p.m., and then Officer Thomas Dwight Smith of the MPD Tactical Squad came on duty. (*See id.* at 1434, 1437–38.) No one entered after the crime-scene and violent-crimes officers. (*See id.* at 1434–35.) The defense did not cross-examine Birdsong. (*See id.* at 1436.)

### (4) Testimony of Thomas Dwight Smith

The State called Officer Thomas Dwight Smith. (*See id.* at 1437.) Smith testified that he took over the security of the house from Birdsong and stayed until the following day. (*See id.* at 1438.) No one was permitted into the home during that period. (*See id.*) On the morning of August

sented during Hammers's testimony.

14, 1980, Smith turned the home over to the crime-scene officers. (*See id.*)

### (5) Testimony of Joe Sanders

The State called Joe Sanders of the MPD's Crime–Scene Squad. (*See id.* at 1441.) On August 14, 1980, he went to 121 North Evergreen to collect physical evidence, take photographs, and process the scene for fingerprints. (*See id.* at 1442.) Strother presented Sanders with forty-two index cards which Sanders identified as "latent lifts" or fingerprints from the home at 121 North Evergreen. (*Id.* at 1445.) The cards were entered into evidence as State's Exhibit 38 (ECF No. 288–1 to –85). (*See* ECF No. 232–3 at 1445.) Sanders's job was to take the cards and write information on the back. (*See id.* at 1446.) At the end of the investigation, he turned them over to the Latent Fingerprint Section, which then determined whether the prints had any value. (*See id.*)

Sanders identified a group of four photographs, which were entered into evidence as State's Exhibit 39 (ECF No. 289–1 to –4), that portrayed true and accurate conditions in the Todds' home on the morning of August 14, 1980. (*See* ECF No. 232–3 at 1446.) These photographs included a photograph taken in the basement showing an old, metal, military ammunition box. (*See id.* at 1447.) Sanders testified that there was money found in the smaller box inside the ammunition box, and the money was taken out, put on the kitchen table upstairs, and photographed. (ECF No. 289–1 to –3; *see* ECF No. 232–3 at 1447.) There were bank books, statement books, and many papers. (*See* ECF No. 232–3 at 1447–48.) The other photograph was taken in the kitchen depicting potatoes lying on the sink and deteriorating, with a knife beside the potatoes (ECF No. 289–4). (*See* ECF No. 232–3 at 1448.)

Sanders identified a laminated plywood clipboard, two pieces of cardboard with writing on them, one sheet of notebook paper, and one ledger book containing several pieces of paper and a decal that were found lying on the floor in the living room just inside the front door. (*See id.* at 1450–52.) The ledger and clipboard were entered into evidence as State's Exhibit 40 (ECF No. 289–5 to –13). (*See* ECF No. 232–3 at 1451–52.)

A "Camp King" brand pocketknife with its blade open was found lying on the bed in the downstairs bedroom. (*See id.* at 1452.) Another knife with the inscription "Dole Bananas" was found on a small table in the same bedroom against the west wall. (*See id.*) These knives were entered into evidence as State's Exhibit 41 (ECF No. 289–14 to –15). (*See* ECF No. 232–3 at 1452.)

Sanders identified the end of a leather belt, which had been cut from the belt in the back bedroom, lying on the floor in front of the table with the "Dole Banana" knife. (*See id.* at 1453.) The end of the belt was entered into evidence as State's Exhibit 42 (ECF No. 289–16 to –17). (*See* ECF No. 232–3 at 1453.)

Sanders identified a safety razor that was collected from the downstairs bathroom in the medicine cabinet, which was entered into evidence as State's Exhibit 43 (ECF No. 289–18 to –19). (*See* ECF No. 232–3 at 1454.) He identified the kitchen knife from the sink, and it was entered into evidence as State's Exhibit 44 (ECF No. 289–20 to –22). (*See* ECF No. 232–3 at 1455.) He identified a stained sweatguard that was collected from the downstairs bedroom. (*See id.*) The sweatguard was entered into evidence as State's Exhibit 45 (ECF No. 289–23 to –25). (*See* ECF No. 232–3 at 1455.) He identified a white face cloth that was given to him on the scene by Ann Fowler from the toxicology lab. (*See id.* at 1456.) The cloth was entered into evidence as State's Exhibit 46

(ECF No. 290–1 to –3). (*See* ECF No. 232–3 at 1456.)

A section of the rear door from the outer wall of the entrance into the kitchen was presented to Sanders. (*See id.*) He testified that he did not collect or tag the item, but he was familiar with it. (*See id.*) The door section was entered into evidence as State's Exhibit 47 (ECF No. 290–4 to – 6). (*See* ECF No. 232–3 at 1456.) The defense did not cross-examine Sanders. (*See id.* at 1457.)

(6) Testimony of Paulette Sutton

The State called Paulette Sutton, an employee of the University of Tennessee Toxicology Laboratory, Forensic Serology Section, to testify as an expert in the field of Forensic Serology, concerning the classification and identification of body fluids. (*See id.* at 1458–60.) On August 31, 1980, Sutton was asked to go to 121 North Evergreen and examine the premises for trace evidence and body fluids. (*See id.* at 1460.) She arrived at the house around 7 p.m., entered from the back door, and proceeded down a hallway turning to the left into the kitchen and dining room area. (*See id.*) The house was very hot and dimly lit with quite a few flies around. (*See id.* at 1460–61.) She looked "primarily for blood stains [and] any sort of trace evidence which might include hair, or fibers, that looked out of place to us." (*Id.* at 1461.) Sutton testified,

> The first stains that came to our attention were on the front porch outside of the screen door, actually on the porch area. There were multiple, very small— about the size of a pencil lead—red/ brown stains on the porch that appeared at the time to be blood stains. These stains were lifted and taken back to our

laboratory for further processing. There was also an amount of red/brown staining on the door jamb from the front door leading onto the porch. These stains were also lifted onto threads and taken back to our laboratory for analysis.

(*Id.*)

Sutton identified a vial with hair taken from the bathroom sink and the area immediately surrounding the sink in the back bathroom that was collected on August 13. (*See id.* at 1462.) The vial was entered into evidence as State's Exhibit 48 (ECF No. 290–7 to –9). (*See* ECF No. 232–3 at 1462.)

Sutton identified a second vial of hair that was removed from a green and white floral designed towel (State's Exhibit 35 (ECF No. 287–46 to –48)) that was found that night under the bathroom sink. (*See* ECF No. 232–3 at 1462–63.) The vial was entered into evidence as State's Exhibit 49 (ECF No. 290–10 to –13). (*See* ECF No. 232–3 at 1463.)

Sutton testified that darkness prevented them from completing their examination of the house. (*See id.* at 1464.) She testified that they asked the police officers to tag some items from their property room that had blood stains on them and bring them to Sutton's lab. (*See id.*) Sutton returned to the house the next day around 1 p.m. to get another look at the house under better lighting conditions.[20] (*See id.*) They observed a kitchen knife lying on the sink which tested positive for human blood, and they asked that it be tagged and brought to the lab for examination. (*See id.* at 1464–65.)[21] They saw nothing else that day. (*See id.* at 1464.)

---

**20.** Sutton testified that there was probably "nothing over a 30 or a 40 watt bulb" in the house, which was fine for living "but not to look for very small stains." (ECF No. 232–3 at 1476.)

**21.** No further testing could be done because the investigators had used up all of the available stain. (*See id.* at 1465.)

Sutton returned to the house again on August 15 around 1:00 p.m. to try to obtain dry specimens of blood from the victims. (*See id.* at 1465.) The blood specimens taken by Dr. Bell at the morgue were in such decomposition that they could not determine the Todds' original blood type. (*See id.*) A dry specimen was obtained from the couch in the living room for Shipley Todd and from the base of the kitchen steps and the door facing the living room into the kitchen for Cleopatra Todd. (*See id.* at 1466.)

Sutton observed what appeared to be human tissue on the seat of the gray recliner in the living room. (*See id.*) She observed splattered red-brown staining that appeared to be blood in the living room and splatters on the front door and the screen door. (*See id.* at 1467.) They had observed blood stains on the front porch the first night that they were at the house. (*See id.*)

Patterson presented State's Exhibit 33 (ECF No. 287–1 to –40), the group of thirty-nine photographs, to Sutton and asked her to pull out the photographs related to her testimony. (*See* ECF No. 232–3 at 1467–68.) Sutton testified, demonstrating the photographs during her testimony, as follows:

> This photograph is of the back bathroom basin. It's fairly hard to see, but the little dark areas here were the hairs that we observed that night. There's also hair around the toilet bowl in the back bathroom and on the floor. Also, the green and white towel from which the hair was removed is here, in place, under the bathroom basin in this photograph. They were the areas that the two vials of hair were removed from.
>
> This is a shot of the front porch as we observed it the first night. The night of the 13th. Very small red/brown stains that are not obvious in the photograph but were to the eye that night, and these

stains were removed. The portion of the door facing that's shown here—The front door that's showing here, shows a little bit better in this photograph, and there was red/brown staining present on the door jamb. And that stain was lifted on the night of the 13th and taken back to our lab.

> . . . .
>
> On the night of the 13th we did examine the back bedroom, and this is the bedroom as you come through the back door immediately on your right. Across the hall from the bedroom. And on this bed, we observed [a] wash cloth that appeared to have red/brown staining we thought would be blood, on the bed, and also what we call an arm guard, or a dress shield, a lacy type, was present on this bed that night. And we asked the police officers to tag it and bring it to our laboratory.

(*Id.* at 1468–69.) Sutton identified the dress shield (State's Exhibit 45 (ECF No. 289–24 to –25)) and the wash cloth (State's Exhibit 46 (ECF No. 290–2 to –3)) as the two items that she was referring to in the photograph. (*See* ECF No. 232–3 at 1469.)

Sutton pointed out the gray recliner where the human tissue was found, the area of red-brown staining smeared inside the front door, the curtains on the right side of the front door, and the door or wall molding with a splatter red-brown stain traveling in "a definite directional pattern." (*Id.* at 1470–71.) She explained that a "definite pattern" occurs when "blood is slung onto an object-when it's flying through the air and it hits an object it generally leaves a pattern of what we call 'splatter', and it will show the direction of the movement, and can actually show the amount of force that has been applied in some cases." (*Id.* at 1471.) Sutton testified that the splatter was consistent

with at least one blow and subsequent blows:

> The first blow bringing blood to the surface and subsequent blows—either on a hand or a weapon, or whatever, when the blows are being hit, and the weapon's being brought back it's slinging blood off of the end of the weapon onto another area.

(*Id.*) In the photographs, Sutton identified a definite splatter pattern that looked like an exclamation point, and the areas where the blood was lifted to obtain the Todds' blood types. (*See id.* at 1471–72.)

Sutton testified that the blood collected on the front porch and the door jamb of the front door was Type O human blood. (*See id.* at 1473–74.) The sample taken in the kitchen near Cleopatra Todd's body and from the floor molding near the living room and kitchen was also Type O human blood. (*See id.* at 1474–75.) The sample taken from the couch was Type O human blood. (*See id.* at 1475.) The dress shield (State's Exhibit 45 (ECF No. 289–23 to –25) was Type O human blood. (*See* ECF No. 232–3 at 1475–76.) The green and white towel (State's Exhibit 35 (ECF No. 287–46 to –48)) and wash cloth in the bedroom (State's Exhibit 46 (ECF No. 290–1 to –3)), however, had Type AB human blood. (*See* ECF No. 232–3 at 1476.) Sutton testified that only about four percent of the population has Type AB blood, which is the rarest blood type, while about forty-seven percent of the population has Type O blood. (*See id.* at 1476–77.) The defense did not cross-examine Sutton. (*See id.* at 1478.)

(7) Testimony of R.L. Hannah

The State called R.L. Hannah of the MPD's Crime Scene Squad. (*See id.* at 1479.) On August 9, 1980, Hannah was called to 242 Auburndale to check a vehicle for fingerprints. (*See id.* at 1479–82.)

Hannah identified the vehicle in State's Exhibit 2 (ECF No. 284–3) as the car he processed; he took the photograph at Exhibit 2 and a group of nine photographs of the car and its contents, which were entered into evidence as State's Exhibit 50 (ECF No. 290–14 to –23). (*See* ECF No. 232–3 at 1482–83, 1487–88.) Hannah reviewed and described the photographs which depicted shoes, a thermos, items of clothing inside and outside the automobile, money on the driveway, and a holster. (*See id.* at 1484–85.) Hannah took a photograph of the garage at 242 North Auburndale and recovered "spent hulls" in the rear. (*See id.* at 1486.) He identified a photograph of the garage with the bullet holes which was entered as State's Exhibit 51.[22] (*See id.*) Hannah identified six cards with latent fingerprint lifts, which were entered into evidence as State's Exhibit 52 (ECF No. 290–24 to –36). (*See id.* at 1486–87.)

Hannah suffered from heat illness that day and had to leave the scene. (*See id.* at 1485.) On cross-examination, Hannah admitted that the crime-scene report in this case was not as detailed as usual because he became ill. (*See id.* at 1490–91.) Hannah processed most of the outside of the automobile before he had to stop. (*See id.* at 1491.) Another officer tagged the evidence that was shown in the pictures. (*See id.*) Hannah never entered the trunk of the car, but he believed that it was opened before he left. (*See id.* at 1491–92.) He took a photograph of the inside of the vehicle, but he did not open and search the console or the glove compartment. (*See id.* at 1492–93.) Hannah testified that another crime scene officer was supposed to have gone out to the scene later, but he did not know who that person was. (*See id.* at 1491.) Sergeant Ralph L. Roby of the MPD's Violent Crimes Squad took the

---

**22.** State's Exhibit 51 is missing.

items that were in the car. (*See id.* at 1486, 1491, 1494.)

(8) Testimony of Ralph L. Roby

The State then called Ralph Roby. (*See id.* at 1494.)[23] On August 9, 1980, Roby was dispatched to a robbery at Brodnax Jewelry. (*See id.* at 78.) When he got in the car, a chase was underway in the midtown area, so he went to Hawthorne Street in midtown. (*See id.*) John Clark had been shot in the stomach and was lying in the driveway between 224 and 226 Hawthorne and was being tended to by paramedics. (*See id.* at 1496.) Roby went to 242 Auburndale where a police motorcycle was laying in the street. (*See id.*) The suspect's vehicle, a silver Cutlass with Arkansas plates, was parked in the driveway. (*See id.* at 1496, 1501.) Roby was present when Hannah dusted the vehicle for prints. (*See id.* at 1496.)

Roby looked in the vehicle for clothing that had been described in the robbery, particularly "a greenish type suit." (*Id.* at 1496–97.) From outside the car, Roby could see a coat lying on the floorboard behind the driver and a matching pair of pants in the back seat. (*See id.* at 1497.) He identified the clothing at State's Exhibit 6 (ECF No. 284–14 to –15) as the pants and jacket that he removed from the vehicle. (*See* ECF No. 232–3 at 1497.) Roby removed eight watches and thirty-nine rings from the coat pocket, a wallet from inside the breast pocket, and twelve rings from the pants pockets. (*See id.*) The items were laid on the pavement and Hannah dusted them for finger prints. (*See id.*) They were photographed and Roby tagged them. (*See id.* at 1498.)[24] Roby identified the wallet, which was entered into evidence as State's Exhibit 53 (ECF No. 290–37 to –39), and it contained more than $300 when located at the scene. (*See* ECF No. 232–3 at 1498–1500.) He identified a passport that was taken from the car's glove compartment, which was entered into evidence as State's Exhibit 54 (ECF No. 290–40 to –42). (*See* ECF No. 232–3 at 1499–1500.) Roby identified "a tape-type bandage" which he found in the back driver's seat of the car; it was entered into evidence as State's Exhibit 55 (ECF No. 290–43 to –44). (*See* ECF No. 232–3 at 1500.) He identified a Tennessee license plate, No. 1T–2852, which he removed from the floorboard or the inside of the back portion of the car. (*See id.* at 1501.) He identified a FM/AM cassette stereo that was removed from the car; it was entered into evidence as State's Exhibit 56 (ECF No. 291–1 to –3). (*See* ECF No. 232–3 at 1503.)

Roby stated that there was "assorted clothing," potted plants, and hair dryers in the car, and it looked as if someone was living in the car. (*See* State's Exhibit 57, ECF No. 291–5; ECF No. 232–3 at 1502, 1504.)[25] Roby identified several items including a black holster, forty-seven cassette tapes, three glasses cases, one pair of glasses, a road atlas, a headset, an alarm clock, and assorted toiletries that were taken from the car; these items were entered into evidence as State's Exhibit 58 (ECF No. 291–5 to –7). (*See* ECF No. 232–3 at 1504–05.)

Roby identified a bag, tagged with Roby's name, which contained items found in the trunk of the car. (*See id.* at 1505.) The bag contained:

---

**23.** Roby's testimony continued into the fourth day of trial, April 20, 1982. (*See* ECF No. 232–3 at 1522, 1527.)

**24.** The watches and rings were released to Brodnax. (*See* ECF No. 232–3 at 1498.)

**25.** Exhibit 57 is missing. (*See* ECF No. 291 at 1 n. 2.)

four bags of marijuana, it lists the weight on each bag; has fourteen marijuana cigarettes; two marijuana cigarette butts; a Bayer aspirin box with four white pills; three capsules and a quarter of a pill; one pipe; three packs of cigarette paper; two bottles of marijuana seed; one plastic tube with marijuana; and one brass, four-piece, can. (*Id.*) The first bag of marijuana weighed approximately four and three-quarter ounces. (*See id.* at 1551.) The second bag weighed ten and three-quarter ounces. (*See id.*) The third bag weighed two and one-quarter ounces, and the fourth bag weighed approximately five and three-quarter ounces. (*See id.*)

Roby noted that there were two more bags, and the tag said, "[s]ee attached list" for an itemized list of the narcotics in each of the two bags. (*Id.* at 1505–06.) Roby then listed the items that were found in the first bag as follows:

Four vials, 15 milligrams, Morphine Sulfate.

One vial, 15 milligrams, Morphine Sulfate, C II, opened.

Three vials of 50 milligrams of Demerol [Meperidine].

One vial of 50 milligrams, one-half full, Demerol Meperidine.

Four bottles of brown . . . 100 each, 5 milligrams of Dolophine [Hydrochlorine].

One bottle brown, with 65 each, 5 milligrams, [Dolaphine Hydrochloride].

One bottle brown, with 65 each, 5 milligrams, Dolaphine Hydrochloride.

Two vials, 30 milligram, . . . ["INJ"] Codeine S Phosphate.

One bottle, 40 tabs, Percodan.

Thirteen vials, 25 milligrams, Leritine.

One white bottle Seconal Sodium with 113 each.

Two white bottles Seconal Sodium, 100 milligrams, 100 each.

Three bottles Nembutal Sodium, 100 milligrams, 100 each.

Two bottles, 50 milligrams, Nembutal Sodium, 100 each.

One bottle brown, Demerol, 100 tablets, 50 milligram.

One bottle brown, Demerol, 100 milligrams, 82 tablets.

One bottle Seconal Sodium, 50 milligrams, 100 each.

One bottle Seconal Sodium, 50 milligrams, 56 each.

One bottle Tuinol, 200 milligrams, 100 each.

One bottle Tuinol, 200 milligrams, 109 each.

One bottle Amytal Sodium, 65 milligrams, 100 each.

One bottle, 100 milligrams, Tuinal, 100 each.

One bottle, 100 milligrams, Tuinal, 93 each.

One bottle, 30 milligrams, Amytal. 100 each.

One bottle brown, Codeine Sulfate, 30 milligrams, 55 each.

One bottle Anytal, 30 milligrams, 67 each.

One bottle Anytal, 50 milligrams, 32 each.

One large bottle of Percodan.

One bottle, large, Percodan, yellow, 405 tablets.

(*Id.* at 1506–08.)

The second bag had the following contents:

Dexamyl, No. 1, Spansule capsules, 65 milligrams, 3 bottles, 139 capsules.

Dexamyl, No. 2, Spansule capsules, 97 milligrams, 3 bottles, 115 capsules.

Dexamyl tablets, 32 milligrams, two bottles, 208 tablets.

Dexedrine, Spansule, 15 milligrams, 4 bottles, 160 capsules.

Dexedrine, Spansule, 10 milligrams, 5 bottles, 250 capsules.

Dexedrine tablets, 5 milligrams, 4 bottles, 184 tablets.

Dexedrine, Spansule, 5 milligrams, 3 bottles, 135 capsules.

Eskatrol Spansules, 15 milligrams, one bottle, 23 capsules.

Ritalin, HCL tablets, 10 milligram, one bottle, 211 tablets.

Ritalin[,] HCL tablets, 5 milligram, two bottles, 715 tablets.

Ritalin, HCL tablets, 20 milligrams, two bottles, 200 tablets.

Benzedrine tablets, 10 milligrams, one bottle, 102 tablets.

Coumadin tablets, one bottle, one tablet.

Percodan tablets, 19 tablets.

Four empty bottles.

Serpasil tablets, 20 milligrams, one bottle, 7 tablets.

Desoxyn, 10 milligrams, one box, 10 tablets.

Percocet, one box, one tablet.

Two bottles, unidentifiable, crusted tablets.

One plastic container containing assorted empty bottles and paraphernalia.

Preludin tablets, 75 milligrams, one bottle, 50 tablets.

Six packs of insulin syringes, and seven loose insulin syringes.

(*Id.* at 1508–09.) These items were entered into evidence as State's Exhibit 59 (ECF No. 291–8 to –11). (*See* ECF No. 232–3 at 1510–11.)

Roby identified a garment bag that was found in the trunk of the car on Auburndale Street. (*See id.* at 1511.) The drugs that were taken from this garment bag (State's Exhibit 59 (ECF No. 291–9)) were laid on the table at police headquarters. (*See* ECF No. 232–3 at 1511.) Currency in the amount of $1932 was removed from the bag. (*See id.* at 1512.) The bag, including the assorted clothing contained inside, was entered into evidence as State's Exhibit 60 (ECF No. 291–12 to –16). (*See* ECF No. 232–3 at 1512.)

Roby identified a purple bag that was laying on the passenger side front floorboard which contained fourteen dollars and change. (*See id.* at 1512–13.) The purple bag was entered into evidence as State's Exhibit 61 (ECF No. 291–17 to –18). (*See* ECF No. 232–3 at 1513.)

Roby also identified a brown bag that contained a pair of glasses, twenty-one cents, assorted papers that were removed from the car, three sheets with a list of different types of drugs and their amounts initialed by Roby, and car papers. (*See id.* at 1513–14.) The brown bag and assorted papers were entered into evidence as State's Exhibit 62 (ECF No. 291–19 to –26). (*See* ECF No. 232–3 at 1514.)

Roby testified about a long-distance call he received on August 14, 1980, from Sergeant Bangley in Pompano Beach, Florida. (*See id.*) Cone had been arrested in a drug store robbery in Pompano Beach, Florida, and for stealing a car from a woman in the parking lot. (*See id.* at 1563–64.) Shots were exchanged between Cone and the officers in connection with his apprehension. (*See id.* at 1564.)

Roby and Sergeant J.C. Boswell went to Pompano Beach for about five days. (*See id.* at 1515, 1555, 1562.) Roby identified two Polaroid photographs of him and "a male white, Gary Bradford Cone, at the Broward County Jail in Florida" on August 18, 1980, at 7 p.m. (*See id.* at 1515–16.) The two photographs were entered into evidence as State's Exhibit 63 (ECF No. 291–27 to –29). (*See* ECF No. 232–3 at 1516.) Roby testified that Cone had been identified to him as "Gerald Mason Harmon." (*Id.* at 1515.) At trial, Roby identified Cone as the same person that he saw at the Broward County Jail. (*See id.* at

1515–16.) Roby noted that when they recovered the vehicle on Auburndale Street, there was a bandage in the car which appeared to have blood on it. (*See id.* at 1516.) In Florida, Roby noticed that Cone had a "healing type scar" on the left index finger over a cut about three-eighths of one inch in length. (*See id.* at 1516–17.)

Roby identified hair samples that were taken from Cone in Roby's presence at the Broward County Jail. (*See id.* at 1517, 1561–22.)[26] The hair samples were entered into evidence as State's Exhibit 64 (ECF No. 291–30 to –32). (*See* ECF No. 232–3 at 1517.) Roby identified nine cards with finger, palm, and foot prints of Cone that were taken at the Broward County Jail in Roby's presence; the cards were entered into evidence at trial as State's Exhibit 65 (ECF No. 291–33).[27] (*See* ECF No. 232–3 at 1518–19, 1562.)

Roby identified a passport photograph of Cone that he removed from the passport found in the suspect's vehicle. (*See id.* at 1520, 1528–29.) The photograph was entered into evidence as State's Exhibit 66 (ECF No. 291–34 to –35). (*See* ECF No. 232–3 at 1520.) Roby testified that State's Exhibit 28 (ECF No. 286–7) looked like the newspaper photograph of the same passport photograph and that the top right photograph in State's Exhibit 21 (ECF No. 285–16) was Cone's passport photograph. (*See* ECF No. 232–3 at 1529–30.) Roby identified the photograph in State's Exhibit 5 (ECF No. 284–11) as Cone's photograph. (*See* ECF No. 232–3 at 1529.) Roby testified that the middle photograph, Number 6, with a red arrow on State's Exhibit 13 (ECF No. 284–26), was a picture of Cone. (*See* ECF No. 232–3 at 1530–31.) He stated that the photograph with

the red arrow in State's Exhibit 21 (ECF No. 285–16) and the top right photograph at State's Exhibit 4 (ECF No. 284–9) were also Cone. (*See* ECF No. 232–3 at 1531.) He identified a photograph at State's Exhibit 19 (ECF No. 285–10) as Cone's driver's license photograph. (*See* ECF No. 232–3 at 1531–32.)

Roby stated that there were two driver's licenses in the wallet taken from the abandoned Cutlass. (*See id.* at 1532.) There were registration papers including an "Application for State Farm Automobile Insurance" for a 1974 Yamaha motorcycle[28] in the name of Gary Bradford Cone, giving the address at 1031 Eaton, Key West, Florida; a receipt for work completed on the car in Lake Village, Arkansas; a registration certificate for Valeree Cone in Lake Village, Arkansas; and a personal property assessment for Valeree Cone (ECF No. 291–25 to –26). (*See* ECF No. 232–3 at 1533–35.) The total cash found in the car was over $2400 in various denominations, "even down to change." (*Id.* at 1535.)

On cross-examination, Dice presented Roby with State's Exhibit 62, specifically three pieces of paper that Roby discovered on August 11, 1980, and took from a bag in the vehicle (ECF No. 291–20 to –23). (*See* ECF No. 232–3 at 1538–39, 1544.) The word "Speed" was written at the top of the list. (ECF No. 232–3 at 1539.) Also on the list were the following: Preludin; Phenmetrazine RCL, 75 milligrams, pink BI–62 190; Eskatrol 15 milligrams; Diatroxamine Sulfate 25; Benzadrine, "[amphetamine] 10 Sulfate 100"; Ritalin HCL Methylphenidate "5 milligrams yellow 75 ... 10 milligrams green 206," "20 milligrams pink 207"; "Dexadrine" "[Dex-

---

**26.** Detective Basore took the hair samples. (*See* ECF No. 232–3 at 1561–62.)

**27.** Exhibit 65 is missing. (*See* ECF No. 291 at 1 n. 2.)

**28.** The wallet also contained a Certificate of Title for the Yamaha motorcycle issued on May 4, 1980, in Kauai, Hawaii. (*See* ECF No. 232–3 at 1552.)

treamphet]" Sulfate "SKF E19 tablets 5 milligrams 333 ... three bottles of 100, ... 433 each"; Spansule, "brown 5 milligrams SKF–E12, 134," "two bottles of 50, one of 31"; "Clear orange dots, caps, 10 milligrams, E13, 250," "five bottles"; "Same, 15 milligrams, E14, 160, 160, three bottles and ten"; Dexamyl "Sulfate, derivative of barbiturates, green, SK8," which stated "reduces usefulness, excitation, tablet, 5 milligram, 208, 208, two bottles full plus 8"; "SKF D91, green, spansule, ... 10 milligrams, 139, two bottles of 50 plus 39. Cap, green, clear, green and white dots, D–92 ... No. 2, 15 milligrams, 115, 115, two bottles of 50 plus 15." (*Id.* at 1539–41.) The word "Downs" was written at the top of the next page. (*Id.* at 1541.) That list read as follows:

Nembutal, NA, Phenabarbitol, Sodium, 2CH, 100 milligrams, 1 1/2 gram, 200, 200, two bottles.

50 milligrams, 3/4 gram, TCF ... 1/2 orange, 1/2 white, 190, 190 one bottle, 490.

30 milligrams, 1/2 gram, little yellow ones, 80, 80, some really....

Seconal sodium, ... red caps, Lilly, F42, 50 milligrams, ... 156, 156, one bottle of 100, plus 56.

Red caps, S–40, 100 milligrams, 31, 31 two bottles, one of 11.

Tuinal ... NA and Amabutyal, NA caps, S66, three green, 200 milligrams, 209, 209 one bottle of 100....

Amytal, [Amobarbital], yellow, 30 milligrams, 1/2 gram 100, 100, one bottle. Tab, orange, 50 milligrams, 3/4 gram, 32, 32.

Capsule, Lilly F2, blue, 65 milligrams, ... 100, 100, one bottle.

Lilly T32 pink, 100 milligrams, 1/12 ... grams, 67, 67.

*Id.* at 1541–42.

The third page had the word "Narc" at the top. (*Id.* at 1542.) That page had the following list:

Dilaudid, 4 milligrams, yellow, 100, 100, one bottle.

Hydromorphone, HCL ... "The Cadillac", ...

Dolophine, HCL, Methadone, 465, 465, four bottles of 100 ... plus 65.

Lilly, Poison, 5 mg, Lilly, J64, white, tab, ... Leritine, [Anileridine], 25 mg, ampul, 14, 14 1 cc ampul.

Demerol, HCL, [Meperidine], injection, HCL, USP, 30 ml bottle ... 5 30 ml, fifty bottles.

Tabs, 50 mg, D35, white tab, Winthrop, 100, 100, one bottle.

. . . .

Codeine Sulfate, 30 mg, 1/2 gram, 55,55.

Lilly, J10, white tab.

Percodan, yellow, END, 122, 422, 422.

[Axycodone] HCL, 4.5 mg.

[Axycodone Terephthlate], .38mg.

Aspirin, 224 mg.

Caffeine, 32 mg.

Phenacetin, 160 mg.

[Demi]/pink END 123, 40, 40.

Codeine, Phosphate, 30 injection, VSP, 2, ... 20 ML bottles, INJ.

30 mg. 1/2 grain/ml, 20 ml vial.

Morphine Sulfate, 20 ML vial, 20 ml bottles, INJ.

15 INJ, USP, 1.5 mg, 1/4 grain, Morphine Sulfate, [Chloroforomder] ... Derivative, .5, 55.

(*Id.* at 1542–43.)

4. Trial Day Four: Tuesday, April 20, 1982, 10:50 a.m. to 6:00 p.m.

a. State's Proof, continued

(1) Testimony of Merny Miller

On the fourth day of trial, April 20, 1982, Merny Miller, the keeper of records for

Illinois Bell in the metropolitan Chicago area, testified for the State. (*See* ECF No. 232–4 at 1569.) Miller identified Illinois Bell's records of customer Sue Cone's telephone usage for telephone number 312–337–0086. (*See id.* at 1569–70.) These records were entered into evidence as State's Exhibit 67 (ECF No. 291–36 to –39). (*See* ECF No. 232–4 at 1570.) Patterson presented the Todds' phone bill (State's Exhibit 27 (ECF No. 286–6)) to Miller, who testified that Sue Cone's phone number appeared on the bill. (*See* ECF No. 232–4 at 1570–71.)

(2) Testimony of Michael P. Malone

The State called Michael P. Malone, a FBI special agent assigned to the Microscopic Analysis Unit of the FBI Laboratory in Washington, D.C. (*See id.* at 1573.) Malone was specially trained in the examination and comparison of hairs and fibers and was qualified as an expert. (*See id.* at 1573–74, 1576–77.) He identified gray cardboard mailers containing glass microscopic slides submitted to him with "question hairs" taken from a bathroom and a towel. (*Id.* at 1575.) The first cardboard mailer and three slides were entered into evidence as State's Exhibit 68 (ECF No. 291–40 to –42). (*See* ECF No. 232–4 at 1575–76.) A second package of four mailers, with each mailer containing two glass slides, contained known hair samples from the Todds and Cone and was entered in evidence as State's Exhibit 69 (ECF No. 291–43 to –45). (*See* ECF No. 232–4 at 1576.) Malone identified State's Exhibit 30 (ECF No. 286–13 to –18) as the known hair samples from the Todds and testified that the hairs from the containers in the exhibit were removed and placed on slides at State's Exhibit 69 (ECF No. 291–43 to –45). (*See* ECF No. 232–4 at 1585–86.) Malone compared the known hair samples from the Todds against any questionable hairs that may have been removed from the scene. (*See id.* at 1586.) Malone explained:

On State's Exhibit 64—now, these are the known hair samples submitted as being from Mr. Cone—the hairs were removed from these envelopes which are inside this exhibit. These hairs were also placed on glass microscope slides, and these slides would also be in State's Exhibit 69.

. . . .

With respect to State's Exhibits 48 and 49, these were hairs submitted as being from a bathroom and a towel. Again, the hairs were removed from the container—small pillboxes—and placed on the glass microscope slides marked State's Exhibit 68.

. . . .

What I did, basically, was I took the slides—marked State's Exhibit 69—which contained the known head hairs of Mr. Todd, Mrs. Todd, and Mr. Cone. I compared these hairs against the hairs in State's Exhibit 68, which were submitted to me as being from the bathroom and from a towel.

. . . .

Basically, in the hairs from the towel and in the hairs from the bathroom, I found brown head hairs of [C]aucasian origin. Now, these particular head hairs did not originate from either Mr. Todd or Mrs. Todd.

I then compared these head hairs with the head hair sample of Mr. Cone. The hairs on the towel and the hairs on the bathroom microscopically matched the head hairs of Mr. Cone. . . .

(*Id.* at 1587–88.)

On cross-examination, Dice pointed out that the October 2, 1980, report stated "that hairs do not possess enough individual microscopic characteristics to be positively identified as originating from a particular person to the exclusion of all others in his or her race group," and the March

31, 1982, report stated that "hair comparisons do not constitute a basis for positive personal identification." (*Id.* at 1591.) Malone confirmed that the statement was correct because hair is not like a fingerprint. (*See id.*)

### (3) Testimony of Jerry McElrath

The State called Jerry McElrath of the MPD's Latent Fingerprint Squad to testify as an expert in the field of latent fingerprint identification. (*See id.* at 1593–95.) He testified that a latent fingerprint examiner examines fingerprints [29] that are lifted at crime scenes, compares them against known prints, and conducts chemical processing of paper articles. (*See id.* at 1594.) Strother presented McElrath with State's Exhibit 38—latent fingerprints from the Todds' house (ECF No. 288–1 to –85); State's Exhibit 52—latent fingerprints from the 1972 Oldsmobile that was recovered at 242 North Auburndale (ECF No. 290–24 to –36); and State's Exhibit 65— Cone's known fingerprints (ECF No. 291– 33). (*See* ECF No. 232–4 at 1595.) McElrath testified that the latent prints in State's Exhibit 38 from the right side of the doorway from the kitchen to the living room were identical to Cone's known print based on nine identification points. (*See id.* at 1596–1601.) A latent fingerprint from State's Exhibit 52 from the left door glass outside of the car was found to be identical to Cone's known print. (*See id.* at 1601–02.) The defense did not cross-examine the witness. (*See id.* at 1602.)

### (4) Testimony of James L. Holder

The State called James L. Holder, a latent-fingerprint examiner for the MPD, as an expert in the field of fingerprint identification. (*See id.* at 1603–04.) Holder examined latent fingerprints from the Todds' house and compared them to Cone's known fingerprints. (*See id.* at 1605–06.) Holder determined that the latent fingerprints taken from the Todds' house (State's Exhibit 38) that were marked "from kitchen side of door facing from living room" were the same as Cone's right palm print, and the fingerprints on the card marked "from right side of doorway from kitchen to living room" were the same as the right index, right middle, right ring, and right little finger based on at least forty-five points of identification compared with Cone's known fingerprints. (*See id.* at 1606–09.) Holder identified three cards of latent fingerprints lifted from Cone's car (State's Exhibit 52) as the same as Cone's known prints. (*See id.* at 1609–10.) The defense did not cross-examine the witness. (*See id.* at 1612.) The State then rested. (*See id.*)

### b. Defense Proof

### (1) Testimony of Valeree Cone

The defense case began with the testimony of Valeree Cone, Gary Cone's mother. (*See id.* at 1631.) Valeree Cone testified that she had one deceased child and three living children, including Sue Cone of Chicago, Illinois, and Gary Cone. (*See id.* at 1631–32.) Her husband Zack Robert Cone retired from the Army in 1966 and died in October, 1972. (*See id.* at 1632– 33.) Valeree Cone testified that the family was "disciplined." (*Id.* at 1645.) Gary Cone's older brother had always wanted to be in the military; he drowned before Cone went to Vietnam. (*See id.* 1645–46.) Valeree Cone thought that Gary Cone enlisted in the service to please his father. (*See id.* at 1646.)

Valeree Cone testified that Gary Cone served in the army from November 1966

---

**29.** A known fingerprint is taken on a fingerprint card in numbered finger blocks, and the person's name is written on the card. (*See* ECF No. 232–4 at 1594.) A latent fingerprint is left by a person touching an object with the body fluids adhering to the surface and is usually invisible. (*See id.*)

until July 1969. (*See id.* at 1648.) He went to Vietnam for one year and was honorably discharged. (*See id.* at 1633–34.) When Gary Cone returned from Vietnam, he "never kept appointments with friends," was "very uptight," and always in a "hurry." (*Id.* at 1643.) He acted like he was "in another world," had trouble sleeping, and was "[r]estless and sometimes hollering" in his sleep. (*Id.* at 1644.) He talked about "flying the bodies back and him having to help handle them and how terrible it was, and the condition the bodies were in at the time." (*Id.*) Cone did not laugh or cry, but was "just holding it in." (*Id.* at 1645.)

Valeree Cone testified that Gary Cone had not used drugs and did not drink prior to going into the army. (*See id.* at 1647.) After he came home from the army, he received a package of marijuana through the mail from Vietnam. (*See id.*) At the time of trial, Gary Cone had been out of the army "at least twelve" years. (*Id.* at 1649.)

Gary Cone had enrolled in the University of Arkansas at Fayetteville, completed a bachelor's degree, earned high honors with a 3.6 grade point average, and traveled to Europe. (*See id.* at 1649–50.) After "a little vacation" in Europe, Gary Cone was incarcerated in Oklahoma for robbery from 1972 until 1979. (*Id.* at 1650.) His father and his fiancee died while he was in prison. (*See id.* at 1654.)

Valeree Cone testified that when Gary Cone got out of the penitentiary, he told her he had a job, but she was "not sure about that." (*Id.* at 1651.) She testified that Cone was working at a restaurant on the waterfront in Key West, Florida. (*See id.* at 1651–52.) She also testified that Cone visited Chicago for a "very little while" and spent a few weeks in Hawaii.

(*Id.* at 1652.) She stated that she "loaned [Cone] quite a bit of money, . . . because he thought that he was going to be able to enroll in college." (*Id.*) Cone had been admitted to law school at the University of Arkansas and scored in the ninety-sixth percentile on the Law School Admissions Test. (*See id.* at 1652–53.) She also let Cone have her car. (*See id.* at 1653–54.)

(2) Testimony of Dr. Matthew Jaremko

The defense's second witness, Dr. Matthew Jaremko, an expert in clinical psychology, saw Gary Cone on two occasions for approximately six hours. (*See id.* at 1667, 1669.) Jaremko diagnosed Cone with post-traumatic stress disorder (also described by examining counsel as "Vietnam Veterans Syndrome")[30] and substance-abuse disorder. (*See id.* at 1668, 1670.) He testified that the four features of post-traumatic stress disorder are: (1) exposure to the trauma of combat; (2) reliving of the combat trauma; (3) emotional and social distance from society and a large change in value system; and (4) stress-related symptoms such as depression, nervousness, and sleep disorders. (*See id.* at 1671.)

Jaremko testified that post-traumatic stress disorder was "the major cause" for Cone's drug use and the result of Cone "being exposed to the trauma of combat and the continuing trauma that occurred after he came back as a Vietnam veteran from an unpopular war, in which he became disenfranchised from the society at large, causing him a great deal of personal stress, social maladjustment." (*Id.* at 1670–71; *see also id.* at 1688.) Jaremko testified that Cone started using drugs in Vietnam and continued to use them to self-medicate against stress. (*See id.* at 1672.) Cone was never treated for Vietnam Vet-

---

**30.** Jaremko testified that Vietnam Veterans Syndrome had been recognized since May of 1980. (*See* ECF No. 232–4 at 1677–78.)

erans Syndrome or the substance-abuse disorder and continued to suffer from these problems. (*See id.* at 1673–74, 1676, 1686.)

Jaremko concluded that Cone was suffering from mental illness in August 1980, when Cleopatra and Shipley Todd were murdered, and that he was incapable of conforming his conduct to the requirements of the law. (*See id.* at 1674.) Jaremko could not say that Cone's mental illness prevented him from knowing the wrongfulness of his conduct. (*See id.* at 1675.) Jaremko testified that Cone showed remorse by saying "that he was very sorry that that happened." (*Id.* at 1675; *see also id.* at 1680.)

On cross-examination, Patterson pointed out that Jaremko was not licensed "in any capacity" in the State of Tennessee. (*Id.* at 1679.) Jaremko's opinion was based on Cone's representations, the interview, information from Dr. Lipman about Cone's drug usage, and psychological testing. (*See id.* at 1679, 1689.) Jaremko testified that Cone described the murders in general terms:

> He described that he was at their house with the agenda of getting cleaned up, getting fed, so that he could flee the area. And in the course of his time there they ceased to cooperate with him, and he started to try to control them physically to cooperate, and that's all the detail I have. He has no more recollection of specifics after that.
>
> . . . .
>
> They became frightened, and that was not what he wanted them [to] do.

(*Id.* at 1681.) Jaremko was aware of Cone's "honorable performance" in college, but not of the fact that he had been accepted to law school. (*Id.* at 1682–83.) Jaremko testified that Cone's values had changed, where he now valued "humanistic oriented values" like kindness more than "achievement oriented values; work, suc-

cess, discipline, money, and so forth." (*Id.* at 1685.) He stated that smart people "can have disorders—psychiatric and psychological disorders." (*Id.* at 1687.) The fourth day of trial ended at 6:00 p.m. (*See id.* at 1692.)

### 5. Trial Day Five: Wednesday, April 21, 1982, 10:35 a.m. to 9:00 p.m.

#### a. Defense Proof, continued

##### (1) Testimony of Jonathan J. Lipman, Ph.D.

The fifth day of trial began at 10:35 a.m. on April 21, 1982. (*See id.*) The defense's third witness, Jonathan J. Lipman, Ph.D., a neuropharmacologist, was qualified as an expert on the effects of drugs on the human body. (*See* ECF No. 232–5 at 1715, 1717, 1721.) Lipman interviewed Cone during his incarceration in 1982, and created a history of Cone's drug use beginning at the age of eighteen. (*See id.* at 1722–23, 1761, 1777.) He concluded that Cone was "a polydrug user" and that his principal drug was amphetamine in various forms, including cocaine. (*Id.* at 1723.) Cone combined his use of amphetamines with opiates, which are morphine-type drugs, to reduce anxiety. (*See id.*) Lipman ascertained that Cone's first drug exposure was in 1966, when he was introduced to hashish while in the army in Germany. (*See id.* at 1724.) In Vietnam, Cone was introduced to opium, which contains morphine, and amphetamine. (*See id.*) Cone was issued amphetamine for fifty-three consecutive nights while on guard in Vietnam. (*See id.*) He continued to use drugs while in college from 1969 to 1972, with his use becoming particularly heavy towards graduation. (*See id.* at 1725.)

While in prison in Oklahoma, Cone's drug use was extremely sporadic. (*See id.* at 1726.) He discovered heroin, and his amphetamine use "broadened and included

other types of [amphetamines], such as Preludin, Desoxyn" or methamphetamine, which is "probably a significant development as regards his escalating drug usage." (*Id.*) He also started injecting opiates and amphetamines. (*See id.*)

Lipman testified that the most potent opiate given by injection was heroin, and the most potent amphetamine given by injection was methamphetamine. (*See id.*) He stated,

> With methamphetamine, the effect of the rush is profound. The usual feeling is[,] on pressing that plunger, where has this been all my life? It isn't something that one can forget. And methamphetamine is the most potent of this class. Because of its ability to very readily enter the brain immediately.

(*Id.* at 1726–27.) Cone's "drug of choice" was Desoxyn—methamphetamine. (*Id.* at 1728.)

After Cone's release from prison around December 1979, Cone was an addict and robbing pharmacies to obtain drugs. (*See id.* at 1729.) He was taking amphetamines and interspersing them with shots of Demerol to "maintain a state of normality." (*Id.* at 1731–32; *see also id.* at 1734, 1743–44.) Lipman ascertained that Cone was taking four shots of methamphetamine in the morning followed shortly by a Demerol injection to take away the paranoid symptoms of the amphetamine. (*See id.* at 1735–36, 1743.) Cone was "also taking Preludin, Phenmetrazine, which is an amphetamine type, by injection, solubilizing those tablets and capsules." (*Id.* at 1734.) "[H]e was also taking Eskatrol and Dextroamphetamine, and a host of other drugs," although on a more sporadic basis. (*Id.*) Lipman testified,

> What I was trying to ascertain was what was his typical pattern at that time. And by means of this visual analogue—Just very simply, I draw a clock. And this is 6 in the morning, and this is 6 in the evening. This is noon, and this is midnight. And I asked him, in December 1979, what sort of drugs and what sort of doses were you typically taking? And I determined that he was taking 15 milligram tablets, as I described, solubilizing them in water, and using those as four injection volumes in the morning. He would rise at approximately 8 A.M. and he would immediately take one injection of Desoxyn. Now, that is equivalent to 56 milligram, conservatively, of methamphetamine, which is rather a large dose. A few minutes thereafter, he would inject 50 milligram– 1 cc. of a 5% solution of Demerol. He wouldn't get up until he'd taken this Desoxyn. He probably—He described he didn't have the strength. Within the hour, the effect of the Desoxyn and the ameliorating effect of the Demerol [would begin] to wear off, he would administer another injection, another 56 milligram, if you assume that it is conservatively one-quarter of that solution. Followed again, twenty minutes later approximately, by the 50 milligram Demerol, 1 cc. dose of a 5% solution. And he would do this again, and again. He would do it four times in the morning. . . .

> In the afternoon—and remembering this is December of 1979, this is when he gets out of jail, he would do, in the afternoon, a very similar thing—excepting—and he would have to solubilize another ten to fifteen tablets—make up another solution—and inject one-fourth shortly after 1 p.m., and again shortly after that, and again shortly after that. Interspersed with these, he would inject the Demerol to reduce the effects of the hyper-vigilance and anxiety which the amphetamine produces.

> In the evening, he would inject more Desoxyn, and immediately more Demerol—or immediately thereafter more

Demerol. And, thereafter, through the evening he would inject only Demerol.... Toward midnight, he would be taking only Demerol; and thereafter, he would sleep.

(*Id.* at 1734–36.)

Lipman described Cone's drug intake as "ferociously large doses" and found that it was astonishing that Cone could sleep between midnight and 8 a.m. (*Id.* at 1736.) Lipman stated, "I could not survive one of these amphetamine doses.... Well, one of those injections and I wouldn't sleep for days." (*Id.* at 1737.) Lipman determined that Cone must be tolerant because he had been sleeping and taking such large doses to function. (*See id.*)

Cone had "a co-dependence upon and between the two drugs." (*Id.* at 1743.) Lipman testified about the increase in Cone's use by April 1980:

Previously, he had taken ten—fifteen, usually fifteen Desoxyn, yellow 15 milligram tablets, and solubilized them in water and injected it as four injections. By April of 1980, he was taking that solution and using it in two injections. His tolerance had gone to the level where he required twice as much to get out of bed in the morning. This was large, but this is rather horrific. It's not unheard of. And certainly I've heard of higher doses being used by speed freaks. But this is a chronic case, this is not a one-week binge. This is between December '79 and April, 1980.

(*Id.* at 1745.) By April 1980, Cone's "drug pattern had changed completely." (*Id.*) He was not sleeping anymore, and he was escalating the Demerol doses in the evening so he could "doze." (*Id.* at 1745–47.) He was using the drugs to keep going, "[n]ot necessarily to keep a normal, healthy routine." (*Id.* at 1747.)

In June 1980, Cone went to Hawaii and continued this pattern of drug use. (*See id.* at 1747–48.) He described a cocaine binge in which he consumed two-thirds of an ounce of cocaine by intravenous injection. (*See id.* at 1748.) Cone described having the feeling of "something crawling under your skin," also known as "formication hallucinosis" or "tactile hallucinations." (*Id.* at 1748–49, 1851.) Lipman testified that Cone had "pervading paranoia, fear, with insight" and noted, in particular, one incident where Cone held a gun while on a deserted beach where he was injecting cocaine, which is very much like amphetamine. (*Id.* at 1748–49.) Cone told Lipman, "There were people after me, I thought, but I had no reason to think so. It was irrational." (*Id.* at 1752.) Lipman attributed this paranoia—overwhelming and unreasonable fear—to a chronic amphetamine toxicity state. (*See id.* at 1851–52.)

Cone continued with this drug pattern until August 1980, and at some point, he began taking amphetamine pills in addition to the injections. (*See id.* at 1750–51.) Lipman also described a "speed binge" that Cone had at a Holiday Inn in Fayetteville, Arkansas, where he was injecting drugs at two-hour intervals for two days. (*Id.* at 1751–52.)

Lipman testified about the difference between acute and chronic amphetamine psychosis and determined that Cone had chronic amphetamine psychosis in August 1980. (*See id.* at 1738–40, 1758.) Chronic amphetamine psychosis is due to large doses of amphetamines being taken over a long time. (*See id.* at 1742–43.) Lipman testified that chronic amphetamine psychosis was a mental illness that could prevent Cone from knowing the wrongfulness of an act and render him substantially incapable of conforming his conduct to the law. (*See id.* at 1758.) He stated that in the first twenty-four hours of withdrawal, in addition to physical symptoms of weakness,

Cone "should lose his mind." (*See id.* at 2490–91.)

Dice presented Lipman with State's Exhibit 59 (ECF No. 291–8 to –11), two lists of drugs. (*See* ECF No. 232–5 at 1759.) Lipman testified that the drugs were mainly amphetamines, opiates, or barbiturates. (*See id.* at 1759–60.) After reviewing State's Exhibit 62 (ECF No. 291–19 to –26), Lipman testified that the list labeled "Downs" was full of barbiturates. (*See* ECF No. 232–5 at 1761.) The list labeled "Speed" was full of amphetamines. (*See id.*) The list labeled "Narc" was full of opiates. (*See id.*)

On cross-examination, Lipman testified that he was not a physician. (*See id.* at 1768.) Although Lipman had been trained in psychology, he was not a psychologist and had no degrees in this country in psychology, psychiatry or the treatment of mental illness. (*See id.* at 1768, 1773–74, 1777.) [31] His only licenses were a Drug Enforcement Administration license for Schedule I through IV drugs which permitted him to work with, possess, and use drugs in research and a license from the State of Tennessee to possess and use drugs in research. (*See id.* at 1768–69, 1772.) He could administer drugs to people "[f]or approved experimental purposes." (*Id.* at 1769.) He noted that Cone was his "subject" and that he did not treat him. (*Id.* at 1773.)

Lipman's conclusions were based solely on Cone's representations about the "use of drugs, the duration of the time, the method, the route, and the symptoms that resulted." (*Id.* at 1781–82.) Lipman stated that his conclusions would differ if the dose, time, and intervals of use were different than what Cone described. (*See id.* at 1781–84, 1846–47.) Lipman testified that Cone had a great deal of familiarity

about the extraction of drugs in tablet forms into solution, but he was less sophisticated about symptoms. (*See id.* at 1847.) With regard to the lists of drugs presented at trial, Lipman testified that there were numerous drugs on those lists that Cone did not use and had stated that he did not like. (*See id.*) The defense rested after Lipman's testimony. (*See id.* at 1867.)

b. State's Rebuttal

(1) Testimony of Ilene Blankman

On rebuttal, Ilene Blankman, Cone's friend and a former marijuana user and heroin addict, testified that from her personal experience, she could recognize symptoms of drug use. (*See* ECF No. 232–6 at 1870–73.) She worked for the State of Florida counseling juvenile delinquents, and through her work, she came into contact with people with drug problems. (*See id.* at 1871.) She saw Cone over a period of time from March through August of 1980, in Key West, Florida. (*See id.* at 1873–74, 1900.) She had a personal policy of trying to stay away from people who used drugs because she had been rehabilitated and drug-free for ten years. (*See id.* at 1871, 1874.) To the best of Blankman's knowledge, Cone was not on drugs during this period of time. (*See id.* at 1875.) Blankman had seen Cone with his shirt off and without long trousers, and she did not see any needle, or "track," marks. (*See id.*) She never saw him acting paranoid. (*See id.* at 1876.) During the time that Cone was at Blankman's home in August 1980, he did not scream, yell, or hallucinate. (*See id.* at 1882.) He did not act unusual. (*See id.* at 1883.) She did not see Cone use any drugs or see him with drugs in her home. (*See id.*) He was not "out of his mind." (*Id.*) Blankman said, "That's why I'm

---

**31.** Lipman had an advanced-level certificate in psychology from Kitson College of Science in England and four years training and practice as a drug counselor at Hatfield Polytechnic. (*See* ECF No. 232–5 at 1773–74.)

shocked that I'm here [testifying], because Gary has always been very docile and kind." (*Id.*)

Blankman testified that sometime between 1:00 a.m. and 3:00 a.m. on Tuesday, August 12, 1980, she was sleeping, and her dog was barking. (*See id.* at 1877.) She went to the porch to see why the dog was barking and found Cone on the porch laying on the sofa. (*See id.*) He spent the night at Blankman's house, and the two of them shared Blankman's bed. (*See id.*) She did not see any track marks on Cone that night. (*See id.*)

The next morning, Cone stated that he needed identification because he had lost his wallet. (*See id.* at 1880.) Blankman and Cone called the driver's license bureau to find out what Cone needed in order to get another license. (*See id.*) The driver's license bureau told Cone that he needed a birth certificate, a voter's registration card, or a previous license. (*See id.* at 1881.) Cone obtained a new voter's registration card. (*See id.*) Cone studied the booklet for the driver's license test at Blankman's house, and then went to take the test. (*See id.* at 1881–82.) He used the name "Gerald Mason Harmon" and gave a Key West address when he took the test. (*See id.* at 1881–85; 1919.) After taking the test, Blankman and Cone returned to the apartment. (*See id.* at 1882.) Cone had the use of Blankman's bicycle and her car, and went out that afternoon. (*See id.*) He returned that evening and spent the night. (*See id.*)

Later, Cone called Blankman from jail in Fort Lauderdale and asked her to send him "some clothing and some money." (*See id.* at 1884.) She did not respond to the request. (*See id.*)

On cross-examination, Dice pointed out that Blankman had been arrested for drug possession in Baltimore, Maryland, and re-

ceived probation and rehabilitation. (*See id.* at 1893.) She also admitted she had been a methadone user. (*See id.* at 1890.) She testified that her statement to the police was "everything [she] knew at that time" about Cone. (*See id.* at 1896.) Blankman said that when she was questioned by the police, she did not say anything about spending the night in bed with Cone. (*See id.* at 1896–98.) She testified that she told Roby that Cone was "now a friend, and might have been a boyfriend." (*Id.* at 1898–99.) Blankman denied that she drove Cone to Pompano Beach knowing that he was going there for a robbery. (*See id.* at 1902–03.) The fifth day of trial ended at 9:00 p.m. (*See id.* at 1909.)

6. Trial Day Six: Thursday, April 22, 1982, 8:35 a.m. to 7:55 p.m.

a. State's Rebuttal, continued

(1) Testimony of Eugene Flynn

The sixth day of trial began at 8:35 a.m. on Thursday, April 22, 1982. (*See id.* at 1909–10.) The State re-called FBI Agent Eugene Flynn, who had been sworn in the previous night. (*See id.*) Flynn testified that on August 14, 1980, at 2:15 p.m., he went to the Broward County Jail in Pompano Beach, Florida, to see Cone, who was in jail under the name of Gerald Harmon, to establish his identity. (*See id.* at 1911.) [32] Flynn told Cone who he was and why he was there, showed Cone his FBI credentials, and advised Cone of his rights. (*See id.* at 1911–12.) Flynn allowed Cone to review a copy of the booking sheet. (*See id.* at 1912.) Flynn asked Cone to "relate his itinerary—for that past week or so—and specifically concerning a shooting of a police officer in Memphis, Tennessee, and a robbery of a jewelry store." (*Id.*) Flynn testified that Cone "admitted to shooting the police officer and robbing the jewelry store" because he could be "posi-

---

**32.** Flynn also saw Cone on August 15, 1980.

(*See* ECF No. 232–6 at 1922.)

tively identified by witnesses" and "by property that he abandoned· after the crimes." (*Id.* at 1912–13.) Cone denied knowing anything about an elderly couple in Memphis and said he did not commit the murders. (*See id.* at 1921.)

Cone told Flynn that he did not have any physical or mental problems, except for a "slight cold" and "slight" drug withdrawal symptoms. (*See id.* at 1915, 1919–20.) Cone said he did not need a doctor or medication. (*See id.* at 1920.) He admitted to sniffing cocaine and using Dilaudid and Demerol. (*See id.* at 1916.) He seemed aware of his surroundings; he realized that he was in jail in Florida, had been brought before a magistrate, and arrested for a crime in Pompano Beach. (*See id.* at 1920.)

Cone's itinerary, as explained to Flynn, was:

> He traveled from Arkansas to Memphis, Tennessee, and from Memphis, Tennessee, just beyond, the Saturday before the interview, the 9th of August; and then on the following day, a Sunday, he traveled from Memphis, Tennessee, to Birmingham, Alabama, to Atlanta, Georgia; and then to Miami, Florida, and ultimately Key West, Florida. He then returned to Miami, Fort Lauderdale, and then to Pompano, Florida.

(*Id.* at 1917.) Cone purchased clothes in Birmingham. (*See id.* at 1918.) He purchased disposable razor blades at the airport in Miami, Florida, and shaved his beard there. (*See id.*) He flew on an Air Florida flight at 7:55 p.m. on August 11, 1980, and arrived at Key West, where he stayed with Blankman. (*See id.* at 1918–19.) The following day, August 12, 1980, Cone obtained a voter's registration card and a Florida driver's license in the name of Gerald Harmon with an address of 1015 Angela Street, Key West, Florida. (*See id.* at 1919, 1925.) Cone told Flynn that he did not have any memory lapses or blackouts during the time period from August 9–14, 1980. (*See id.* at 1919.) Cone admitted that he assumed the name "Harmon" to change his identity to avoid detection and attempted to negotiate a guilty plea in exchange for a fifteen-year sentence for the jewelry store robbery and shooting of the police officer. (*See id.* at 1920–21.)

Flynn did not believe from his observations that Cone suffered any mental disease or defect. (*See id.* at 1923–24.) Flynn believed that Cone was capable of understanding the nature of his actions and the requirements of the law and could conform his conduct to the law. (*See id.* at 1924.) Flynn testified that Cone was not having nightmares, "hollering and screaming," or acting as though he were out of his mind on the two days that Flynn saw him. (*See id.* at 1937.)

(2) Testimony of Ralph L. Roby

On rebuttal, Roby testified that he saw Cone on two occasions in Florida and described his physical condition:

Q. I'll ask you whether or not, in what state of dress was he when you observed him?

A. Okay, that would have been on the 18th when we were taking the hair samples from Mr. Cone. We stripped him, down, he was nude. We took pubic hair, hair from the arms, chest, beard, head.

Q. And you got a good look at his total body. Is that correct?

A. We did.

Q. Did you observe any needle marks on his body?

A. None whatsoever.

(*Id.* at 1939.) On cross-examination, Roby admitted that Blankman's statement about Cone not having needle marks was not in the report. (*See id.* at 1943.) Roby said that he never told Blankman to tell him "in detail everything that happened" between

her and Cone. (*Id.* at 1944.) Roby was "sure there [were] things that happened that we didn't bring up." (*Id.*) Roby admitted that he did not make any remarks in his statements about Cone not having needle marks on his arm, but Roby stated that he physically examined Cone in jail. (*See id.* at 1945.)

### (3) Testimony of Ben Bursten

On rebuttal, Ben Bursten, a psychiatrist on the forensic team at the Midtown Mental Health Center, testified regarding his examination of Cone at the request of the trial court on January 20, 1982. (*See id.* at 1954–55.) In that examination, Bursten took a social history, concentrating on the time period at issue in the case and also went further back into Cone's past to elicit relevant facts from his background. (*See id.* at 1955.) Bursten asked Cone what he did in the army. (*See id.*) Cone did not indicate that he saw combat in Vietnam, but he did talk about dead bodies. (*See id.* at 1956, 1964.)

Bursten was familiar with post-traumatic stress disorder and Vietnam Veterans Syndrome, but he did not find any evidence that Cone had either of those conditions:

> I found nothing in the story, as I got it, to in any significant way support a finding of the delayed stress reaction, or the Vietnam stress reaction. There were some things which might conceivably be construed that way, but it's the kind of symptom—or syndrome, if you will, where you have to put everything together. And in putting everything together, I can say that I don't—I don't have a good case for calling this—Mr. Cone as suffering from the Vietnam stress syndrome.

(*Id.* at 1956.)

Bursten discussed Cone's amphetamine use. (*See id.* at 1956, 1964.) Assuming everything Cone told Bursten about his drug use was true, Bursten did not find that Cone suffered any mental disease or defect, that he was unable to perceive the wrongfulness of his conduct, or that he was unable to conform his conduct to the requirements of the law on August 9–10, 1980. (*See id.* at 1957.) Regarding intravenous drug users, Bursten noted that addicts can inject themselves in different areas of the body and that four or five injections may not leave needle tracks. (*See id.* at 1966.) Bursten stated that the track marks would be hard to hide, however, if someone was injecting drugs intravenously for months, six to ten times a day. (*See id.* at 1968.) Bursten also testified that he was "acquainted with what is called amphetamine psychosis." (*Id.* at 1966–67.)

### (4) Testimony of John Robert Hutson

The State then called John Robert Hutson, a clinical psychologist and the clinical director of Midtown Mental Health Center, who had examined Cone at the request of the trial court. (*See id.* at 1978–79.) Hutson saw Cone on two occasions on January 18, and February 10, 1982, and was part of the forensic evaluation team. (*See id.* at 1981.) Hutson obtained a social history and pursued the history of drug abuse, Cone's military involvement, his previous criminal record, psychiatric care, and medical care. (*See id.* at 1981–82.) Hutson reviewed investigative reports and witnesses' descriptions of what had transpired during the crimes with a particular interest in Cone's behavior, verbalizations, and conversations. (*See id.* at 1982.) Hutson reviewed psychiatric reports from Florida. (*See id.*) He reviewed the drug history that Cone reported to him, but he could corroborate "very little" of that history. (*Id.* at 1982–83.) Hutson did not form an opinion at the time about whether Cone suffered Vietnam Veteran's Syndrome or post-traumatic stress syndrome "primarily because I *didn't* think he did

suffer from it." (*Id.* at 1982.) Hutson's opinion was that on August 9–10, 1980, Cone did not suffer mental illness or defect, did not lack the ability to appreciate the wrongfulness of his conduct, and could conform his conduct to the requirements of the law. (*See id.* at 1983.)

The State rested its rebuttal, and there was no sur-rebuttal. (*See id.* at 1986.)

b. Guilt–Phase Closing Arguments [33]

Closing arguments were heard on April 22, 1982. (*See* ECF No. 232–7 at ii.) Patterson summarized the evidence for the State:

I believe the proof is that [Cone] got out of prison in November of 1979[,] from his own witnesses in his behalf, and the proof shows that he was back in custody on August 13, 1980. Now, here's a fellow that is able to go to Hawaii, and apparently not work—as I call work. I'm talking about getting up every morning and putting on your clothes and going to some job where you are productive. Has a passport. Why would he need a passport? I don't need a passport to come to work. Goes to Key West, Florida. Has an automobile that—I've got a '73 automobile. How does he do all this? I'm not trying to be absurd, but he says he's a drug addict. I say [baloney]. He's a drug seller. Doesn't the proof show that? Well, let's see what we found in this car.—

MR. DICE: I want to object, if Your Honor please, for the record.

MR. PATTERSON: Let's see what—

THE COURT: Excuse me.

MR. DICE: Not indicted. Not charged. Not one piece of evidence.

THE COURT: Yes, I'm, going to sustain the [objection] to any argument along the line of drug selling, General. I think that's improper argument.

MR. PATTERSON: For a point of clarification, I can argue an inference from the fact, can't I?

THE COURT: Yes, but you can't argue the inference from the fact that someone has been violating the law by selling drugs, I think, General. So, I'm going to have to sustain the objection to that.

(*Id.* at 2014–15.)

Patterson switched focus to what items were found in the car:

What was in that car? You have the benefit of what was in that car. Sure, he had a drug store in that car. What else did he have? I believe Sergeant Roby said that he had $2,400 and some odd cents in American currency. Did he get it from working? I submit to you he did not. In addition, in that car, he had the papers of where he'd owned a motorcycle in Hawaii. I'm assuming they don't give motorcycles away in Hawaii, I assume you have to buy that. Some of you may know how much a motorcycle might cost in the United States. But I submit to you it costs money. . . .

(*Id.* at 2016.)

Patterson addressed the value of Lipman's testimony:

But I submit to you when you were listening to Doctor—what's his name, the pharmacologist—couldn't even write a prescription. They bring him in here as an expert and submit to you—Excuse the expression, "That dog don't hunt." Look to the facts of what Mr. Cone did on Saturday and Sunday to go to his mental attitude. He wasn't drug crazy.

33. The closing arguments outlined here are limited to issues relevant to the arguments related to Cone's mental state and drug use.

He is a robber and a killer. Simple as that. Nothing complicated about this.

He robbed Brodnax. He knew what he was doing when he did it. He tried to avoid the police. And he did a pretty good job of it. Got all the way to Key West, Florida, within a period of forty-eight hours. Doesn't that show a pretty good mental process?

Then you have this pharmacologist who sees him a year and a half later, and he says: why, this fellow is drug crazy. What did the people say that were near him at the time? They didn't see any indications of anything like that. That's their theory. I'm not asking you to rely upon theories.

Look at the cold, hard facts, and you will find this....

(*Id.* at 2023–24.)

Dice began the defense's closing argument stating,

[N]othing that John Dice has to say or April Ferguson has to say, nor General Strother nor General Patterson, is evidence. And each and every one of you promised that you would hold me to that standard. So, I ask you to do that, again. And, in fairness, I ask you to hold the State to the same standard.

(*Id.* at 2030.)[34] Dice addressed the issue of Cone's sanity.

Now, we're discussing here an issue of sanity. We're discussing here whether or not a human mind has been affected so much by something in that person's life which cause[s] you to view his actions as those of either the deliberate or cool or premeditated person, or would they cause you to view his actions—and each and every one of you promised me that you would look at the whole man in this lawsuit—as a person who is out of control under the standard of the law as

His Honor, Judge Beasley, will give it to you.

(*Id.* at 2032–33.)

Dice addressed Cone's Vietnam service and the effect it had on him:

I put his mother on the stand, and she testified my boy was gone for a year, and he was back and he was changed. And he had nightmares, and he talked about body bags and bringing back the remains of his fellow soldiers. And Dr. Bursten talked about body bags.

But, you see, there's something else that Dr. Bursten didn't talk about. The State asked Dr. Bursten ["]are you an expert in Vietnam Veterans Syndrome?["] And he didn't say, ["Y]es, I am.["] He simply said that he had analyzed my client in that regard and he didn't feel it was applicable. Then he also said something that was extremely strange about that. He said, ["]I never asked him about his role in combat.["]

And, you see—I ask each and every one of you, how can a doctor form an opinion as to what a man suffered under combat if he doesn't ask him about it? You see?

. . . .

Well, you see, there's only been one specialist in the treatment of Vietnam veterans in this courtroom, a doctor named Matthew Jaremko. And that's all....

You see, the [uncontroverted] truth is that he's employed here in Tennessee at the Vietnam Veterans Center as a government employee and he treats Vietnam veterans for the problems he talked about, and I'll come back to that. And I submit to you that the Defense has put

---

34. During Dice's closing, the judge instructed the jury, "[Y]ou understand that if evidence hadn't been established by the proof that you're not to consider it." (ECF No. 232–7 at 2035.)

that issue solidly and squarely before you.

When [Cone] came back I submit to you that he was a changed person. . . .

. . . .

Dr. Matthew Jaremko came down here. He is a qualified clinical psychologist. He is an expert in Vietnam Veteran's Syndrome. He is a person who spent—Not the hour that Dr. Bursten spent with my client—but some six hours with him. He is a person who stated to you that there are many people being treated by him for Vietnam Veteran's Syndrome. He is a person who stated to you that it would rob the Defendant—if he suffered from it, as he diagnosed him as he did—of the ability to judge the wrongfulness of his act or to conform his conduct to the law. . . .

(*Id.* at 2035–37, 2054.)

Dice addressed Cone's drug use:

And I suggest to you that Dr. Lipman, in his testimony, has talked to you about an addict out of control. A person with no ability to reason. And a person to whom the needle—the needle had become the rule of life, and the drug the substance of his mind.

(*Id.* at 2041.) He noted that the cross-examination of Lipman was limited to the fact that Lipman was a "British scientist" and that he did not know Cone was studying to be a lawyer and had scored well on the law school admissions test. (*Id.* at 2055–56.)

Dice noted Hayes's testimony that the "individual had a spacey look to him, and that he made a [weird] remark of, 'Nice shopping at Brodnax on a Saturday afternoon.'" (*Id.* at 2042.) He noted that Songu Mize walked out, despite Cone's warnings, and that no shots were fired. (*Id.*) Dice noted that Stovall testified that during his first encounter with Cone, Cone got out of his car and pointed at Stovall. (*Id.* at 2043.) He noted that Cone had not shot

at anyone until Stovall told Allen to shoot Cone. (*Id.* at 2044.) He noted Mr. Slaughter's comment that "here comes a guy down the street in shorts, he's got an arm covered up by his shirt, and he's got sort of a funny looking smile on his face." (*Id.* at 2047.) He noted Tuech's comment that the person was "nervous" and "looking around." (*Id.*)

Dice argued that Cone's actions in the Todds' house were "multiple and repeated and senseless blows. They are bizarre. They are without sense." (*Id.* at 2051.) Dice argued that Cone was not a "clever criminal." (*Id.*) He noted that Cone, though a person with a known prison and fingerprint record, left his fingerprints all over the Todds' house and asked if "that [was] the action of a cool and premeditated and deliberate individual?". (*Id.* at 2051–52.) He argued that the call to Cone's sister from the Todds' house shed light on Cone's mental state:

And what else does this person do? He makes a phone call—as I told you, not the Government in its opening statement, as I told you in the Defense's opening statement—to his sister. 1 + dialing. Four minute long phone call to Sue Cone in the city of Chicago. Now, that's—That is some attempt to cover up who I am by identity, isn't it? Or is it the action of a person out of control? Is it the action of a person out of control, and a person who in a pathetic and bizarre attempt to bind up the wounds he created—not hide the bodies as the Government has suggested—wraps newspaper and towels around the heads of his victims.

(*Id.* at 2052.) Dice also argued about the fact that there was money left in the basement of the house:

The only thing we know is that in a house with over $1,000 in the base-

ment—where supposedly my client was hiding—none of it was touched....

(*Id.* at 2053.)

Dice questioned Blankman's credibility:

And who do we call as our expert in rebuttal? We call a young lady by the name of Ilene Blankman in here. You see? And how did she get up here? She flew up here under the power of the State. I don't think anybody on this jury has seen or heard the testimony of an FBI agent named Kelly. Why was it necessary for Ms. Blankman to fly up here with an FBI agent on her arm? I don't know. I don't know. You figure that out.

And she said something that was absolutely incredible to me. She said, ["]I didn't know that Gary Cone was an addict, I didn't know that Gary Cone engaged in the use of drugs.["]

(*Id.* at 2056.) He questioned her credibility about Key West being the "drug mecca" of the United States. (*Id.* at 2057.) He continued:

You see? And if she's working for the Sheriff's Department with juveniles is she going to admit in a court of law that perhaps she's done something violative of the law? It's for you to decide whether she's credible or not. But I ask you—She looked old enough to me to fly up here by herself. And there's no reason or proof yet as to why she came up here with that FBI agent. I don't know.

(*Id.*)

Dice questioned Blankman's comment about Cone having track marks:

And then she said—She said that she didn't see any needle marks on Gary. Well, see, here's something that's amazing to me about that, ladies and gentlemen.

If you think somebody's not an addict, why would you even bother to look? And something also is very interesting about that, too. She admits that two years ago she wasn't asked that question. But now, her memory is suddenly clear of that? She couldn't even remember where she was working two years ago. So, why, when she's flown up here with a government agent on her arm, does she suddenly remember that? Well, I suppose it'll be said to you: well, the reason is because we didn't know that drug use was going to be a defense. But we know now, so we asked. I don't know what they'll say. I'm sure they'll come up with something....

(*Id.* at 2057–58.) He questioned Blankman's veracity as it related to her house, which she described as "a little bitty house" and which Roby described as "a two story house." (*Id.* at 2058.) He questioned her veracity about her testimony that she and Cone shared the bed because there was nowhere to sleep. (*Id.*) Dice argued that "perhaps she was embarrassed about" sleeping with Cone and "[p]erhaps we'll also say she was embarrassed to admit that her role with Gary Cone in Key West, Florida, was different from what she portrayed it to be." (*Id.* at 2059.)

Dice noted that Agent Flynn, despite being an experienced FBI special agent, did not examine Cone's arms and did not take a blood sample or urinalysis despite the fact that he suspected Cone of drug use. (*Id.*)[35]

Dice argued that all the experts relied on Cone's description of his drug use. (*Id.* at 2060.) He argued that "the fact that we've had experts on both sides who have differing honest opinions ought to create

---

**35.** Despite Dice's argument, the transcript does not indicate that Dice asked Flynn about whether he examined Cone's arms, whether

he took a blood sample or urinalysis, or whether he found it necessary to do any of these things.

reasonable doubt in your minds." (*Id.*) Dice noted that the physical evidence of needles and syringes in the car and fourteen marijuana cigarettes—two of which were smoked—demonstrated Cone's drug use. (*Id.*) Dice rebutted the State's argument that Cone was a drug dealer,

> And what does the State dare to do this afternoon? They come in, without any evidence whatsoever, and they stand up before you and they say he was selling.
>
> And I say to you, General, where are the charges? Where are the charges? And where is your evidence? Where are the people to whom he sold?

(*Id.* at 2061.)

On rebuttal, Strother stated that Cone was not affected by Vietnam. (ECF No. 232–8 at 2065.) Strother noted that Cone went to the University of Arkansas after he returned from Vietnam, and that the photograph of Cone that his counsel presented to the jury as representing Cone in his normal state was taken after Vietnam while Cone was in college. (*Id.*) With regard to the drug argument, Strother states:

> [The defense says], ["]well, the State shows no evidence. Where are the indictments? Where are the charges for drug sales?["] There aren't any charges for drug sales, but that doesn't mean that you can't look and question in deciding whether or not this man was, in fact, a drug user, or why he had those drugs. Did he just have those drugs, or did he have those drugs and thousands of dollars in that car? Among those drugs are there only the drugs he used? How do we know if he used drugs? The only thing that we ever had that he used drugs, period, is the fact that those drugs were in the car and what he told people. What he told people. But according to even what he told people, there are drugs in there he didn't even

use. A whole page of drugs. Barbiturates that he didn't even use. Why would those be there? Why would he have those in there? Why? Common sense, and a reasonable answer to that? Same place that $2,000 came from.

(*Id.* at 2068.)

Strother stated that there was no evidence that Cone saw combat, not even from Jaremko. (*Id.* at 2069.) He stated that being in the Supply Unit and handling body bags was not the same as "being in the jungles with bullets whizzing by your head. That's being in Supply." (*Id.*) Strother then addressed the symptoms related to Vietnam Stress Syndrome:

> We said, ... what are the symptoms of Vietnam Stress Syndrome? [Dr. Jaremko] says, ["]well, you know what a person does when they have it, they come back and their tendency is they reject materialistic things. They just put them aside and they have no interest in the concrete and material, and their interests go off in other directions.["] Well, let's look at that and let's look at Mr. Cone.
>
> He comes back from Vietnam. His interest is not in material things. What does he do? He goes to the University of Arkansas. And what does he do? He gets a degree in business and finance. Is that putting aside material things, business interests? Is that a symptom? Is that consistent with what the doctor said? And then what does he say that these people turn to? Truthfulness and kindness. Is that a truthful and kind man who went into that house and administered twenty-two blows to the head? Sixteen blows to the head? Kind and truthful man? Put aside worldly things?
>
> Is it a man who's put aside [worldly] things who walks into Brodnax and takes $112,000 worth of watches and

rings? Is that consistent with what their own psychologist said the symptoms were of this?

(*Id.* at 2069–70.)

Strother stated that Lipman was a paid expert who had never testified in a criminal case in front of a jury. (*Id.* at 2070–71.) He stated that even Lipman said that if Cone had the history of taking these drugs and was "suddenly cut off," then Cone "would be out of his mind." (*Id.* at 2071.) He argued that none of the experts saw Cone until two years later. (*Id.* at 2073.) He focused on the people who saw Cone "in or around the time of the offense." (*Id.* at 2073–74.) He argued that Cone picked Brodnax Jewelers, a place which held items of value, to rob. (*Id.* at 2074.) Cone "looked the place over first, went back out, came back in, looked around, found the watches, saw where the rings were, and then out comes the gun. . . . [Then he said d]on't push that alarm button." (*Id.*) He noted that Cone told Songu Mize, "Don't worry, I won't panic." (*Id.* at 2075.) He did not shoot Songu Mize when she walked out. He did not park his car right in front of the store where everyone could see it. (*Id.*) He drove down the street obeying the speed limit. (*Id.* at 2075–76.) He stole a Tennessee license plate to put on his car and then removed it after the Brodnax robbery. (*Id.* at 2075.) He changed clothes and put on a pair of shorts. (*Id.*) Strother argued that Cone was "a calm, cool, professional robber." (*Id.* at 2074.)

Strother noted that Cone tried to run over Stovall, tried to outrun the police cruiser, and then twice hid the car so it was not clearly seen from the street. (*Id.* at 2076–77.) He argued that Cone jumped the fence and waited, like "the brave soldier with that gun pointed," for Allen to round the corner. (*Id.* at 2077.) Cone shot Doug Clark, who had "his fearful little bottle," in the stomach to get away. (*Id.*) Strother stated "[Cone] crosse[d] the street and tried to get a car. Man needs a car, doesn't he? Doesn't that make sense? He's just left his. He knows the police have his. He needs a car. Tries to get a car. Doesn't quite make it." (*Id.*)

Strother argued that Cone was not out of control when he walked up to Tuech's apartment with nothing but the clothes on his back and an empty pistol: "Doesn't so-and-so live here? Oh, no, I'm sorry, they don't. Well, gosh, I must be mistaken, can I use you telephone?" (*Id.* at 2078.) Strother contended that the next person Cone talked to, other than his sister who had not testified, was Blankman. (*Id.* at 2079.) Blankman said Cone went to bed, and woke up the next morning trying to get new identification; Cone got a voter's registration card and took and passed a driver's license test. (*Id.*) Strother noted that when Flynn saw Cone in Florida he was "perfectly rational." (*Id.* at 2080.)

Strother stated that the murders were not irrational. (*Id.*) Strother noted that Cone abandoned his car and his wallet with money in it, but somehow got from the Todds' house to Key West, and suggested that "maybe [Cone] sprouted wings and flew." (*Id.* at 2081.) Mrs. Todd's purse was ransacked and dumped. (*Id.*) From all the fingerprints in the house, the police managed to find Cone's fingerprints in two places: the doorway to the kitchen and the doorway to the hallway that led to the kitchen. (*Id.*) There were gloves in the photographs. (*Id.*)[36] Strother argued that there was splattered blood at the front door from Mrs. Todd, and

> this man who's out of his mind, so that no one would walk up to this front door and look in and see that dead body while

---

**36.** (*See* ECF No. 287–28.)

he was still in that house, or while he was still around and come on in, cooly, deliberately—just like every other act he did—drug that body to where it was found in the kitchen. Why do I say that? Not because I say it, but the proof shows it.

Looking at the photograph, and look, if you will, right at the bottom of that post and then right on the edge of that doorway.... What else in the world could have made that but the head of Mrs. Todd? The bloody, bloody, pulpy, massey, head of Mrs. Todd, as she was drug by that animal down that hallway. Why else would her dress—except as he grabbed her by her feet and pulled her down that hallway—just slipped up around her body, as you see in that photographs? ... Unreasonable? No. The cool, deliberate act of a cool, deliberate murderer.

(*Id.* at 2082–83.) [37]

Strother then argued that Cone's actions related to the murder of Mr. Todd were rational:

Mr. Todd. Look where his head was— which is what was beaten, and where the blood came from—and where it is on that pillow.... How in the world[,] if his head's there and he's out on that couch[,] would he end up in that position, unless that man grabbed him and pulled him down and hid him behind that couch where he, too, couldn't be seen from that doorway.[38]

And then what did he do? This man who's so unreasonable, who's so irrational, but so desperate. He goes in and he apparently shaves. He cuts his hair. He changes his appearance.

(*Id.* at 2083.)

Strother contested Dice's argument that it was irrational for Cone to leave the money in the basement. (*Id.*) Strother argued that Cone may not have found the money in the basement as it was "[a]ll in boxes inside of boxes. Just like elderly people tend to, at times, squirrel away money in a place like that." (*Id.*) Strother noted how Cleopatra Todd's purse had been dumped out, continuing to argue that Cone's behavior was rational. (*Id.* at 2083–84.)

Strother argued that it was rational for Cone to call his sister because he had no other place to turn for help, "What other choice does he have?" (*Id.* at 2084.) Strother noted that the police had found Cone's identification and knew who he was. (*Id.*) Cone's only chance was to get out of the Todds' house "very, very, quickly." (*Id.*)

Strother concluded,

No, you're not dealing with a crazy person, an insane man. A man, in their words, out of his mind. You're dealing, I submit to you, with a premeditated, cool, deliberate—and even cowardly, really—murderer.

He wasn't so tough when it was he and Stovall one-on-one with their guns out. But he's pretty tough when it's a ninety-four year old man, and a seventy-nine year old lady.

Under the facts and circumstances in this case—And I'm not going to go over them all, but the verdicts as charged, I

---

**37.** There is no reference to the particular photo to that Strother was presenting to the jury. However, certain photographs depict Mrs. Todd's body and the blood splatters on the walls. (*See* ECF No. 287–21 to –22.) Other pictures depict blood splatter on the front door. (*See* ECF No. 287–39.)

**38.** There is no reference to the particular photo to that Strother was presenting to the jury. However, certain photographs depict Mr. Todd's body and the couch where he had been laying. (*See* ECF No. 287–12 to –18.)

submit to you, are the only verdicts supported by the proof in this case: We, the jury, find Gary Bradford Cone guilty of murder in the first degree in the perpetration of a burglary as charged in the first count of each of those indictments, and I submit to you that that and that alone is the verdict that truth dictates and justice demands.

(*Id.*) Arguments ended at 5:06 p.m. (*Id.* at 2085.)

### c. Jury Instructions

The trial court began reading the charge of the law at 5:09 p.m. (*See id.* at 2086.) The court began by addressing the six separate indictments and instructing the jury,

Although each of the above indictments embrace and include more than one offense, the defendant cannot be convicted of more than one offense in each indictment.

These six cases have been consolidated for trial at one time, but it must be remembered at all times that even though the cases are being tried together, they are separate and distinct cases and must be treated by you as such.

(ECF No. 319–1 at 2160–61.)

The court instructed:

The law makes it the duty of the Court to give in [the] charge to the Jury the law relative to the case on trial and the duty of the Jury to carefully consider all of the evidence delivered to them on the trial and, under the law given them by the Court, render their verdict with absolute impartiality.

The Jury are the sole judges of the facts, and of the law as it applies to the facts in the case. In making up your verdict, you are to consider the law in connection with the facts; but the Court is the proper source from which you are to get the law. In other words, you are the judges of the law as well as the facts

under the direction of the Court. The Jury in no case should have any sympathy or prejudice or allow anything but the law and the evidence to have any influence upon them in determining their verdict. They should render their verdict with absolute fairness and impartiality as they think truth and justice dictate. Every fact and circumstance in the case you may consider in arriving at your verdict.

The evidence and arguments in this case have been completed, and it is my duty now to instruct you as to the law. The law applicable to this case is stated in these instructions, and it is your duty to carefully consider all of them. The order in which these instructions are given is no indication of their relative importance. You should not single out one or more of them to the exclusion of another or others but should consider each one in the light of and in harmony with the others.

The [indictments] in this case are the formal written accusations charging the defendant with [those] crime[s]. They are not evidence against the defendant and do not create any inference of guilt.

At times during the trial, I have ruled upon the admissibility of evidence. You must not concern yourself with these rulings. Neither by such rulings, these instructions, nor any other remarks which I have made, do I mean to indicate any opinion as to the facts or to what your verdict should be.

Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them.

You are the exclusive judges of the facts in this case. Also, you are the

exclusive judges of the law under the direction of the court. You should apply the law to the facts in deciding this case. You should consider all of the evidence in the light of your own observations and experience in life.

(*Id.* at 2162–63 (alterations in original).)

The trial court then instructed the jury on the law as to each indictment. (*Id.* at 2164–84.) The court instructed the jury on the law related to voluntary drunkenness or intoxication (*see id.* at 2188–90) and insanity at the time of the commission of the crime (*see id.* at 2191–95), including specific instructions related to a presumption of sanity (*see id.* at 2193) and consideration of lay and expert witness testimony as it relates to insanity (*see id.* at 2192–93). The trial court instructed the jury on identity (*see id.* at 2196); direct and circumstantial evidence (*see* ECF No. 319–2 at 2197); the presumption of innocence (*see id.* at 2198); the State's burden of proof beyond a reasonable doubt (*see id.*); the fact that the defendant was not required to testify (*see id.* 2201); flight by the defendant (*see id.* at 2205); the use of notes (*see id.* at 2206); consideration of the evidence as to each individual indictment (*see id.* at 2207); and the unanimity required for a verdict (*see id.* at 2208).

On the issue of impeachment of witnesses and credibility, the court instructed,

A witness may be impeached by proving that he or she has made material statements out of court which are at variance with his or her evidence on the witness stand. However, proof of such prior inconsistent statements may be considered by you only for the purpose of testing the witness' credibility and not as substantive evidence of the truth of the matter asserted in such statement. Further, a witness may be impeached by a careful cross-examination, involving the witness in contradictory, unreasonable and improbable statements. However, immaterial discrepancies or differences in the statements of witnesses do not affect their credibility unless it should plainly appear that some witness has willfully testified falsely.

CREDIBILITY OF WITNESSES

You are the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony. If there are conflicts in the testimony of the different witnesses, you must reconcile them, if you can, without hastily or rashly concluding that any witness has sworn falsely, for the law presumes that all witnesses are truthful. In forming your opinion as to the credibility of a witness, you may look to the proof, if any, of his or her general character, the evidence, if any, of the witness' reputation for truth and veracity, the intelligence and respectability of the witness, his or her interest or lack of interest in the outcome of the trial, his or her feelings, his or her apparent fairness of bias, his or her means of knowledge, the reasonableness of his or her statements, his or her appearance and demeanor while testifying, his or her contradictory statements as to material matters, if any are shown, and all the evidence in the case tending to corroborate or to contradict him or her.

(*Id.* at 2199–2200.)

The court instructed the jury on opinion and expert testimony,

Generally a witness may not testify as to his opinions or conclusions. But the Court may permit a witness who has special knowledge or experience on a particular question to testify as an expert on that question. An expert witness may state an opinion and give reasons for his testimony.

Expert testimony should be received by you with caution. While expert testimony is sometimes the only means of, or

the best way of reaching the truth, yet it is largely a field of speculation, beset with pitfalls and uncertainties, and requires careful and intelligent evaluation on your part if it is to be a valid means of reaching the truth. You are not bound to accept expert testimony, but you should give it such weight and value as you think it deserves along with all the other evidence in the case, governed by the purpose to arrive at the truth.

(*Id.* at 2204.)

The court instructed the jury about evidence related to criminal offenses not charged in the indictments,

If any evidence has been introduced in this case tending to show the commission by the defendant of any offense other than that charged in these indictments, you can consider it only for the purpose of determining the mental condition of the defendant at the time of the alleged offenses for which he is now being tried.

(*Id.* at 2203.)

The court instructed the jury how to proceed through the indictments and lesser-included offenses to obtain a verdict. (*Id.* at 2209–18). The trial court concluded the reading of the charge at 6:45 p.m. (ECF No. 232–8 at 2087.) [39]

Dice objected to the trial court's "failure to charge the degree of felony required to be committed after the burglary" (*id.* at 2088), as Dice contended that "burglary involve[d] the intent to commit a felony, and the felony was not specified [in the charge to the jury,] nor [was] the degree of burglary" (*id.* at 2092). Dice also objected to the court's explanation of the procedure by which the jury would find the defendant guilty by reason of insanity, and to the judge not physically removing

from the jurors their trial notes prior to deliberations. (*Id.* at 2092–93.)

The judge gave the jurors the option to begin deliberations or to wait until the next morning. (*Id.* at 2089–90.) The jurors chose to begin deliberations the next day; the jury was instructed not to discuss the case and not to begin deliberations. (*Id.* at 2090–91.) The jury retired from open court at 7:47 p.m. (*Id.* at 2091.) The sixth day of trial ended at 7:55 p.m. (*Id.* at 2096.)

### 7. Trial Day Seven: Friday, April 23, 1982, 8:40 a.m. to 4:15 p.m.

#### a. Jury Instructions, continued

The seventh day of trial began at 8:40 a.m. on Friday, April 23, 1982. (*See id.*) The judge released the alternate juror. (*See id.* at 2097–98.) The judge informed the jury that he had reduced the jury instructions to writing, commented on the corrections and marks on the document, and emphasized "the fact that this must be maintained exactly as I read it to you." (*Id.* at 2098–99.) The judge left the instructions for the jury's convenience. (*Id.* at 2099.) The jury retired from open court to begin deliberations at 8:50 a.m. (*Id.* at 2101.)

#### b. Jury Verdict

At 10:32 a.m., the jury advised that they wished to report to the court, and court resumed at 10:50 a.m. (*Id.* at 2102.) The jury returned to court at 10:55 a.m. and delivered its verdict. (*See id.* at 2103–07.) Cone was found guilty on one count of Robbery by Use of a Deadly Weapon, three counts of Assault with Intent to Commit Murder in the First Degree, two counts of Murder in the First Degree During the Perpetration of a Burglary, and

---

**39.** One juror requested a recess during the reading of the charge, and the court took a recess from 6:15 p.m. to 6:25 p.m. (*See* ECF No. 232–8 at 2086–87.)

two counts of Murder in the First Degree. (*See id.* at 2104–06.)

### B. The Penalty Phase—April 23, 1982
#### 1. Opening Arguments

The penalty phase of the trial began on April 23, 1982, after Cone was found guilty on all counts. (*See* ECF No. 232–8 at 2104–06; ECF No. 232–9.)

Strother outlined the law that would be charged for sentencing in his opening statement:

> If the jury unanimously determines that at least one statutory aggravating circumstance or several statutory aggravating circumstances have been proved by the [S]tate beyond a reasonable doubt, and said circumstance or circumstances are not outweighed by any mitigating circumstance, the sentence shall be death.

(ECF No. 232–9 at 2112–13 (internal quotation marks omitted).) He asserted that the jury could consider the proof presented in the guilt phase along with the proof that was about to be presented for sentencing when evaluating the aggravating and mitigating circumstances. (*Id.* at 2113.)

The State sought to prove four aggravating circumstances:

- ■ The defendant was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person[;]

. . . .

- ■ The defendant knowingly created a great risk of death to two or more persons, other than the victim murdered, during his act of murder[;]

. . . .

- ■ The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind[; and]

. . . .

- ■ The murder was committed for the purpose of avoiding a lawful arrest.

(*Id.* at 2113–14 (internal quotation marks omitted).)

The defense sought the application of the following mitigating circumstances:

- ■ [T]he murder ... was committed while the Defendant was under the influence of extreme mental or emotional disturbance [and extreme duress;]

. . . .

- ■ The capacity of the [D]efendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment[;]

. . . .

- ■ [Defendant] has expressed remorse for his conduct[; and]

. . . .

- ■ [Defendant was] an honorably discharged veteran ... [whose] drug abuse began under the stress and strain of combat service.

(*Id.* at 2116–18 (internal quotation marks omitted).)

#### 2. State's Proof
##### a. Testimony of J.A. Blackwell

The State called its first witness for the penalty phase, J.A. Blackwell, Criminal Court Clerk for Shelby County. (*See id.* at 2119.) Blackwell identified records for Cone's three convictions on August 9, 1972, for robbery with a firearm. (*See id.* at 2120–21.) The offenses for which Cone was

convicted occurred on December 28, 1971; March 7, 1972; and May 22, 1972. (*See id.* at 2124–25.) Cone was sentenced to twenty-five years in jail on each charge. (*See id.* at 2120–21.)[40] Blackwell testified that these records were certified copies of records from the Clerk of Court for Oklahoma County, Oklahoma. (*See id.* at 2122.) The records were entered into evidence as State's Exhibit 71 (ECF No. 291–47). (*See* ECF No. 232–9 at 2121–22.)

On cross-examination, Dice pointed out, and Blackwell affirmed, that the records indicated that Cone was awarded the Bronze Star for his military service. (*See id.* at 2123–24.) Cone was a supply sergeant, E–5, and was honorably discharged in July 1969. (*See id.* at 2124.)

### b. Testimony of James L. Holder, C.M. Stovall, Bert Allen, and Jimmy Hammers

The State next called several MPD employees. James Holder testified that the fingerprints in State's Exhibits 65 and 71 were of the same individual. (*See id.* at 2126–27.) C.M. Stovall testified that "the whole [police] force was out there trying to arrest" Cone after the armed robbery. (*Id.* at 2129–30.) The search for Cone "lasted all through the night" into the next morning. (*Id.* at 2130.) Efforts to apprehend Cone continued until he was taken into custody in Florida. (*See id.* at 2130–31.) Bert Allen testified that on August 9, 1980, he attempted to arrest Cone for armed robbery. (*See id.* at 2132.) Jimmy Hammers testified that on August 13, 1980, he was one of the first officers to enter the Todds' house and observe the condition, location, and position of the bodies in the house. (*See id.* at 2133.) He examined photographs and testified that the photographs[41] showed the result of "a heinous, atrocious, cruel murder that would evidence depravity of mind." (*Id.* at 2136.)

### 3. Defense Proof

Cone's attorney presented no evidence at the sentencing phase of trial and relied on mitigating circumstances presented during the guilt phase. (*See id.* at 2115–17, 2144.)

### 4. Penalty–Phase Closing Arguments

Patterson presented closing arguments for the prosecution. (*Id.* at 2144–47.) He only addressed the aggravating circumstances to be proved by the prosecution. (*See id.*) Dice waived final argument. (*Id.* at 2147.)

### 5. Jury Instructions

After a short recess, the jury was recalled at 2:45 p.m. and read the jury instructions for the sentencing phase (ECF No. 319–2 at 2219–22). (ECF No. 232–9 at 2149.) The jury was given a jacket (i.e., folder) with the indictments, a copy of the jury instructions from the guilt phase, and the additional charges related to the sentencing phase prior to deliberations. (*Id.* at 2150.)

### 6. Jury Verdict

The jury retired at 3:05 p.m. to deliberate. (*See id.*) The jury returned at 4:05 p.m. to deliver its verdict. (*See id.* at 2150–51.) The jury found that four aggravating circumstances had been proven: (1) Cone's previous convictions for a felony involving "the use or threat of violence to the person"; (2) that Cone "knowingly created a great risk of death to two or more

---

**40.** Cone also pled guilty to one count of escape and one count of larceny of an automobile on January 11, 1973, and was sentenced to three years on each count to run concurrently. (*See* ECF No. 291–47 at PageID 6776.) He was paroled on December 5, 1978, for the armed robbery convictions. (*See id.* at PageID 6780–81.)

**41.** The photographs that Hammers examined were not identified or referenced as trial exhibits.

persons, other than the victim murdered, during his act of murder"; (3) that the murder was "especially heinous, atrocious, or cruel in that it involved torture or depravity of mind"; and (4) that "the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." (*Id.* at 2151–53.) The jury unanimously found there were "no mitigating circumstances sufficiently substantial to outweigh the statutory aggravating ... circumstances." (*Id.* at 2152, 2154.) The jury decided the punishment would be death for the murders of both Shipley and Cleopatra Todd. (*Id.*) The court then sentenced Cone to death by electrocution. (*See id.* at 2155–56.)

## VII. LEGAL ANALYSIS

### A. The *Brady* Standard

■ Cone's *Brady* claim was not addressed in the state courts and is subject to *de novo* review. *See, e.g., Rompilla v. Beard,* 545 U.S. 374, 390, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); *Brooks v. Tennessee,* 626 F.3d 878, 891 (6th Cir.2010). In *Brady,* the Supreme Court held, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. *Brady* guarantees access to favorable evidence regardless of whether the evidence is admissible at trial. *United States v. Phillip,* 948 F.2d 241, 255–56 (6th Cir.1991). There are three components to a *Brady* violation: (1) "the evidence at issue must be favorable to the accused, either because it is exculpatory ... or impeaching"; (2) "that evidence must have

been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Wogenstahl v. Mitchell,* 668 F.3d 307, 323 (6th Cir.2012). Because of the Court's mandate, *see supra* Part I, the Court's inquiry is limited to the materiality/prejudice components of the *Brady* inquiry. *See Cone,* 2010 WL 2270191, at *4.

■ In the *Brady* context, prejudice or materiality is a difficult test to meet. *Jamison v. Collins,* 291 F.3d 380, 388 (6th Cir.2002). A reviewing court considers the withheld information "in light of the evidence available for trial." *Jells v. Mitchell,* 538 F.3d 478, 502 (6th Cir.2008). "Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the case would have been different." *Wilson v. Parker,* 515 F.3d 682, 701 (6th Cir. 2008) (citing *Kyles v. Whitley,* 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)); *see also Wogenstahl,* 668 F.3d at 323. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Wilson,* 515 F.3d at 701–702 (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)) (internal quotation marks omitted); *see also Wogenstahl,* 668 F.3d at 323.[42] "[T]he *Brady* standard is not met if the petitioner shows merely a reasonable *possibility* that the suppressed evidence might have produced a different outcome...." *Montgomery v. Bobby,* 654 F.3d 668, 678 (6th Cir.2011); *see United States v. Anderson,* 488 Fed.Appx. 72, 75 (6th Cir.2012) (stating that *Brady* does not require disclosure of information that has

**42.** In *Bagley,* the Supreme Court adopted the prejudice standard of *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for *Brady* claims. *Bag-*

*ley,* 473 U.S. at 682, 105 S.Ct. 3375; *see also United States v. Dominguez Benitez,* 542 U.S. 74, 81–82, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004).

only "a mere possibility of helping the defendant"). *Brady* "only applies to evidence that was known to the prosecution, but unknown to the defense, at the time of trial." *Hodges v. Parker*, 493 Fed.Appx. 704, 707 (6th Cir.2012) (quoting *Apanovitch v. Houk*, 466 F.3d 460, 474 (6th Cir. 2006)) (internal quotation marks omitted); *see Henness v. Bagley*, 644 F.3d 308, 325 (6th Cir.2011) (finding no *Brady* violation where the defendant is "aware of the essential facts that would enable him to take advantage of the exculpatory evidence" (internal quotation marks omitted)). There is no prejudice where the defendant "knew or should have known the essential facts permitting him to take advantage of the information in question." *Jones v. Bagley*, 696 F.3d 475, 487 (6th Cir.2012) (quoting *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)) (internal quotation marks omitted).

The Court must consider the effect of the suppressed evidence "collectively." *Cone*, 556 U.S. at 474, 129 S.Ct. 1769 (quoting *Kyles*, 514 U.S. at 436, 115 S.Ct. 1555) (internal quotation marks omitted); *see Brooks*, 626 F.3d at 892; *see also Wong v. Belmontes*, 558 U.S. 15, 15, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009) (per curiam) ("[I]t is necessary to consider *all* the relevant evidence that the jury would have had before it if [the defense] had pursued [a] different path—not just the mitigation evidence [the defense] could have presented, but also the [other] evidence that almost certainly would have come in with it."). The question is "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Montgomery*, 654 F.3d at 679 (quoting *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555) (internal quotation marks omitted). The Sixth Circuit has repeatedly acknowledged that "[e]vidence that is merely cumulative to evidence presented at trial is not material for purposes of *Brady* analysis." *Id.* (alteration in original) (quoting *Brooks*, 626 F.3d at 898) (internal quotation marks omitted).

## B. Consideration of the Withheld Information

The withheld information consists of a series of MPD and FBI communications referring to Cone as a drug user, an eyewitness statement, MPD interview notes, supplemental offense reports, letters from the DA's office to Blankman, the DA's interview notes about Blankman and the Big Star robbery, and a letter about an insurance payment for the Big Star robbery, *see supra* Part V. (*See* ECF No. 230.) Cone contends that these documents are material because they demonstrate his known drug use, his demeanor at the time of the crimes, and the source of the money found in his car. (*See* ECF No. 266–1 at 3–5, 11–12.) These documents purportedly bring into question the veracity of the prosecution's rebuttal witnesses and the prosecutor's arguments. (*Id.* at 4–5, 10–12.) Cone asserts that the only issue at his trial was whether, as a result of drug use—flowing from service in Vietnam—he was guilty of first-degree murder and/or deserved the death penalty. (*Id.* at 5.) Cone argues that the prosecution secured the death sentence by claiming that Cone did not use and was not addicted to drugs, while withholding proof from numerous independent, unbiased witnesses who described him as being on drugs, behaving as if he were intoxicated, and having a drug problem including a long history of amphetamine use. (*Id.* at 1.) He contends that due process prohibits this type of manipulation of fact-finding, and that there is a reasonable probability that one juror, if he had heard the exculpatory evidence, would have voted for life. (*Id.* at 1, 15–16, 20; ECF No. 268 at 4–5.)

Respondent argues that much of the withheld information, specifically the FBI documents and law enforcement teletypes, is hearsay. (ECF No. 265 at 33; ECF No. 269 at 5–6 n. 2.)[43] Respondent points out that, as the Sixth Circuit stated, it "would not have been news to jurors that Cone was a drug user" given the substantial direct evidence presented at trial, and any withheld information related to Cone's drug use was cumulative. (ECF No. 265 at 34, 48.) Respondent argues that even if the withheld evidence could have firmly established that Cone was a drug user, evidence of drug use or abuse can be considered aggravating by a jury, rather than mitigating. (*Id.* at 48.) Further, Respondent asserts that it is not the mere fact of Cone's drug use and addiction but the extent to which his judgment was affected when he murdered the Todds that is determinative of whether there is a reasonable probability that the outcome of the sentencing proceeding would have changed. (ECF No. 269 at 4–6.) He contends that the issue is whether

the force and tendency of the proffered evidence supporting [Cone's] claim that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was *substantially impaired as a result of mental illness or defect or intoxi-cation* which was insufficient to establish a defense to the crime but *which substantially affected his judgment* at the time he murdered the Todds.

(*Id.* at 6.) Respondent asserts that the record contains clear and overwhelming evidence that Cone was not substantially impaired such that his judgment was substantially affected as evidenced by his calculated and deliberate conduct. (*Id.* at 6–13.)

Respondent notes that the evidence of the aggravating circumstances was so overwhelming that it took the jury only forty-five minutes to sentence Cone to death. (ECF No. 265 at 45–47.) Respondent contends that Cone's mitigating evidence was "thin" when balanced against the aggravating factors. (*Id.* at 48.) Respondent argues that the cumulative effect of the withheld information considered in view of the overwhelming weight of the evidence of the aggravating circumstances "clearly establishes that there is no reasonable probability that the effect of the proffered evidence would have changed the result of his sentencing proceeding." (*Id.* at 29; *see also id.* at 45, 53; ECF No. 269 at 13–15.)[44]

### C. Cone's Drug Use and Mental State

To support Cone's *Brady* claim that the prosecution's witnesses knew about his

---

**43.** For *Brady* purposes, the issue is not whether the documents themselves are admissible, but whether the information could have led to admissible evidence. *Phillip*, 948 F.2d at 256; *see Henness*, 644 F.3d at 325 (finding a police informational summary about a detective interview was inadmissible hearsay because it must "lead to the discovery of additional, admissible evidence that could have resulted in a different result at trial" to constitute a *Brady* violation). The focus of the Court's inquiry on remand is the sentencing phase. Under Tennessee law, evidence may be presented in the sentence proceedings on any matter relevant to punishment. *See* Tenn.Code Ann. § 39–13–204(c) (2012); *State v. Johnson*, 632 S.W.2d 542, 548 (Tenn.1982) (stating that "[a]ny such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence" (citing Tenn.Code. Ann. § 39–2404(c))); *see also State v. Jordan*, 325 S.W.3d 1, 45–46 (Tenn.2010) (stating a "rigid adherence" to any particular rule of evidence is contraindicated by § 39–13–204(c)).

**44.** Respondent preserves his argument that Cone failed to produce any evidence on the other elements necessary to establish a *Brady* violation. (ECF No. 265 at 29 n. 6.)

drug use, Cone relies on the following documents from the DA's file:

- August 10, 1980, Law Enforcement Teletype System ("LETS") teletype authorized by Memphis Police Sergeant R.L. Roby: "Suspect is heavy drug user, armed and dangerous." (ECF No. 230–1);

- August 11, 1980, LETS teletype authorized by Memphis Police Sergeant R.L. Roby: "Armed and extremely dangerous, drug user." (ECF No. 230–2);

- August 11, 1980, LETS teletype authorized by Memphis Police Sergeant R.L. Roby: "Armed and extremely dangerous, drug user." (ECF No. 230–3);

- Memphis Police Department Offense Report, Charles & Debbie Slaughter; "They said he looked wild eyed and might not have been wearing shoes." (ECF No. 230–4; ECF No. 274–1);

- August 27, 1980, statement of Robert H. McKinney about August 8, 1980, robbery of Stepherson's Big Star, including: "Q. The person you saw responsible for the robbery, did he appear to be drunk or high on anything? A: Well he did, he acted real weird that is the reason I watched him." (ECF No. 230–5 at 1809);

- August 23, 1980, telephone interview of Sue Cone conducted by Sergeant Roby regarding Gary Cone's psychological and drug problems (ECF No. 230–6);

- Pompano Beach Police Department Supplement describing Gary Cone: "Subject was observed to be looking about in a frenzied manner and also

appeared to be looking for a place to run" and when officers approached "the subject was still walking in his agitated manner." (ECF No. 230–7);[45] and

- August 11, 1980, Memphis Police Department Supplementary Offense Report, J.L. Collier: James Daniels, Chief of Police of Lake Village, Arkansas, "did state he found out Cone was a heavy drug user, but had never been arrested in the Lake Village area." (ECF No. 230–8).

(ECF No. 71 at 13–14.)

1. Roby, the LETS teletypes, Sue Cone, and the MPD Supplemental Offense Report (ECF No. 230–1 to –3; ECF No. 230–6; ECF No. 230–8)

 Cone asserts that the withheld LETS teletypes and Sue Cone interview notes (*see* ECF No. 230–1 to –3; ECF No. 230–6) provided crucial information because Roby issued the "drug user" memos, yet he testified that he saw no track marks on Cone and that Cone did not appear to be a drug user. (*See* ECF No. 71 at 14.) Cone contends that Roby's credibility would have been "shattered" had the jury learned that in his conversation with Sue Cone (*see* ECF No. 230–6), Roby acknowledged that her brother had a drug problem and acted on that knowledge by sending bulletins throughout the nation about his drug use. (*See* ECF No. 266–1 at 4, 15–16; ECF No. 268 at 3.)

Respondent argues that Roby never testified that he did not believe Cone was a drug user. (*See* ECF No. 265 at 37.) Roby testified that he observed Cone with-

---

**45.** Cone supplemented the record with what was purported to be a complete copy of the supplemental police report. (ECF No. 274.) The original document at ECF No. 230–7 was written by Sergeant Grieco, Detective D. Flynn's passenger, and designated as "DA's File 623." (*See* ECF No. 230–7.) The document at ECF No. 274–2 appears to be Detective D. Flynn's account of the events and precedes Grieco's report as DA's File 621 and 622. (*See* ECF No. 274–2.)

out clothes when hair samples were being procured, and when Roby was asked whether he observed track marks on Cone's body, Roby said "none whatsoever." (*Id.* at 37–38.) Respondent argues that Gary Cone could have presented additional witnesses, including Sue Cone, who could corroborate his assertions of heavy drug use. (*See id.* at 38–39.) He asserts that the MPD evidence does not have any impeachment value and fails to offer additional mitigation value beyond what the jury had already been presented. (*See id.* at 39.)

Cone contends that the Supreme Court rejected Respondent's argument when Justice Stevens stated that the withheld evidence did not contradict Roby's testimony, but it unquestionably placed it in a different light. (*See* ECF No. 268 at 3.) The Court stated:

> As the dissent points out, Roby did not testify directly that Cone was not a drug user and FBI Agent Eugene Flynn testified that, at the time of Cone's arrest in Pompano Beach, Cone reported that he had used cocaine, Dilaudid, and Demerol and was suffering from "slight withdrawal symptoms." It is important to note, however, that neither Flynn nor Roby corroborated Cone's account of alleged drug use. Taken in context, Roby's statement that he had not observed any needle marks on Cone's body invited the jury to infer that Cone's self-reported drug use was either minimal or contrived. Therefore, although the suppressed evidence does not directly contradict Roby's trial testimony, it does place it in a different light.

*Cone,* 556 U.S. at 471 n. 17, 129 S.Ct. 1769 (citations omitted).

Although Roby testified on direct and as a rebuttal witness, *see supra* pp. 114–15 and 983–84, Cone focuses his argument on Roby's rebuttal testimony. (*See* ECF No. 266–1 at 7, 15.) Cone seeks to use the withheld information to corroborate the evidence of his drug use and also to contest the prosecution's argument that he was a drug dealer. Roby testified that Cone was in possession of a large amount of drugs and drug paraphernalia. (*See* ECF No. 232–3 at 1505–10, 1540–44, 1552–53.) As a rebuttal witness, Roby testified that when he saw Cone in an undressed state after his arrest in Florida, Roby saw no needle marks on Cone's body, *see supra* p. 984. (ECF No. 232–6 at 1939.) Roby's testimony about loose syringes, broken pills, pipes, and marijuana butts found in the car supports the proposition that Cone was a drug user, *see supra* pp. 970–71. (*See* ECF No. 232–3 at 1505–10, 1540–44, 1552–53.)[46] Roby's testimony on direct examination about the quantity and assortment of drugs, including marijuana seed, *see supra* pp. 970–72, that were found in the car; Cone's hand-written inventory and categorization of drugs, *see supra* pp. 973–75; and the absence of track marks on his body supports the proposition that he was a drug dealer. Roby did not claim to have any personal knowledge of Cone's drug use. Roby's testimony about the track marks was based on his personal observation, corroborated by Blankman's testimony, *see supra* pp. 981–82, and not rebutted.[47]

---

**46.** Dice used this physical evidence to argue that Cone was a drug user at trial, *see supra* p. 989. (*See* ECF No. 232–7 at 2060.)

**47.** Although Lipman and Jaremko testified about Cone injecting drugs, they presented no testimony about whether they observed track marks or about Cone's injection sites. Bursten testified that it would be "highly unlikely" that someone could hide track marks from multiple injections into his veins of six, eight, or ten times a days over a period of months, *see supra* pp. 984–85. (*See* ECF No. 232–6 at 1968–69.)

The LETS teletypes were sent on August 10–11, 1980, prior to Cone being taken into custody and based on information that Chico County and Lake Village, Arkansas, law enforcement officials reported to MPD Officer J.L. Collier on August 9, 1980, as stated in his supplementary offense report:

> Working from identification that was found in the suspect's car, this writer contacted Off. Chuck Thompson, dispatcher for the Chico County Sheriff's Office, Lake Village, Ark.,....
>
> This call was made to Off. Thompson at 6 P.M., 8/9/80. His phone number is 1–501–265–5372. Mr. Thompson further stated he didn't know much about the suspect, only that he was a heavy drug user, ... and referred me to their Chief of Police, Lake Village, Ark, Mr. James Daniels.
>
> At 6:30 P.M., 8/9/80, I called Chief Daniels, 1–501–265–5039, and after explaining our situation to him, he immediately stated he would contact his officers and any information they could come up with, he would call me back. Chief Daniels did call back several times, however he only had bits and pieces of unconfirmed information concerning Cone. He did state he found out Cone was a heavy drug user, but had never been arrested in the Lake Village area....

(*See* ECF No. 230–8.) The argument that Roby was "not shy about proclaiming Cone's extensive drug use to law enforcement throughout the nation," (*see* ECF No. 266–1 at 15), is without merit because Roby was simply reporting hearsay about a suspect who was on the run to assist officers who were attempting to capture him. When the LETS bulletins were sent,

Roby had not seen Gary Cone and had not spoken with Sue Cone.

Roby's telephone interview of Sue Cone occurred [48] after her brother had been taken into custody in Florida and after Roby saw Cone on August 18, 1980. (*See* ECF No. 230–6.) Sue Cone started the conversation stating that her brother had "a severe psychological problem." (*Id.* at 506.) Roby then asked if there were any psychological problems of which they were not aware. (*See id.* at 507.) Sue Cone responded that a doctor was going to see Cone at the jail in Florida to address Cone's psychological problems, and "he needs to work on the drugs." (*Id.*) Roby responded, "What about Gary's drug problem." (*Id.*) Sue Cone said, "I just wasn't aware just how severe it was, but I do now." (*Id.*) Roby then noted the large amount of drugs found in the car. (*Id.*) Roby commented that he saw Gary Cone in person, and that "physically he appear[ed] to be alright." (*Id.* at 510.)

Roby did not mention drugs until after Sue Cone said that her brother had a drug problem. Roby's statements are not an acknowledgment of Cone's drug problem, but a response to Sue Cone's comments. Roby appears to be merely attempting to obtain more information. The interview notes from Roby's conversation with Sue Cone are consistent with Roby's trial testimony and do not impeach his credibility.

Roby had no personal knowledge of Cone's drug use. Roby did not testify falsely. Lipman testified extensively about Cone's drug use. The disclosure of the supplemental police report and the LETS teletypes may have led to the fact that the police at the time the teletypes

---

48. Roby's initials and the date "8/23/80" are written on the five-page typed transcript. The conversation includes statements by Sue Cone that she had recently talked to her brother, that she talked to him by phone regularly, that she was "lending him money to go to law school," and that she knew "he had checked in with Oklahoma" where he was on parole. (ECF No. 230–6 at 507–08.)

were sent had "unconfirmed information" from Arkansas law enforcement officials that Cone was a heavy drug user. The essential fact that Cone was a heavy drug user was known to him and corroborated through Lipman's and Jaremko's testimony. The corroborative value of this information is limited because of the lack of reliable sources and detail about Cone's drug use. The Court finds that the information in these teletypes, the Sue Cone interview notes, and the supplemental police report do not provide or lead to evidence that Gary Cone was substantially impaired in his judgment due to drug use at the time of the murders and did not create a reasonable probability that if they were disclosed the outcome of the sentencing proceedings would have been different.

### 2. Eyewitness Evidence of Cone's Demeanor (ECF No. 230–4 to – 5; ECF No. 230–7)

Cone argues that the MPD offense report about Charles and Debbie Slaughter (ECF No. 230–4),[49] Robert McKinney's statement (ECF No. 230–5), and the Pompano Beach Police Department Supplement (ECF No. 230–7) are withheld evidence that Cone was intoxicated on drugs. (ECF No. 266–1 at 3–4.) Cone asserts that this withheld evidence of drug use would have been available as defense proof and provided impeachment of the prosecution's rebuttal witnesses Roby, Flynn, Blankman, Bursten, and Hutson to firmly establish that Cone was "actively intoxicated by amphetamines when observed by the Slaughters, actively using amphetamines when observed by Officer Grieco, and a drug user at the time of the offense." (Id. at 15 (citation omitted) (internal quotation marks omitted).) Cone argues that the descriptions of his appearance and actions described by eyewitnesses are clear signs of amphetamine use as made clear by Dr.

Murray Smith, a medical doctor and specialist in the evaluation and treatment of addiction. (Id. at 14; ECF No. 268 at 3; ECF No. 246–1; ECF No. 246–4.) Cone contends that this evidence would have strongly supported his defense and argument for life and corroborated the evidence that he used drugs. (ECF No. 266–1 at 15.) He further contends that the evidence would have undermined the prosecution's experts' claim that Cone did not suffer mental illness based on a perceived absence of proof about Cone's drug use. (Id.)

#### a. Statements of Charles and Debbie Slaughter (ECF No. 230–4)

▮ Cone argues that the description of him as "wild-eyed" described a drug-induced state and is consistent with a description of a person with dilated pupils and contraction of the eyelid muscles from amphetamine use. (See ECF No. 266–1 at 13–14.) The MPD report lists S.H. Cock as the reporting officer and also bears what may be Sergeant Roby's signature. (ECF No. 230–4.) The report, which is somewhat difficult to read, states:

> At approx. 1326 hrs. I arrived in the area of [Auburndale] and Poplar to cruise the area for a MW responsible for a robbery, R & LI 80–08–09–1614, and also responsible for shootings on N. Auburndale and Hawthorne. At this time I was advised of the MW fitting the description was seen in the rear of condominium at 143 N. Auburndale and I talked to Charles Slaughter, MW, and his daughter Debbie Slaughter, in the rear of this location. They were working on a car just toward the alley, just a few minutes before I came up. They described this MW as about 30, 5'7" to 5'8", stocky build, about 180 lbs., had brown curly collar [length] hair, neat

---

49. This document also appears in the record as an exhibit to Cone's Motion to Expand the Record. (ECF No. 165–2; see ECF No. 274–1.)

looking, a full brown beard with a gray white [s]pot in the center of his chin. He was wearing gold wire rim glasses with [c]lear lens[es] and was wearing green cut off arm[y] pants, no shirt and was carrying a dark color plaid shirt in his right hand. They said that he looked wild eyed and might not have been wearing shoes. The Slaughters live[ ] at 143 N. Auburndale, phone 726–9112. I talked to them a second time approx. 1415 hrs.

(ECF No. 274–1.)

At trial, Charles Slaughter testified that the man was "walking rather briskly" (ECF No. 231–11 at 1118.) A description of the man that Charles Slaughter saw was given to defense counsel. (*Id.* at 1122.) Charles Slaughter verified that it was his statement and that he told police that the man "grinned a funny kind of a grin and muttered something and then walked on by." (*Id.* at 1123–24.) Debbie Slaughter (then Debbie Howell and now Debbie Slaughter–Crawford) testified about her identification of Cone to the police. (*See id.* at 1127–29.) Her description of Cone at trial was limited to his race, his clothing, and the fact that something was draped over his right hand. (*See id.* at 1127–28.) Cone was dressed in a mis-matched green suit and new black shoes when he robbed the jewelry store. (*See id.* at 979.) When the Slaughters saw Cone, he was evading a police chase; he had removed his shirt, was wearing cut-off shorts, was barefoot, and had something draped around his hand. (*See id.* at 1124, 1128.) Respondent contends that the Slaughters' descriptions of Cone (ECF No. 230–4) as walking "rather briskly," looking "wild-eyed and might not have been wearing shoes," are not surprising, especially considering that it was a hot summer day, that Cone had just robbed a jewelry store, that he had been in a high speed police chase, and that he had shot a police officer and a bystander. (*See* ECF No. 265 at 41–42.) Given

the events of the day, it is understandable that Cone may have appeared "wild-eyed" or disoriented. The MPD report (ECF No. 230–4), without stronger evidence related to Cone's demeanor, has little exculpatory or impeachment value.

Cone requested an evidentiary hearing to explore Slaughter–Crawford's withheld statement and to show that Cone was "foaming at the mouth" when she saw him fleeing through Memphis. (*See* ECF No. 246.) On May 18, 2009, nearly twenty-nine years after seeing Cone in the alley, Slaughter–Crawford reportedly told Chris Armstrong, an investigator in the Capital Habeas Unit of the Federal Public Defender for the Middle District of Tennessee, that she remembered the incident with Cone very well and that Cone had a "crazy look on his face" and was "foaming at the mouth." (ECF No. 246–2.) Slaughter–Crawford refused to sign a declaration prepared by the Federal Public Defender's office. (*Id.*) Glori Shettles, a mitigation investigator, submitted a declaration that she was introduced to Slaughter–Crawford at a party on or about July 9, 2009. (ECF No. 246–3.) According to Shettles, Slaughter–Crawford told Shettles about the visit from Armstrong. (*Id.*) Slaughter–Crawford told Shettles that the man she observed run by her was "foaming at the mouth." (*Id.*) April Goode, Cone's trial counsel, indicated that the disclosure of the MPD report would have led to the additional description of Cone as "foaming at the mouth" which, along with the description of being "wild-eyed," was a classic description of an amphetamine user. (ECF No. 246 at 3–4; *see* ECF No. 246–1 at 2.)

This Court granted Cone leave to depose Slaughter–Crawford about her out-of-court statements that Cone had a "crazy look on his face" and was "foaming at the mouth." (ECF No. 254 at 2, 7.) In a

deposition held on March 29, 2011, when asked about the events of August 9, 1980, Debbie Slaughter–Crawford testified, "First of all, it was thirty years ago. So what I remember might be kind of over the years like enhanced or even distorted. So I would like to say I don't remember. It has been thirty years. So I don't have too much to contribute I don't think." (ECF No. 270–1 at 7.) She acknowledged that she had spoken to Chris Armstrong, an investigator in the Federal Public Defender's office, about what she saw, but she continued to assert that she did not remember and that she did not "feel good about saying too much more." (*Id.* at 7–8.) Slaughter–Crawford stated that she had no idea what the man she saw looked like, but she thought he had a beard and that his shirt was off. (*See id.* at 8–9.) She said, "He appeared to be desperate.... I mean, you could tell something was going on. He is not your average guy just walking by." (*Id.* at 9.) She continued to describe his facial expression as "desperate," but admitted that she may have told Armstrong that he had a "crazy look" on his face. (*Id.*) She said that Armstrong "ambushed" her. (*Id.* at 10.) She did not know exactly how to word things, but she told him the truth. (*See id.*) She did not recall telling Armstrong that Cone was "foaming at the mouth." (*Id.*) She stated:

> I don't remember that. I may have said that back at the time. You all can look at the testimony. But I promise I can't remember "foaming" at this moment. That may be one of the things that I said as a 16–year old and it got like snowballed as you think about things

over the years. I can't remember any "foaming."

(*Id.* at 10–11.) When confronted with Armstrong's statement, Slaughter–Crawford responded, "I probably did say that, but I never signed anything because it is too long ago for me to know for sure." (*Id.* at 11.) She stated that she did not sign Armstrong's statement "for that very reason because it wasn't the whole truth, and it is thirty years of not remembering this case." (*Id.* at 13.)

Slaughter–Crawford remembers that she was fearful when she saw Cone and that he had a "desperate look." (*Id.*) However, she would not commit to a statement saying that Cone had a "crazy look" or was "foaming at the mouth." (*Id.*) Later in the deposition, she acknowledged that when she saw Armstrong the first time, she may have told him that Cone had a "crazy look" and was "foaming at the mouth." [50] (*Id.* at 15.) She remembered speaking with someone (Glori Shettles, a mitigation investigator) at her friend's mother's home about Cone's case, but she did not remember telling Shettles that the man she saw that day in August was foaming at the mouth. (*See id.* at 14, 16.) Slaughter–Crawford explained what she meant by a "desperate look" on Cone's face:

> Just the look in his eye. If I can remember correctly, there was a fear that I felt at the time, and I think my father did, too. He stepped up and said something or motioned or something to the man, so I think we both felt it extentual [sic] as much as anything.
>
> . . . .

---

50. Slaughter–Crawford's testimony regarding her 2009 conversation with Investigator Armstrong initially appears to be unequivocal, but ultimately reflects an inability to recall the "foaming at the mouth" statement attributed to her. (*See* ECF No. 270–1 at 11 ("[The conversation was] too long ago for me to know for sure."); *id.* at 17–20 (stating that Slaughter–Crawford was unable to recall how she described Cone in subsequent conversations).) Conversely, her actual recollection, under oath, is consistent and reflects only that Cone appeared "desperate."

I don't remember an actual expression other than the whole situation, here comes a man with no shirt on who has a desperateness about him on foot, cops are circling everywhere.... It just provoked fear.

(*Id.* at 20–21.)

Cone argues that when Slaughter–Crawford's "only interest was in telling the truth about Gary Cone's appearance as he ran through Memphis—Ms. Crawford told Chris Armstrong ... that Cone had a 'crazy look on his face' and was 'foaming at the mouth.'" (ECF No. 271 at 1.) Cone asserts that Slaughter–Crawford's deposition testimony is "simply not credible" and criticizes her "newly-claimed memory loss." (ECF No. 266–1 at 14 n. 1; *see also* ECF No. 271.)

There are credibility issues related to both Slaughter–Crawford's deposition testimony and the statements that Cone was "foaming at the mouth." Slaughter–Crawford did not tell police that Cone was "foaming at the mouth" at the time of the event or prior to trial. There is no evidence that she told anyone that Cone was "foaming at the mouth" until 2009, twenty-nine years after she saw Cone. Cone came in contact with several people in the Brodnax jewelry store, multiple police officers, Herschel Dalton, and the Slaughters that day. There is no corroborating evidence that Cone was "foaming at the mouth" or exhibiting other symptoms that might be associated with his purported drug use from other eyewitnesses. Armstrong and Shettles's statements are hearsay, and Slaughter–Crawford will only commit to a statement that Cone looked "desperate." The Court finds that speculation that the disclosure of this document would have led to evidence that Cone was exhibiting symptoms of amphetamine use during his escape after the Brodnax robbery does not tend to show that he was substantially affected by his drug use at the time of the murder and is not sufficient to establish a reasonable probability that the outcome of the sentencing proceedings would have been different. *See Henness,* 644 F.3d at 325–26 (stating that speculation does not establish a *Brady* violation).

b. Statement of Robert McKinney (ECF No. 230–5); Stepherson's Big Star Robbery

 The second piece of withheld information about Cone's demeanor is Robert McKinney's statement about the Stepherson's Big Star robbery on August 8, 1980. (ECF No. 230–5.) The statement is four pages. (*See id.*) The focus of Cone's argument about whether Cone appeared to be "drunk or high" or "acted real weird" appears on the third page of the statement. (*Id.* at 1809.) On the first page of McKinney's statement, he describes in narrative form what he saw on August 8, 1980, stating: "I thought he was just shoplifting and I just kinda observed him from then and [until] he got to the front of the store...." (*Id.* at 1807.) McKinney further states:

Q: The person you saw responsible for the robbery, did he appear to be drunk or high on anything?

A: Well he did, he acted real weird that is the reason I watched him.

Q: Okay, tell me how he acted weird?

A: Well he just wandered around the store, this was before the robbery, he just kinda went to the back and I was at the back and he came around up front and I came around up front. Some distance from him, kinda of observing him.

Q: Okay, when you say weird, I believe you previously thought he might have been a shoplifter. Was this weird in that he was acting strange not like a regular customer?

A: Yes, he wasn't acting like a regular customer.

Q: How was his physical appearance or his mental abilities or physical abilities, you know, his speech or walk?

A: Only thing I heard him say was could you get change for a hundred dollar bill.

Q: Did he sound drunk or like he had mental problems.

A: Well, no he didn't sound drunk, well he ... didn't strike me at the time but he just looked strange. He was just walking around and picking up items.

Q: Did he appear to be killing time?

A: Yes sir that is the word I was looking for.

Q. Alright as far as mental abilities, did he appear to be having any problems.

A: No just I never just say knew anybody on dope but from what I have seen and what I think the way people act, like they kinda of....

Q: Was he staggering?

A: Not [per se], he just kinda just wandering, just wandering.

(*Id.* at 1809–10.)

Cone focuses on McKinney's statements that Cone acted "weird" and appeared to be "high." (ECF No. 71 at 13; ECF No. 266–1 at 3, 13–14; ECF No. 268 at 3.) Respondent contends that the description of Cone acting "real weird," but "he didn't sound drunk ... he just looked strange," (ECF No. 230–5 at 1809–10), is consistent with someone who is nervous when preparing to rob a store and would not be viewed as unusual by a jury. (*See* ECF No. 265 at 41; ECF No. 269 at 6–7.) McKinney's statement indicates that McKinney believed that Cone may have been "high," although he did not necessarily know how someone who was "high" would act. McKinney provides no detail about Cone's physical appearance or behavior that would confirm that Cone was intoxicated.

McKinney's statement should be read in context in order to ascertain its relevance and exculpatory value. The Big Star robbery was the day prior to the Brodnax robbery. The jury was not aware of the Big Star robbery. McKinney did not testify at trial, and his statement does not impeach the testimony of other witnesses.

Cone's behavior could simply reflect the fact that he was staking out the store that he was about to rob. At best, disclosure of this statement could have resulted in obtaining additional information from McKinney about Cone's behavior the day of the Big Star robbery. Still, a description of Cone's behavior at the Big Star robbery would not lead to the conclusion that, at the time of the murders two days later, Cone was on drugs, nor would it indicate the degree of his intoxication or impairment. Further, the prejudice associated with presenting the jury with additional evidence of Cone's criminal activity would outweigh the probative value of a description indicating that Cone acted "weird" two days prior to the murders.[51] The

---

51. Cone had not been convicted of the Big Star robbery. Evidence related to his commission of the Big Star robbery would not generally be admissible by the prosecution because the "obvious prejudice" would require reversal of the conviction. *See State v. Parton,* 694 S.W.2d 299 (Tenn.1985); *Bunch v. State,* 605 S.W.2d 227, 229 (Tenn.1980) ("It is well established, of course, that in a criminal trial evidence that the defendant has committed some other crime wholly independent of that for which he is charged, even though it is a crime of the same character, is usually not admissible because it is irrelevant."); *see also* Tenn. R. Evid. 404(b), advisory commission's cmt. (amended July 1, 1991) (Rule 404(b) is a codification of the common law rule in *Parton* ). The court instructed the jury not to consider evidence of other offenses except to ascertain the defendant's mental condition, *see supra* pp. 993–94. Since the jury was not aware of the Big Star robbery,

Court finds that this statement does not create a reasonable probability that the sentencing outcome would have been different.

c. Pompano Beach Police Department Supplement (ECF No. 230–7)

██ The third piece of withheld evidence about Cone's demeanor is the Pompano Beach Police Department Supplement written by Sergeant Grieco. (ECF No. 230–7.) Cone contends that Grieco "went to great pains" to describe him as "frenzied" and "agitated," descriptions that are consistent with Cone's actual drug use and drug addiction. (ECF No. 266–1 at 14.) Grieco's supplement describes the police response to an armed robbery on August 13, 1980, which involved a suspect described as a "W/M with a brown two piece suit, brown hair and carrying a brown satchel." (ECF No. 230–7.) Grieco and Detective D. Flynn[52] saw a man fitting that description "at the rear of Sambo's Restaurant"; the man was "observed to be looking about in a frenzied manner and also appeared to be looking for a place to run." (*Id.*) As the officers approached the suspect in their police car, "[t]he subject was still walking in his agitated manner." (*Id.*)[53] The supplement then describes the defendant's flight and the exchange of shots with the officers before his apprehension. (*See id.*)

Cone contends that normal people are not depicted in the manner that he was. (*See* ECF No. 268 at 3.) Respondent argues that the officer's description was not surprising given the fact of the robbery, assaults, and other events that had recently taken place and was "clearly more pro-

bative of an individual fleeing police than a person on drugs." (ECF No. 265 at 42; *see also* ECF No. 269 at 8–9.)

The disclosure of this report may have caused Cone's defense counsel to question Grieco and D. Flynn about Cone's appearance and demeanor at the time of his arrest in Florida, three days after the Todds' murders. Given the fact that Grieco was pursuing Cone as a fleeing robbery suspect, the descriptions "frenzied" and "agitated" do not necessarily lead to a conclusion that Cone was either on drugs or experiencing withdrawal. The undisputed facts are that Cone had just moments earlier robbed a drug store and had, in the prior week, robbed a grocery store and a jewelry store, shot a police officer and a bystander, beaten an elderly couple to death, fled from Memphis, through Birmingham, Alabama, to Florida, and attempted to change his identity. This sequence of events undoubtedly could have caused Cone to behave in a frenzied or agitated manner, regardless of his drug use, state of intoxication, or withdrawal.

There was little testimony at trial about Cone fleeing the police after the robbery in Florida. The report indicates that during the exchange with police, Cone fired two shots at police and attempted to fire a third shot, but his gun did not discharge. (*See* ECF No. 230–7; ECF No. 274–2 at 621.) The report could not be used to impeach any witness at trial. The report, much like McKinney's statement about the Big Star Robbery, provides evidence that would be prejudicial to Cone as it shows that he committed yet another crime and

we can presume this instruction was related to a possible drug offense.

**52.** Detective D. Flynn is not the same person as FBI Agent Eugene J. Flynn, who had worked for the FBI, Miami Division, for nineteen years at the time that he testified. (*See* ECF No. 232–6 at 1910.)

**53.** Flynn's report does not refer to Cone as "frenzied" or "agitated." Flynn's only description of Cone is as a "W/M, long brown hair, wearing a tan suit coat and pants, carrying a brown bag." (ECF No. 274–2 at 621.)

again used deadly force against a police officer during the six-day time period from August 8–14, 1980.

The evidence at trial indicates that Cone was no longer in possession of drugs after he abandoned his car in an attempt to escape from the police. Hayes, Schratz, the Mizes, the Slaughters, Officer Allen, Dalton, Clark, and Tuech came into contact with Cone from the time period of the Brodnax robbery up until the Todds' murders. Both Dice and the prosecution presented arguments about Cone's mental condition based on what these witnesses saw regarding Cone's behavior and demeanor during this time period, *see supra* pp. 985–86, 987–88, 989–92. The Court properly instructed the jury that argument was not evidence, and based on that instruction, the jury found that there were no mitigating factors "sufficiently substantial" to outweigh the aggravating factors, *see supra* pp. 996–97. Even considering the MPD report about the Slaughters, McKinney's statement, and the Pompano Beach Supplement together, the descriptions of Cone's appearance do not provide reliable evidence that he was intoxicated to the point that his judgment was substantially affected. There are no reliable corroborating accounts of Cone's appearance or behavior that lead to the conclusion that Cone either had access to, used, or was intoxicated on drugs when he murdered the Todds. Further, Cone's escape was well-executed despite a manhunt in Memphis. There is no indication that Cone was losing his mind, as Lipman described, from withdrawal symptoms. The Court finds that there is not a reasonable probability that the disclosure of the Pompano Beach

report individually or cumulatively with the MPD report or the McKinney statement would lead to sufficient corroborating evidence of Cone's drug use, state of intoxication, or withdrawal at the time of the murders to change the outcome of the sentencing proceedings.

 3. Flynn and the FBI Records
(ECF No. 230–9 to –19;
ECF No. 230–23)

 Cone argues that the following FBI records are replete with documentation that he was a drug user:

- August 12, 1980, FBI teletype: "SUBJECT BELIEVED HEAVY DRUG USER." (ECF No. 230–9 at 526);[54]

- August 12, 1980, FBI Airtel: "ARMED AND EXTREMELY DANGEROUS; DRUG USER." (ECF No. 230–10);

- August 14, 1980, FBI teletype: "ARMED AND DANGEROUS. DRUG USER. ESCAPE RISK." (ECF No. 230–11 at 530);

- August 14, 1980, FBI Airtel: *"ARMED AND DANGEROUS DRUG USER; ESCAPE RISK."* (ECF No. 230–12);

- August 16, 1980, FBI Airtel: *"ARMED AND DANGEROUS. DRUG USER. ESCAPE RISK."* (ECF No. 230–13 (Alice Jane Schmidt Pelley interview));[55]

- August 18, 1980, FBI Statistics Letter: *"ARMED AND DANGEROUS;*

---

**54.** This teletype also states "subject believed to have been arrested for drug charge." (ECF No. 230–9 at 523.)

**55.** Respondent argues that Pelley's statement that Cone was thrilled about being accepted to law school (*see* ECF No. 230–13) is evi-

dence that Cone was not seriously impaired as a result of drug use. (*See* ECF No. 265 at 36.) Cone being excited about law school is not relevant to the *Brady* issue. The exculpatory nature of this document is based on the designation of Cone as a "Drug User," not on Pelley's statement.

*DRUG USER."* (ECF No. 230–14 at 533);

- 5 separate copies of FBI photographs and description of Gary Cone: *"ARMED AND DANGEROUS, DRUG USER, ESCAPE RISK."* (ECF No. 230–15);
- August 13, 1980, 2:53 p.m., FBI teletype: "Drug User" (ECF No. 230–16);
- August 15, 1980, 10:49 a.m., FBI teletype: "Drug User" (ECF No. 230–17);
- FBI report re: Memphis teletype: "While in prison, Cone was caught in possession 750 amphetamine pills...." (ECF No. 230–18 at 549);
- FBI report: "Subject believed heavy drug user." (ECF No. 230–19 at 554); and
- Copy of Jonathan Lipman's report from the FBI file (ECF No. 230–23).

(*See* ECF No. 71 at 14–17.) Cone argues that these documents could have been used to impeach FBI Agent Eugene Flynn and discredit the prosecution's claims that Cone did not use drugs. (*See id.* at 16; ECF No. 266–1 at 13–15.)

Respondent contends that these FBI documents are not material because the documents: (1) "do not on their face contain admissible evidence"; (2) do not impeach Flynn's testimony because Flynn did not state that Cone did not appear to be a drug user; and (3) as the Sixth Circuit Court of Appeals stated, "[i]t would not have been news to jurors that Cone was a 'drug user'." (ECF No. 265 at 33–34) (quoting *Cone v. Bell,* 492 F.3d 743, 757 (6th Cir.2007) (internal quotation marks omitted).) Respondent argues that the evidence would not have impeached Flynn's testimony because: (1) Cone "denied that he suffered any physical or mental problems except for slight drug withdrawal symptoms and a slight cold"; (2) he was mentally alert and able to recount details

about his travels from Memphis to Florida; (3) he suffered no mental problems or blackouts; (4) he stated that he fled to Florida where he stayed with Blankman; (5) he "changed his appearance and identity"; and (6) he changed his identity by obtaining a voter registration card and taking a driving test to obtain a driver's license under an assumed name. (*Id.* at 34–35.) Respondent argues that the fact that Lipman's report was in the FBI files was neither unusual nor nefarious, and had no probative value as to Flynn's veracity. (*Id.* at 35.)

FBI documents are inadmissible hearsay and could not be presented at the guilt phase of trial. Cone could obtain value from their disclosure if the documents caused his attorneys to engage in further investigation or if they were useful in impeaching the credibility of a witness at trial. The disclosure of these documents only reveals that the FBI believed that Cone was a heavy drug user and that Cone possessed a large amount of pills while incarcerated in Oklahoma. Cone and the jury were both aware of the essential facts related to his drug use. Lipman testified extensively at trial about Cone's heavy drug use. Roby testified about the large quantity and variety of drugs found in Cone's car. There was substantial evidence of Cone's drug use at trial, regardless of whether the jury ultimately believed that Cone was just a drug user or both a drug user and drug dealer. The disclosure of the FBI documents does not lead to exculpatory information about Cone's drug use that had not already been presented to the jury.

The impeachment value of the FBI documents is very limited as it relates to Flynn's testimony. Flynn acknowledged that Cone was a drug user, testified about Cone's complaint of withdrawal symptoms and his admitted use of cocaine, Dilaudid,

and Demerol. (*See* ECF No. 232–6 at 1915–16, 1919–20.) Dice had access to Flynn's field notes, and the ability to attack his credibility at trial. (*See id.* at 1926–27.) Although Flynn was a prosecution witness, his testimony contradicts the prosecution's argument that Cone was not a drug user. Flynn's veracity is not put in question by these documents.

Flynn's lay opinion that Cone had the capability to understand the nature of his acts, the requirements of the law, and conform his conduct (*see id.* at 1924) was based on both Cone's representation that he did not have any mental problems and the facts and evidence related about Cone's ability to execute the crimes, escape, and change his identity. The fact that Flynn was a FBI agent who was investigating "Gerald Mason Harmon" (Cone) to determine his identity and that he was called as a prosecution witness makes it obvious to the jury that Flynn was not a disinterested witness. The disclosure of the documents in question is not necessary for the jury to reach that conclusion.

Cone's argument about Lipman's report (ECF No. 230–23) being in the FBI file is unpersuasive because it has no probative value as to Flynn's veracity. (*See* ECF No. 265 at 35–36.) There is nothing inherently wrong with the prosecution sharing a copy of Lipman's report with a law enforcement agency. The record does not indicate when the report was provided to the FBI and if Flynn had access to it prior to testifying. Lipman's report described Cone's drug use, his dependence on opiates, his "period of approximately 18(? ?) hours of drug-free state," and his withdrawal beginning August 8, 1980, and as he fled to Key West. (ECF No. 230–23 at 1924–25.) Flynn's testimony about Cone's drug use was limited to his personal observance and what Cone related to him. The testimony was consistent with the Lip-

man report to the extent it acknowledged Cone's drug use and withdrawal symptoms. Lipman's report does not put Flynn's veracity into question.

The Court finds that the FBI records do not impeach Agent Flynn's testimony, nor would they lead to information that would impeach his testimony. Therefore, there is not a reasonable probability that if the FBI records were disclosed the outcome of the sentencing proceedings would have been different.

4. Ilene Blankman (ECF No. 230–20 to –22; ECF No. 230–24 to –25)

 Cone contends that the following withheld evidence is material because it could have been used to attack the credibility of Ilene Blankman's rebuttal testimony, given on Wednesday, April 21, 1982:

- February 9, 1982, cover letter from Joseph L. Patterson to Ilene Blankman (ECF No. 230–20) ("Enclosed herewith please find a copy of your statement, which you requested. . . .");

- March 22, 1982, letter from Joseph L. Patterson to Ilene Blankman (ECF No. 230–21) (regarding compliance with trial subpoena);

- FBI report of Special Agents Robert W. Kelly and Eugene Flynn regarding an event during trial at 9:45 p.m. on April 21, 1982, statement of "Gloria" to Ilene Blankman that Blankman was a "turncoat" and "trying to burn" Gary Cone. Blankman did not respond. (ECF No. 230–22 at 1946);

- Handwritten notes of DA's interview of Ilene Blankman (ECF No. 230–24 at 1942) (Cone "never used drugs around me.");

- April 27, 1982, post-trial letter from Joseph Patterson and Don Strother to Ilene Blankman (ECF No. 230–25)

("We certainly appreciate your cooperation....").

(*See* ECF No. 71 at 16–17; ECF No. 266–1 at 4, 7–9.) In the first letter, Patterson included a copy of Blankman's statement. (ECF No. 230–20.) In the second letter, Patterson included a copy of Blankman's statement, a subpoena, and directions about when Blankman should appear to testify. (ECF No. 230–21.) The letter also stated that Patterson would be contacting FBI Special Agent Kelly to coordinate Blankman and Kelly's appearance in Memphis. (*Id.*) The third document is a memo which describes an incident where a woman named Gloria, who claimed to be a personal friend of Cone's trial lawyer John Dice, approached Flynn, Kelly, Blankman, Strother, and Patterson at a restaurant, called Blankman a "turncoat," and accused her of "trying to burn" Cone. (ECF No. 230–22 at 1946.) The fourth document is the DA's handwritten notes of an interview with Blankman which stated that Cone never used drugs around her and that she never saw Cone with drug paraphernalia. (ECF No. 230–24.) The final document is a letter from Patterson and Strother thanking Blankman for her cooperation in the trial and advising her of the sentence. (ECF No. 230–25.)

Cone contends that these documents would show the "cozy relationship" between the prosecution and Blankman and that the pretrial interview notes, which are very cursory, are not consistent with Blankman's damaging testimony. (*See* ECF No. 266–1 at 4–5.) Cone claims that these notes would have "tipped the scales in favor of life" because they do not reflect Blankman's testimony that Cone was not paranoid and not acting in an unusual way. (*Id.* at 16 n. 3; *see* ECF No. 232–6 at 1875–76.)

Respondent argues that these documents do not diminish Blankman's credibility. (*See* ECF No. 265 at 43–44.)

Blankman was the one witness who had spent extended periods of time with Cone on multiple occasions between March and August 1980. (*See id.* at 44.) Blankman testified that she had never seen any indication that Cone was using drugs or observed drugs in his possession and that he was not acting unusual when he came to her home in August 1980. (*See id.* at 44, 52–53; ECF No. 232–6 at 1870–76, 1882–83.) Respondent argues that the jury knew that Blankman was a cooperating witness, and that these "innocuous letters," including a thank-you note after trial, could not have had any impact on the jury's view of her veracity. (*See* ECF No. 265 at 52–53.)

Blankman was a prosecution witness, although purportedly a friend of Cone. She testified that she came to Memphis with FBI Agent Kelly two days prior to trial. (ECF No. 232–6 at 1888.) These factors, Blankman's admitted drug use, and her participation in helping Cone obtain a new identity as Gerald Mason Harmon put Blankman's credibility in question. Dice attacked her credibility based on the fact that she came to Memphis with a FBI agent, who never testified in the case, "on her arm," *see supra* pp. 987–88, as well as on other issues. The Court properly instructed the jury on credibility issues, *see supra* pp. 993–94.

The letters providing Blankman's statement (ECF No. 230–20), addressing the subpoena and her travel to Memphis to testify (ECF No. 230–21), and informing her of the outcome of the trial and thanking her for her cooperation (ECF No. 230–25) have no probative value. These letters do not direct her to testify in any particular manner or demonstrate that she received any benefit from her testimony.

The prosecutor's notes stating Cone "[n]ever used drugs around [Blankman]" do not contradict Blankman's testimony

about Cone's drug use. (ECF No. 265 at 44–45; *see* ECF No. 230–24.) There is no evidence that Blankman's testimony was untruthful. Blankman's drug addiction, rehabilitation, and convictions were revealed. (ECF No. 232–6 at 1870–71, 1889–91, 1893–94.) Blankman was thoroughly cross-examined. Cone's counsel had access to her statement and raised issues about inconsistencies in her statement, specifically about Blankman having spent the night in bed with Cone. (*See id.* at 1885, 1896–97.) Blankman responded:

A. Everything that I told them is on here, and these are questions that were asked me and I answered the best of my knowledge at the time. And maybe they did not ask me that at the time.

Q. All right. Maybe they didn't, or maybe they did? Is that correct?

A. Well, if they had asked me, it would be on here and it's not on here. So, obviously, they didn't ask me.

(*Id.* at 1897.) Although the interview notes are not entirely consistent with Blankman's testimony, there is nothing in the notes that impeaches Blankman in any significant way. The jury was aware of Blankman's purported friendship with Cone, her personal problems with drugs and the law, and the fact that she was escorted to Memphis by a FBI agent. The jury had an adequate opportunity to determine the credibility of her testimony. *See Jalowiec v. Bradshaw*, 657 F.3d 293, 313 (6th Cir.2011) (stating that impeachment evidence may not be material where weaknesses and inconsistencies in the prosecution's case were exposed on cross-examination).

Cone alleged that the presence of Lipman's report in FBI files could be used to attack Blankman's credibility. (*See* ECF No. 71 at 17.) That argument, as it relates to Blankman, is not developed in Cone's motion for relief. The mere presence of the report in an FBI file provides no basis to attack Blankman's credibility where there is no indication that she saw the report, that her testimony was altered to conform with the report, or that her testimony was untruthful.

The FBI report about the incident involving "Gloria" is inadmissible hearsay. "Gloria" was a personal friend of Dice, who was in love with Dice and wanted to help him with the trial, and was very suspicious of the prosecutors and the State's testimony. (ECF No. 230–22 at 1946.) "Gloria" also informed Blankman, the FBI agents, and prosecutors that she would discuss the meeting with Dice the following morning. (*Id.*) Gloria's opinion of Blankman is not relevant to Cone's sentencing. The report states "Blankman made no response to her accusations and all parties involved refused to discuss the trial explaining that it was not proper." (*Id.*) Blankman had testified earlier that day, and nothing about the fact that these persons (the prosecutors, a prosecution witness, and law enforcement agents) were having dinner together after the trial is exculpatory.

The documents at ECF Nos. 230–20 to –25 do not impeach Blankman's credibility. The Court finds there is not a reasonable probability that the outcome of Cone's sentencing would have changed based on the disclosure of these documents.

### 5. Source of Money (ECF No. 230–26 to –27)

 Cone relies on the following documents to refute the prosecution's argument that the money found in the car was from selling drugs:

- Don Strother's handwritten notes regarding the indictment of Gary Cone for robbery of $1893.72 from Big Star (ECF No. 230–26); and

- September 11, 1980, letter from Insurance Company of North America

to MPD informing of $2013.72 insurance payment to Big Star from robbery loss. (ECF No. 230–27.)

(ECF No. 71 at 17.) Cone asserts that "while the prosecutor argued that [the] money and drugs in Cone's car showed he was a drug dealer, the prosecutor knew that almost all of the money in Cone's car came from [the Big Star] robbery" because he indicted Cone for that robbery and returned the money to the victim. (*See* ECF No. 266–1 at 16.)

Respondent contends that even assuming that a portion of the money found in Cone's car was from the Big Star robbery, that fact does not support Cone's claim that he was merely a drug user. (*See* ECF No. 265 at 40.) Respondent contends that the money was obviously "not all the money the petitioner had in his possession" when considering that Cone had money to travel from Memphis to Miami, buy new clothes in Birmingham, and pay for an airline ticket from Miami to Key West. (*Id.*)

The DA's notes indicate that the DA, at least, considered indicting Cone for the robbery with a deadly weapon of Stepherson's Big Star for the amount of $1893.72. (ECF No. 230–26 at 883.) In a September 11, 1980, letter from the Insurance Company of North America to the MPD, the insurance company notes that a payment of $2013.72 was made to the insured as a result of the robbery on August 8, 1980. (ECF No. 230–27.) There is no indication in these documents, despite Cone's assertions, that the police or DA paid the money recovered from Cone to either Big Star or the insurance company, only that the insurance company paid Big Star for their loss.

Roby testified that $1932 was found in a bag in Cone's car and that the "total cash ... found in the automobile" was $2400. (*See* ECF No. 232–3 at 1511, 1535.) The amount found in the car was substantially in excess of the loss reported by Big Star. The Tennessee Court of Criminal Appeals noted:

> Officers also found the sum of $2,459.94 in the appellant's abandoned automobile. At the time of the trial, the appellant was under indictment for the robbery of a Big Star grocery store from which $1,893.72 was taken. The Big Star robbery also occurred on the day before the murder of the two elderly people. The record does not reveal the source of the rest of the money that was found in the abandoned automobile ($566.22).

*Cone v. State,* 747 S.W.2d 353, 354 (Tenn. Crim.App.1987). Respondent notes that Cone, despite having left a substantial amount of money in Memphis, had money to pay for travel and execute his escape.

At trial, Cone's mother testified that Cone had worked in restaurants in Key West, Florida. (*See* ECF No. 232–4 at 1651–52.) Parole records dated July 1979, which were introduced at sentencing, stated that Cone had worked at a car dealership in Muskogee, Oklahoma, and that his sister was assisting him in obtaining employment in Chicago. (*See* ECF No. 232–11 at PageID 2936–37; ECF No. 291–47 at PageID 6780–81.) The records indicate that he had $662.43 in savings. (*See* ECF No. 232–11 at PageID 2937; ECF No. 291–47 at PageID 6781.) There was no other evidence related to Cone's employment after his release from prison in Oklahoma in November 1979. The only other source of money mentioned at trial was an unspecified loan from his mother for him to go to law school, *see supra* p. 977.

Evidence at trial indicated that despite a lack of employment or income, Cone purchased a motorcycle (*see* ECF No. 232–3 at 1533, 1552) and traveled to Chicago and Hawaii (*see* ECF No. 232–4 at 1651–52). A large amount of drugs were found in Cone's car. (*See* ECF No. 232–3 at 1505–

10, 1539–44, 1552–53.) According to Lipman, Cone was a polydrug user who used amphetamine as his principal drug, Desoxyn (methamphetamine) as his drug of choice, and who also used Demerol, Preludin, Phemetrazin, Dextroamphetamine, and cocaine, *see supra* pp. 978–80. Some of the drugs found in the car did not match Cone's profile of drug use, for example the anti-coagulant Coumadin, Serpasil for blood pressure, and barbiturates. (*See* ECF No. 232–5 at 1759–60.)[56] On cross-examination, Lipman testified that there were numerous drugs on those lists that Cone did not use and had stated that he did not like, *see supra* p. 981. (*See* ECF No. 232–5 at 1847.) These statements from Cone's defense witness support the inference that Cone was selling drugs. Further, the statement in ECF No. 230–18 that Cone was found in possession of 750 amphetamine pills while in prison supports the inference that Cone sold drugs. The prosecution's argument that Cone sold drugs was a reasonable inference considering the large quantity and variety of drugs, the large amount of money, and Cone's few known sources of income.

The argument that Cone was a drug dealer is not evidence, and the trial court appropriately instructed the jury, *see supra* pp. 992–93. (*See* ECF No. 231–10 at 944, 955; ECF No. 232–7 at 2015–16; ECF No. 232–11 at 2163.) The trial court instructed, "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them." (ECF No. 232–11 at 2163.) The trial court further

instructed, "You should consider all of the evidence in the light of your own observations and experience in life." (*Id.*) Dice also reminded the jury in his closing argument that counsel's arguments were not evidence, *see supra* p. 985.

Cone, more than anyone else involved in this case, knew about the source or sources of the money found in or around his car during his escape. The evidence about the Big Star robbery would be more prejudicial to Cone than probative, *see supra* pp. 1006–08. The Court finds that the withheld evidence about the money from the Big Star robbery (ECF No. 230–26 to –27) does not put the case in such a different light as to undermine confidence in the sentence.

D. Cumulative Effect

■ In determining whether there is a reasonable probability that the outcome of Cone's sentencing would have been different with the inclusion of the withheld evidence, the Court must "assess the effect of the suppressed evidence 'collectively,' rather than 'item by item.'" *Cone*, 556 U.S. at 474, 129 S.Ct. 1769 (quoting *Kyles*, 514 U.S. at 436, 115 S.Ct. 1555); *see also Brooks*, 626 F.3d at 892.

Cone relies heavily on the Supreme Court's opinion to support his *Brady* claim. He focuses on the language that a "key component" of the prosecution's strategy "involved discrediting Cone's claims of drug use." (ECF No. 266–1 at 7 (quoting *Cone*, 556 U.S. at 454–55, 129 S.Ct. 1769) (footnote omitted) (internal quotation marks omitted).) The Supreme Court noted that the State established that Cone's experts' opinions "were based solely" on Cone's representations about his drug use.

---

56. Although Lipman testified that amphetamine users usually use barbiturates, Cone reportedly had a "co-dependence upon and between" amphetamines and opiates, which, like barbiturates, relieve some of the anxiety-producing effects of amphetamines. (*See* ECF No. 232–5 at 1743–44.)

*Cone,* 556 U.S. at 455, 129 S.Ct. 1769. The Court stated that the suppressed documents strengthened the inference that Cone was impaired by the use of drugs at the time he committed these crimes. *Id.* at 470, 129 S.Ct. 1769. Justice Stevens, speaking for the majority, observed:

> In sum, both the quantity and the quality of the suppressed evidence lends support to Cone's position at trial that he habitually used excessive amounts of drugs, that his addiction affected his behavior during his crime spree, and that the State's arguments to the contrary were false and misleading.

*Id.* at 471, 129 S.Ct. 1769. (*See* ECF No. 266–1 at 11–12.)

The majority of the testimony about Cone's drug use was presented by Lipman and based on Cone's statements to him. Cone's mother testified that a package of marijuana was shipped to Cone after he returned from Vietnam, which was approximately twelve years prior to the Todds' murders. Jaremko diagnosed Cone with substance-abuse disorder.

Cone contends that Roby, Flynn, and Blankman were used to discredit his argument that his drug use and addiction made him less culpable. (ECF No. 266–1 at 7–8.) Cone contends that these witnesses were not being truthful. (*See id.*) He argues that prosecution experts Bursten and Hutson opined that Cone had no defense to the crimes, but that Hutson explained that this opinion was "based upon the fact that [Hutson] had 'very little' evidence to corroborate Cone's history of drug use." (*Id.* at 7–8 (emphasis omitted).) Cone argues that the withheld evidence was material because it addressed critical mitigating evidence about drug use and mental illness, and the sentencing hearing would have had an "entirely differ-

ent focus and character" had it been disclosed. (*Id.* at 12 (internal quotation marks omitted).) Cone argues that the withheld evidence could have "provided significant impeachment of the prosecution's rebuttal witnesses," firmly establishing that he was actively using amphetamines at the time of the crimes, and providing independent corroboration of his accounts of drug use. (*Id.* at 15.) Cone argues that his defense would have been strengthened through "independent corroborative proof of drug use and addiction withheld by the prosecution." (*Id.* at 17.) He contends that the mitigating evidence about his remorse [57] and his honorable military service was diminished by the prosecution's suppression of evidence. (*See id.* at 19.)

The withheld information provides limited information about Cone's drug use and no corroboration for Cone's theory about amphetamine psychosis. *See LaCaze v. Warden La. Corr. Inst. for Women,* 645 F.3d 728, 736 (5th Cir.2011) (stating a *Brady* violation is more likely to occur with strong corroboration). None of the state's three rebuttal fact witnesses saw Cone just prior to or at the time of the Todds' murders. Although Cone did not know at trial about the withheld documents, he knew the essential facts of his own drug use. *See Jalowiec,* 657 F.3d at 311. The law enforcement witnesses had no personal knowledge of Cone's drug use, and the impeachment value of the undisclosed documents is limited.

Blankman is the only rebuttal witness who had personal knowledge of Cone's drug use. Blankman's testimony exceeded the scope of the DA's interview notes. The DA's notes are cursory on their face and do not purport to be exhaustive. The

---

57. Evidence that Cone showed remorse is limited to Jaremko's testimony, *see supra* p. 978. (*See* ECF No. 232–4 at 1675.)

notes have virtually no impeachment value and only corroborate Blankman's statement that Cone "[n]ever used drugs around me." (*See* ECF No. 230–24 at 1924.) Further, Blankman's credibility was tested at trial. Cone has not demonstrated that Blankman's testimony was false or that she received a promise or deal in exchange for her testimony.

The fact of Cone's drug use, in contrast to the assertion that Cone was a drug dealer, was a central defense issue at trial. **Therefore, the degree of Cone's drug use and whether it resulted in chronic/acute amphetamine psychosis or another mental condition that substantially affected his judgment is the key mitigating factor that would have to be enhanced by the withheld evidence to determine that there is a reasonable probability that the result of the sentencing proceeding would have been different.** As the Sixth Circuit stated:

> It would not have been news to the jurors, that Cone was a "drug user." They had already heard substantial direct evidence that he was a drug user, including the opinion of two expert witnesses, the testimony of Cone's mother, drugs found in Cone's car, and photographic evidence. Despite this evidence, the jurors concluded that Cone's prior drug use did not vitiate his specific intent to murder his victims and did not mitigate his culpability sufficient to avoid the death sentence.

*Cone,* 492 F.3d at 757. The withheld evidence provides no insight into the doses, frequency, and intervals for Cone's drug use. Only Lipman's testimony was that detailed, and even he admitted that his opinion would change depending on these factors.

Respondent argues that, "even if petitioner's new evidence firmly established [Cone] was a 'drug user', that fact could just as likely be viewed as aggravating rather than mitigating by the jury" and could have created a "two-edged sword which can harm a capital defendant as easily as it can help him at sentencing." (ECF No. 265 at 48 (quoting *Tompkins v. Moore,* 193 F.3d 1327, 1338 (11th Cir. 1999)) (internal quotation marks omitted).) The Court finds that there is no reasonable probability that a jury would perceive corroborating evidence of Cone's drug use as a factor mitigating in Cone's favor toward a life sentence.

Regarding the collective effect of withheld evidence, three Sixth Circuit cases are instructive.

In *Henness v. Bagley,* 644 F.3d 308 (6th Cir.2011), *cert. denied sub nom. Henness v. Robinson,* — U.S. ——, 132 S.Ct. 1970, 182 L.Ed.2d 822 (2012), the petitioner alleged a *Brady* violation based on the state's failure to disclose five police informational summaries. *Henness,* 644 F.3d at 324–25. The Sixth Circuit determined that Henness had knowledge of information contained in two of the summaries. *Id.* at 325. The third summary contained hearsay, and Henness did not make a showing that it led to admissible evidence which could have resulted in a different result at trial. *Id.* The fourth and fifth summaries contained information about a threatening letter received by Henness's mother which Henness argued showed that the murder for which he was convicted involved a "drug deal gone bad." *Id.* The court determined, however, that there was no link between the letter and the murder, and speculation was insufficient to establish a reasonable probability that the result at trial would have been different. *Id.* at 325–26 (citing *Cone,* 556 U.S. at 449, 129 S.Ct. 1769). The court concluded that the withheld evidence, when considered cumulatively, did not establish a reasonable probability that the trial would have been

different had the evidence been disclosed to the defense. *Id.* at 326.

In *Beuke v. Houk*, 537 F.3d 618 (6th Cir.2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 2792, 174 L.Ed.2d 294 (2009), the Sixth Circuit determined that nine pieces of withheld evidence did not have the cumulative effect of establishing a reasonable probability that their disclosure would have altered the result of the proceeding. The petitioner alleged that the prosecution failed to disclose evidence involving information about initial descriptions of the assailants, other suspects, witness' inconsistent statements, and a witness's criminal history; evidence that a FBI witness was a paid informant and that a witness was being investigated for child pornography; and evidence that more than one gun was used to shoot the three victims. *Beuke,* 537 F.3d at 634–36. The court found that the inconsistent statements were related to tangential issues, not the petitioner's guilt, and that objective evidence sufficiently linked the petitioner to the murder. *Id.* at 635–36. The court also found that the victims' in-court identifications of their assailant were not undermined by inaccurate sketches or physical descriptions. *Id.* at 636. Further, the outcome of the trial was not prejudiced by the lack of a witness's criminal record, a list of suspects, or the investigating officer's handwritten notes. *Id.* Taken together, the court concluded, "Considering as we must the cumulative effect of all nine pieces of undisclosed evidence, we find that Beuke has failed to establish a 'reasonably probability' that the disclosure of this evidence would have altered the result of this proceeding." *Id.* The withheld evidence did not constitute a *Brady* violation. *Id.*

In *Fautenberry v. Mitchell,* 515 F.3d 614 (6th Cir.2008), *cert. denied,* 555 U.S. 951, 129 S.Ct. 412, 172 L.Ed.2d 299 (2008), the Sixth Circuit found there was no *Brady* violation. *Fautenberry,* 515 F.3d at 628–

32. Fautenberry asserted that the prosecution failed to disclose five categories of exculpatory evidence. *Id.* The court addressed each category. *Id.* After having rejected the first four *Brady* claims, in addressing the fifth category of evidence the court stated:

> The remainder of the alleged *Brady* evidence—evidence regarding [the third victim's] arguments prior to his disappearance, the sexual nature of the murders, and Fautenberry's depression and suicidal inclinations—is not material for *Brady* purposes. In fact, the evidence is virtually insignificant in light of the overwhelming evidence both of guilt (i.e., the confessions to [a FBI agent, a Portland police officer, and an ex-girlfriend] and the physical evidence connecting Fautenberry to [the third victim's] murder) and the sentencing specifications (i.e., the three-judge panel's finding that the "mitigating factors pale before the simple fact that [Fautenberry's] actions were plotted, vicious, persistent[,] and utterly callous"). Considering as we must the cumulative effect of all the alleged *Brady* evidence, we conclude that Fautenberry has failed to establish a "reasonable probability" that the disclosure of this evidence would have altered either his decision to enter a no-contest plea or the three-judge panel's sentence of death.... Because this evidence is not material under *Brady,* Fautenberry cannot show prejudice to excuse his procedural default.... And because Fautenberry cannot establish prejudice to excuse his procedurally defaulted *Brady* claim, he is not entitled to habeas relief on that basis.

*Id.* at 632 (fourth and fifth alterations in original) (footnote omitted) (citations omitted).

Cone seeks to use law-enforcement reports and other withheld evidence to corroborate his assertions that he was a drug user and that at the time of the murders, he was intoxicated to the point that he suffered amphetamine psychosis. *See also Abdur'Rahman v. Colson*, 649 F.3d 468 (6th Cir.2011), *cert. denied*, ⎯ U.S. ⎯, 133 S.Ct. 30, 183 L.Ed.2d 677 (2012) (applying *Cone's* test for materiality and finding no *Brady* violation for a withheld police report where petitioner was aware of his own erratic behavior during a police interrogation). As in *Henness,* the withheld evidence involves facts known to Cone about his drug use. These facts were not only known, but also presented to the jury, *see supra* pp. 1002–03, 1010–11. When considered collectively, the withheld evidence provides little information about Cone's drug addiction other than the fact that some law enforcement officials, based on hearsay, characterized Cone as a heavy drug user. The evidence is both lacking in corroborative and impeachment value and fails to further Cone's assertion that he suffered from chronic/acute amphetamine psychosis or an altered mental state that would relieve him of culpability for his crimes. Contrary to Cone's claims, the prosecution's witnesses did not testify falsely. Further cross-examination would have only led to the fact that Cone had a reported history in law enforcement circles of drug abuse and, perhaps, that Cone had an alternative criminal explanation for a portion of the money found in his car—the robbery of the Big Star on August 9, 1980.

*Fautenberry* is particularly relevant to the instant case because both cases involve an issue of the petitioner's mental state and its effect on sentencing. Similar to the overwhelming evidence of guilt and the heinous nature of the crimes in *Fautenberry,* the evidence of the appropriateness of Cone's sentence was overwhelming given the brutality—i.e., the heinous, atrocious, and cruel nature—of the Todds' murders,

Cone's prior criminal history, and Cone's escape. To the extent that Cone attempted to mitigate his sentence by demonstrating that he was in an altered mental state at the time of the crimes, the focused and efficient manner in which Cone executed his escape negates that argument.

The Court finds that the withheld evidence, when considered cumulatively, does not establish a reasonable probability that, had it been disclosed, Cone's sentence would have been different.

## VIII. CONCLUSION

For the balance of aggravating and mitigating factors to have weighed in favor of Cone at trial, a high degree of personal drug use and mental impairment had to be established as to Cone. Cone's guilt was uncontested. Overwhelming physical and testimonial evidence supported the charges. *See Cone,* 747 S.W.2d at 354. The proof was that Cone was deliberate and calculated in his actions when perpetrating the crimes and executing his escape. There was overwhelming evidence of the aggravating factors that: (1) Cone had been convicted of one or more felonies prior to this incident; (2) Cone brutally beat and killed an elderly couple because they "ceased to cooperate" and thus his actions were "especially heinous, atrocious, or cruel" and involved torture or "depravity of mind"; (3) the murders were for the purpose of preventing a lawful arrest or prosecution; and (4) the murders constituted felony-murder in the perpetration of burglary. *See Cone,* 665 S.W.2d at 94–95. The mitigating factors to be considered included evidence about Cone's service in Vietnam and his Bronze Star, his showing of remorse as recalled by Jaremko, the substantial evidence of his drug use, and the evidence of his drug-induced mental state at the time of the crimes. Cone's experts presented different, but not neces-

sarily inconsistent, views of his mental state. Jaremko, a psychologist, diagnosed Cone with post-traumatic stress disorder and substance-abuse disorder that grew from a practice of self-medication for post-traumatic stress, but he could not conclude that Cone did not know the wrongfulness of his conduct. (*See* ECF No. 232–4 at 1670–72, 1675.) Jaremko did not go into any detail about Cone's substance abuse, nor did he diagnose Cone with amphetamine psychosis. Lipman, a neuro-pharmacologist, chronicled Cone's substance abuse, determined that Cone suffered from chronic amphetamine psychosis, and concluded that Cone was substantially incapable of conforming his conduct to the law and that his condition could prevent him from knowing the wrongfulness of his actions. (*See* ECF No. 232–5 at 1724–29, 1731–40, 1758.) Both defense experts' testimony was rebutted by prosecution experts Bursten and Hutson. *See supra* pp. 983–85. The jury determined that the evidence did not affirmatively establish a mitigating factor related to Cone's capacity at the time of the crimes. (ECF No. 319–2 at 2219–26.)

In the instant case, the evidence of mental impairment, especially impairment related to drug use, could be just as aggravating as it is mitigating. *See Cullen v. Pinholster*, —— U.S. ——, 131 S.Ct. 1388, 1410, 179 L.Ed.2d 557 (2011) (stating new evidence of more serious substance abuse, mental illness, and criminal problems is "by no means clearly mitigating" because the jury might have concluded that the petitioner was simply beyond rehabilitation); *Sutton v. Bell*, 645 F.3d 752, 763 (6th Cir.2011) (stating "[i]t is well established that ... extensive involvement with drugs" is "often viewed by juries as harmful," not mitigating); *Pietri v. Fla. Dep't of Corr.*, 641 F.3d 1276, 1284 (11th Cir.2011) ("[D]etailed evidence of extensive drug abuse can be a two-edged sword." (internal quotation marks omitted)); *Vasquez v.*

*Thaler*, 389 Fed.Appx. 419, 429 & n. 40 (5th Cir.2010) ("The Supreme Court has held that evidence of mental impairment can be both mitigating and aggravating ...." (citing *Penry v. Lynaugh*, 492 U.S. 302, 324, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002))); *see also Wackerly v. Workman*, 580 F.3d 1171, 1178 (10th Cir.2009) ("[W]hatever mitigating effect such evidence might have had if presented, it is just as likely the jury would react negatively to it." (internal quotation marks omitted)).

As stated earlier, *supra* Part I, the Supreme Court, in returning this case to the District Court, specifically observed:

It is possible that the suppressed evidenced, viewed cumulatively, may have persuaded the jury that Cone had a far more serious drug problem than the prosecution was prepared to acknowledge, and that Cone's drug use played a mitigating, though not exculpating, role in the crime he committed. The evidence might also have rebutted the State's suggestion that Cone had manipulated his expert witnesses into falsely believing he was a drug addict when in fact he did not struggle with substance abuse.

Neither the Court of Appeals nor the District Court fully considered whether the suppressed evidence might have persuaded one or more jurors that Cone's drug addiction—especially attributed to honorable service of his country in Vietnam—was sufficiently serious to justify a decision to imprison him for life rather than to sentence him to death. Because the evidence suppressed at Cone's trial may well have been material to the jury's assessment of the proper punishment in this case, we conclude that a full review of the suppressed evidence and its effect is warranted.

*Cone,* 556 U.S. at 475, 129 S.Ct. 1769 (footnote omitted).

The Court has reviewed the entire record in this case plus all of the undisclosed evidence and its probable effect. The standard to be applied by the District Court in evaluating the merits of defendant's *Brady* claim is whether there is a reasonable probability that, had the suppressed evidence been disclosed, the result of the proceeding would have been different.

The question for this Court is the effect of the withheld evidence on Cone's sentence. The Court has analyzed each of the individual *Brady* claims and made a determination as to each claim as to whether the suppressed evidence might have persuaded one or more jurors that Cone's drug addiction—especially if attributed to his honorable service in Vietnam, was sufficiently serious to justify the imposition of a life sentence rather than the imposition of the death penalty. *See supra* pp. 1002–03, 1006, 1007–08, 1009, 1011, 1013–14, 1015. The Court has also analyzed the cumulative effect of the undisclosed material. *See supra* p. 1018.

Taken as a whole, the withheld evidence is insignificant in comparison to the overwhelming weight of evidence regarding Defendant's guilt and the aggravating sentencing factors. For the reasons previously stated, it is the conclusion of the Court that there is not a reasonable probability that had the withheld evidence been disclosed, the result at the sentencing hearing would have been different. The withheld evidence does not undermine confidence in the sentence determined by the jury.

Therefore, Cone's *Brady* claims are found to be without merit and are DENIED. Respondent's Motion for Partial Summary Judgment on the *Brady* claims is GRANTED. Petitioner's Motion for Relief on the *Brady* Claims is DENIED.

## *APPENDIX OF EXHIBITS*

| No. | Item | CM/ECF Docket Entry |
|---|---|---|
| 1 | **Collective: 3 photos Brodnax Jewelry Store, black & white, 3x5, 8/9/80** | ECF No. 284–1 and –2 |
| | Exterior of Store | ECF No. 284–1 |
| | Collection of 3 photos: exterior, interior counter, interior counter reverse | ECF No. 284–2 |
| 2 | **Photo, auto black & white, 3x5** | ECF No. 284–3 |
| 3 | **3 sheets, collective recovered merchandise taken in robbery,** | ECF No. 284–4 to –6 |
| | Photocopy of watches | ECF No. 284–5 |
| | Phototcopy of rings | ECF No. 284–6 |
| 4 | **Photocopy of group of 6 mug photos, 1 sheet** | ECF No. 284–7 to –9 |
| | Cone mugshot | ECF No. 284–8 |
| | Group of photocopied photos (6) Hayes reviewed on day of robbery | ECF No. 284–9 |
| 5 | **Collective: 8 mug photos black & white, 2x4** | ECF No. 284–10 to –13 |
| | Group of 8 photos Hayes reviewed | ECF No. 284–11 |
| | Photo of Cone | ECF No. 284–12 |
| | Photo of Cone, reverse | ECF No. 284–13 |
| 6 | **Collective: jacket, trousers, Olive drab** | ECF No. 284–14 and –15 |
| 7 | **Pair of black shoes** | ECF No. 284–16 and –17 |
| 8 | **Photographic aerial map of Midtown area, grey/blue paper, approx. approx. 3' × 5'** | ECF No. 284–18 and –19 |
| 9 | **Photo, suspect's vehicle, black & white, 2x3** | ECF No. 284–20 |
| 10 | **Photo, area where shots fired** | ECF No. 284–21 |
| 11 | **Pair of blue trousers** | ECF No. 284–22 and –23 |

| | | |
|---|---|---|
| 12 | Rough sketch of area for demonstrative purposes, yellow sheet | ECF No. 284–24 |
| 13 | Photocopies of two groups of mug shots, 2 sheets stapled together | ECF No. 284–25 to –27 |
| | Group of photos of short-haired men, reviewed by Benbrook at MPD station | ECF No. 284–26 |
| | Group of photos of long-haired, unkempt men, reviewed by Benbrook at MPD station (same photocopy as ECF No. 284–9) | ECF No. 284–27 |
| 14 | Gallon jug labeled "grape juice" containing liquid | ECF No. 284–28 to –30 |
| 15 | Collective: 3 photos, Clark home, 224 Hawthorne, black & white, 3x5 | ECF No. 285–1 |
| | 3 photos: 1. Clark's brother's house at 224 Hawthorne 2. Grape juice jug laying in yard 3. Front yard of house north of Clark's brother's house with mat Clark was placed on after being shot | |
| 16 | Collective: 2 photos, back yard north of 224 Hawthorne, black & white, 3x5 | ECF No. 285–2 and –3 |
| | 2 photos | ECF No. 285–2 |
| | 1. View of backyard from shooter's perspective 2. View of backyard from Clark's perspective | |
| | Close-up ECF No. 285–3 photo 1, marked with position of shooter and Clark | ECF No. 285–3 |
| 17 | Aerial photo of crime scene area Hawthorne/Auburndale Streets, black & white, 10x16 | ECF No. 285–4 to –6 |
| | Aerial view | ECF No. 285–5 |
| | Close-up of marked area where Clark was shot, car's path | ECF No. 285–6 |
| 18 | Blue gym shorts | ECF No. 285–7 and –8 |
| 19 | Collective: 7 photos in envelope, mug photos, color, 1x1 | ECF No. 285–9 to –11 |
| 20 | Aerial photo of crime scene area 143 North Auburndale, black & white, 10x16 | ECF No. 285–12 to –15 |
| | Aerial photo | ECF No. 285–13 |
| | Aerial view, marked by Slaughter with Cone's path, Slaughter's house, Dalton's house | ECF No. 285–14 |
| | Close-up of right side of aerial view with markings | ECF No. 285–15 |
| 21 | Photocopy of 6 mug photos, 1 sheet, black & white | ECF No. 285–16 and –17 |
| | Collective of 6 photocopied mug photos, identified with Debbie Slaughter's signature | ECF No. 285–16 |
| | Close-up of Cone from ECF No. 285–16 | ECF No. 285–17 |
| 22 | Hollow–point .38 caliber slug in white envelope | ECF No. 285–18 and –19 |
| 23 | Lead slug in white envelope | ECF No. 285–20 |
| 24 | Collective: 5 photos, 141—143 North Evergreen, black & white, 3x5, 8/9/80 | ECF No. 285–21 to –23 |

| | | |
|---|---|---|
| | Envelope | ECF No. 285–21 and –22 |
| | Photos of Dalton residence | ECF No. 285–23 |
| | 5 photos: | |
| | 1. Front of house | |
| | 2. House with Monte Carlo behind the residence | |
| | 3. Driveway between houses facing Monte Carlo | |
| | 4. Back of Monte Carlo with license plate | |
| | 5. Left profile of Monte Carlo, driver's door ajar | |
| 25 | **Aerial photo of crime scene area Evergreen/Belvedere Streets, black & white, 10x16** | **ECF No. 286–1 to –3** |
| | Aerial photo | ECF No. 286–2 |
| | Close-up of area marked with Dalton's house, arrow of direction Cone traveled, Linda Teusch's house | ECF No. 286–3 |
| 26 | **Photo—Mr. Shipley Todd, Mrs. Cleopatra Todd, color, 8x10, August 1980** | **ECF No. 286–4** |
| 27 | **Telephone bill for Todd residence, in envelope/advertising material** | **ECF No. 286–5 and –6** |
| 28 | **Newspaper photo excised from article published in The Commercial Appeal** | **ECF No. 286–7 and –8** |
| | Excised photo of Cone | ECF No. 286–7 |
| | Commercial Appeal article | ECF No. 286–8 |
| 29 DE-FENSE | **Letter dated 9/2/80 to Mrs. Valeree Cone from Mrs. Carl Schaetlee** | **ECF No. 286–9 to –12** |
| 30 | **Collective: 2 while lab containers** | **ECF No. 286–13 to –18** |
| 31 | **Tennessee License plate—1–T2852** | **ECF No. 286–19 and –20** |
| 32 | **COURT'S EXHIBIT: Mid–South Magazine Section, *The Commercial Appeal*, 4/18/82; article, "Admissions of an Ex–Memphian," by Tim Paulson, excluded from jury** | **ECF No. 286–21 to –27** |
| | Article, page 1 | ECF No. 286–22 |
| | Article, page 2 | ECF No. 286–23 |
| | Article, page 3 (with sentence referring to the Todd murders) | EC F No. 286–24 |
| | Article, close-up of page 3 | ECF No. 286–25 |
| | Article, "The Hill," from Sports Section D–4, *The Commercial Appeal*, 4/18/82, excluded from jury | |
| | Article, page 1 | ECF No. 286–26 |
| | Article, page 2 | ECF No. 286–27 |
| 33 | **Collective: 39 photos, crime scene, 121 N. Evergreen, color, 3x5, 8/13/80** | **ECF No. 287–1 to –40** |
| | 1. The front view of the two-story white house at 121 North Evergreen; | ECF No. 287–2 |
| | 2. Three newspapers lying on the front porch at the front door of the house; | ECF No. 287–3 |
| | 3. A photo taken from the front door looking into the living room, in a western direction, showing the lawn chair and the ledger book and pad just west of the front door; | ECF No. 287–4 |
| | 4. The back view of the house showing the back door; | ECF No. 287–5 |

5. Another view of the back door and the five steps leading up to the door; ECF No. 287–6

6. What appeared to be a bare footprint just left of the back door; ECF No. 287–7

7. Photograph taken from standing outside on the back steps, or in the backyard, looking into the back door of the house; ECF No. 287–8

8. The ledger book where someone was listing the items that they had purchased at the store, the date they purchased them, and the amount, and part of the lawn chair in the living room at the front door; ECF No. 287–9

9. The front door showing the porch and the living room; ECF No. 287–10

10. Front door, living room floor with a blood smear that had been wiped; ECF No. 287–11

11. The living room showing the couch where Shipley Todd was lying or had been sitting, the pillow, and the newspaper; ECF No. 287–12

12. The couch; ECF No. 287–13

13. The back of the couch; ECF No. 287–14

14. The living room taken from the north showing the direction south; ECF No. 287–15

15. The living room showing the male victim, the coffee table, and couch; ECF No. 287–16

16. Part of the male victim's feet and the coffee table; ECF No. 287–17

17. Photograph showing where the male victim was between the couch and the coffee table; ECF No. 287–18

18. Photograph taken from the hallway showing the entrance to the kitchen as you enter from the back; ECF No. 287–19

19. Photograph taken in the living room, in a western direction, showing the entrance from the kitchen to the living room; ECF No. 287–20

20. A portion of the kitchen, along with the female victim's body; ECF No. 287–21

21. Photograph taken from the living room showing the hall entrance into the kitchen where the victim was found; ECF No. 287–22

22. The small bathroom at the rear of the house; ECF No. 287–23

23. The sink showing the hair inside; ECF No. 287–24

24. Photograph showing the commode and the hair; ECF No. 287–25

25. The commode, hair on the floor and around the commode; ECF No. 287–26

26. A photograph taken from the hallway looking into the small bathroom, showing the sink and the towel that was on the floor underneath the sink; ECF No. 287–27

27. A photograph taken at the rear of the house as you enter the back door,

looking down the hallway, showing a cabinet which had doors open and the drawers pulled out; ECF No. 287–28

28. The bed in the back bedroom, downstairs on the south side of the house, showing a white purse with its contents; ECF No. 287–29

29. The back bedroom showing the bed, the purse, the newspaper, and the blue dress with the white slip hanging on the end of the bed; ECF No. 287–30

30. The back bedroom showing the bed, purse, and a small night table; ECF No. 287–31

31. The back bedroom showing the open chest of drawers; ECF No. 287–32

32. The back bedroom showing the Sunday newspaper, a white purse, a white lacy lady's garment with blood spots on it; ECF No. 287–33

33. The back bedroom showing the television and dresser; ECF No. 287–34

34. The back bedroom showing the night stand on the west side of the bed; ECF No. 287–35

35. The back bedroom showing the television, dresser, and cedarrobe with the doors hanging open; ECF No. 287–36

36. The blood spots on the ceiling in the living room above the mirror and the east wall; ECF No. 287–37

37. The east wall in the living room and the molding with blood spots; ECF No. 287–38

38. The front door taken from inside the house, showing the curtain with blood spots on it; ECF No. 287–39

39. View of bathroom, cupboard door open ECF No. 287–40

**Collective: 2 pieces of paper, hand-written notations of meter readings, Memphis Light, Gas, and Water usage** **ECF No. 287–41 to –45**

**Green and white towel, soiled** **ECF No. 287–46 to –48**
 Green side of towel ECF No. 287–47
 White side of towel ECF No. 287–48

**Broken screen door hook (in small envelope, 1x1)** **ECF No. 287–49**

**Norelco electric razor** **ECF No. 287–50 to –52**

**Collective: 42 white index cards containing latent prints taken at 121 N. Evergreen, 8/14/80** **ECF No. 288–1 to –85**

**Collective: 4 photos, crime scene, 121 N. Evergreen, basement area, kitchen sink area, 8/14/80** **ECF No. 289–1 to –4**
 Close-up of ammunition box ECF No. 289–1
 Photo from basement with ammunition box ECF No. 289–2
 Money found in ammunition box laid out on table ECF No. 289–3
 Sink area with potatoes and knife ECF No. 289–4

**Collective: plywood clipboard, ledger (related papers)** **ECF No. 289–5 to –13**

| | | |
|---|---|---|
| | View of all 3 items (clipboard, ledger, page from notebook | ECF No. 289–6 |
| | Close-up of page from notebook | ECF No. 289–7 |
| | Assorted papers | ECF No. 289–8 |
| | Close-up of ledger contents | ECF No. 289–9 |
| | Close-up of two pages in ledger | ECF No. 289–10 |
| | Close-up of two pages in ledger | ECF No. 289–11 |
| | Reverse view of three items in ECF No. 289–6 | ECF No. 289–12 |
| | Close-up of reverse view of notebook page | ECF No. 289–13 |
| 41 | **Collective: 2 knives; 1 "Camp King," 1 "Dole Bananas"** | **ECF No. 289–14 and –15** |
| 42 | **End of leather belt** | **ECF No. 289–16 and –17** |
| 43 | **Safety razor in plastic container** | **ECF No. 289–18 and –19** |
| 44 | **Butcher knife (2 views), approx. 12–inches in length, 7–inch blade** | **ECF No. 289–20 to –22** |
| 45 | **White lacy sweatguard, stained (2 views)** | **ECF No. 289–23 to –25** |
| 46 | **White face cloth (2 views)** | **ECF No. 290–1 to –3** |
| 47 | **Section of wood from outside kitchen door frame** | **ECF No. 290–4 to –6** |
| | Unpainted side | ECF No. 290–5 |
| | Painted side | ECF No. 290–6 |
| 48 | **Vial containing hair removed from back bathroom, 121 N. Evergreen, 8/13/80** | **ECF No. 290–7 to –9** |
| 49 | **Vial containing hair removed from green and white towel, back bathroom, 8/13/80** | **ECF No. 290–10 to –13** |
| 50 | **Collective: 9 photos, auto and contents, at 242 N. Auburndale, 8/9/80** | **ECF No. 290–14 to –23** |
| | 9 photos: | |
| | 1. Cone's car, view from rear driver's side | ECF No. 290–15 |
| | 2. Items of clothing, holster | ECF No. 290–16 |
| | 3. Interior of car, driver's side | ECF No. 290–17 |
| | 4. Items found in car, money | ECF No. 290–18 |
| | 5. View of backseat of car, from outside, rear driver's side | ECF No. 290–19 |
| | 6. Items of clothing, floorboards | ECF No. 290–20 |
| | 7. Interior, passenger's side | ECF No. 290–21 |
| | 8. Items of clothing | ECF No. 290–22 |
| | 9. Rear of car, Arkansas license plate | ECF No. 290–23 |
| 51 | **Photo: garage rear of 242 N. Auburndale, 8/9/80** | **NOT IN DOCKET, MISSING** |
| 52 | **Collective: 6 white index cards containing latent prints taken from auto at 242 N. Auburndale, 8/9/80** | **ECF No. 290–24 to –36** |
| 53 | **Collective: wallet and contents** | **ECF No. 290–37to –39** |
| | Wallet open, face-down | ECF No. 290–38 |
| | Wallet open, face-up | ECF No. 290–39 |
| 54 | **Passport** | **ECF No. 290–40 to –42** |
| | Passport closed, front view | ECF No. 290–40 |
| | Passport open, first page | ECF No. 290–41 |
| | Passport open, emergency contact address | ECF No. 290–42 |
| 55 | **Tape bandage** | **ECF No. 290–43 and –44** |
| 56 | **General Electric FM/AM Cassette-radio** | **ECF No. 291–1 to –3** |
| | Front view | ECF No. 291–2 |
| | Rear view | ECF No. 292–3 |
| 57 | **Plastic bad containing assorted clothing** | **ECF No. 291–4, MISSING** |

| | | |
|---|---|---|
| 58 | Bag of items: holster, 47 cassette tapes, 3 glasses cases, 1 pair glasses, 1 road atlas, 12 "D" batteries, 1 headset, alarm clock, assorted toilet articles | ECF No. 291–5 to –7 |
| | Entire contents | ECF No. 291–6 |
| | Close-up of Cone's Arkansas driver's license | ECF No. 291–7 |
| 59 | Assorted drug items, including two lists on yellow paper. Items taken from auto 8/9/80, 242 N. Auburndale | ECF No. 291–8 to –11 |
| | Entire contents | ECF No. 291–9 |
| | Close-up of list on yellow paper, page 1 | ECF No. 291–10 |
| | Close-up of list on yellow paper, page 2 | ECF No. 291–11 |
| 60 | Assorted clothing contained in suit bag, removed from trunk of car at 242 N. Auburndale | ECF No. 291–12 to –16 |
| | Garment bag open, contents | ECF No. 291–13 |
| | Close-up of Exhibit tag | ECF No. 291–14 |
| | Top view of garment bag, closed | ECF No. 291–15 |
| | Top view of garment bag, reverse | ECF No. 291–16 |
| 61 | Purple bag containing change | ECF No. 291–17 and –18 |
| 62 | Collective: brown/gold bag containing assorted papers, 2 pairs of glasses, 21 cents | ECF No. 291–19 to –26 |
| | Close-up of papers, list of drugs, amounts | ECF No. 291–20 |
| | Close-up of papers, list of drugs, amounts | ECF No. 291–21 |
| | Close-up of papers, sunglasses | ECF No. 291–22 |
| | Close of envelope for title, sunglasses | ECF No. 291–23 |
| | Close-up of Valeree Cone's Arkansas car registration certificate | ECF No. 291–24 |
| | Close-up of Valeree Cone's property assessment from Arkansas County of Chicot Assessor | ECF No. 291–25 |
| | Wide-view of all contents | ECF No. 291–26 |
| 63 | Collective: 2 Polaroid photos, Broward County Jail, Pompano Beach, Florida, 8/18/80, color, 2x4 | ECF No. 291–27 to –29 |
| | Full picture of Cone and Roby | ECF No. 291–28 |
| | Close-up of Cone's cut finger | ECF No. 291–29 |
| 64 | Collective: large envelope containing 9 small envelopes of hair samples of Defendant | ECF No. 291–30 to –32 |
| | Wide view of all envelopes | ECF No. 291–31 |
| | Reverse of each envelope | ECF No. 291–32 |
| 65 | Collective: 9 cards of known prints of Defendant; complete set of known prints | ECF No. 291–33, MISSING |
| 66 | Passport photo of Defendant, color, 1½ × 1½ | ECF No. 291–34 and –35 |
| | Small photo | ECF No. 291–34 |
| | Close-up of same | ECF No. 291–35 |
| 67 | Illinois Bell Telephone Co. subscriber usage for Sue Cone, Area Code 312–337–0086, 3 sheets stapled together | ECF No. 291–36 to –39 |
| 68 | Question hair from bathroom, towel; 3 grey cardboard mailers, each containing 2 slides; total of 6 slides | ECF No. 291–40 to –42 |
| 69 | Known hair of Mr. Todd, Mrs. Todd, Defendant: 4 cardboard mailers, each containing 2 slides; total 8 slides | ECF No. 291–43 to –45 |
| 70 | Sketch of hair sample analysis procedure | ECF No. 291–46, MISSING |

| 71 | Certified copies of Court records from State of Oklahoma: CRF 72–1431; CRF 72–1476; CRF 72–1477 | ECF No. 291–47 |
| COURT'S EXHIBIT A | Collective: 3 photos of victims' bodies, excluded from jury, color, 3x5, 8/13/80; SEALED | ECF No. 291–48 |
| COURT'S EXHIBIT B | MPD Supplementary Offense Report | ECF No. 291–49 |